23-1552

# United States Court of Appeals for the Federal Circuit

NEENA BISWAS,
*Petitioner*,

v.

DEPARTMENT OF VETERANS AFFAIRS,
*Respondent*.

On Appeal from the Merit Systems Protection Board
Case No. MSPB-1:DA-1221-15-0471-W-2

**OPENING BRIEF FOR PETITIONER**

STERLING L. DERAMUS
2229 First Avenue North
Birmingham, Alabama 35203
(205) 504-0189 (Tel)
(205) 449-7392 (Fax)
Email: sderamus@deramuslaw.com

*Counsel for Petitioner*

## CERTIFICATE OF INTEREST

Counsel for Petitioner, Neena Biswas certifies that:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Neena Biswas

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities:

None.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Not applicable.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Dated: June 21, 2023

/s/ Sterling L. Deramus
Sterling L. Deramus

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ........................................................................1

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES........................................................................2

STATEMENT OF THE CASE........................................................................2

A. Dr. Biswas Applies For The Chief Hospitalist Position As A Qualified Citizen........................................................................3

B. The VA Pre-Selects Dr. Ignatius Oyula, A Non-Citizen, Over Dr. Biswas. ........................................................................4

C. The VA Fails To Follow Hiring Guidelines When Refusing To Consider Dr. Biswas. ........................................................................5

D. Dr. Biswas Discloses Illegal Hiring Practices That Are Never Investigated........................................................................8

E. The VA Retaliates By Re-Classifying Dr. Biswas As A "Temporary" Employee. ........................................................................9

F. The Administrative Judge's Findings........................................................................13

SUMMARY OF THE ARGUMENT ........................................................................14

ARGUMENT ........................................................................15

Standard of Review ........................................................................15

A. Applicable Legal Principles........................................................................15

B. The Administrative Judge Erroneously Applied the *Carr* Factors. ..............17

1. The administrative judge failed to properly weigh the strength of the evidence in support of the VA's personnel actions. ........................................17

a) The administrative judge misconstrued Dr. Biswas' "conduct." ...........17

(1) Dr. Biswas never criticized her co-workers' "national origin." .........17

(2) Other hospitalists shared Dr. Biswas' concerns about harassing schedules made to favor non-citizen hospitalists. .................................199

(3) The July 21st incident. ..................................................................22

b) The VA never actually investigated Dr. Biswas' complaints. .............288

2. The administrative judge failed to properly weigh evidence of retaliatory motive on the part of the VA officials involved in Dr. Biswas' termination. ..29

a) No incremental discipline was imposed before termination despite recommendations for counseling. ...........................................................29

b) The VA's failure to investigate Dr. Biswas' complaints is circumstantial evidence of retaliatory motive. ..........................................................33

c) The VA reclassified Dr. Biswas as a temporary employee to make it easier to fire her. .....................................................................................35

d) The administrative judge ignored evidence that Dr. Goodenberger had retaliated against other VA hospitalists. ...................................................37

3. The administrative judge failed to consider evidence that the VA did not take similar actions against non-whistleblowers ...........................................38

C. The Administrative Judge Erroneously Applied The Law To The Facts. ....40

1. The VA cannot support its termination decision based on "conduct" not set forth in Dr. Biswas' termination letter. ...................................................40

2. Dr. Biswas was similarly situated to permanent employees who were not terminated for the same "conduct." ...............................................................433

3. The administrative judge erroneously applied case law describing the severity of misconduct required to justify termination. ...............................455

4. Making protected disclosures "outside the chain of command" is not "insubordination." ...........................................................................................47

CONCLUSION ..........................................................................................48

CERTIFICATE OF COMPLIANCE ..........................................................50

ADDENDUM

## TABLE OF AUTHORITIES

### CASES

*Carr v. Social Sec. Admin.*,
185 F.3d 1318 (Fed. Cir. 1999) .......................... 14, 17, 29, 30, 31, 32, 39, 44, 46

*Church v. Dept. of Army*,
6 M.S.P.R. 737 (1981) ..........................................................................45

*Crowe v. Smith*,
261 F.3d 558 (5th Cir. 2001) ..........................................................................22

*Durr v. Dept. of Veterans Affairs*,
104 M.S.P.R. 509 (2007) ..........................................................................45

*Frederick v. Dep't of Justice*,
73 F.3d 349 (Fed. Cir. 1996) ..........................................................................15

*Greenspan v. VA*,
464 F.3d 1297 (Fed. Cir. 2006) .......................................... 15, 16, 40, 41, 45, 47

*Hawkins v. Smithsonian Institution*,
73 M.S.P.R.. 397 (1997) ..........................................................................41, 42

*Huffman v. Office of Pers. Mgmt.*,
263 F.3d 1341 (Fed. Cir. 2001) ..........................................................................47, 48

*Kewley v. Dep't of Health & Human Serv.*,
153 F.3d 1357 (Fed. Cir. 1998) ..........................................................................15

*King v. Nazelrod*,
43 F.3d 663 (Fed. Cir. 1994) ..........................................................................40, 41, 42

*LaChance v. White*,
174 F.3d 1378 (Fed. Cir. 1999) ..........................................................................15, 46

*McCarthy v. Int'l Boundary and Water Comm: U.S. and Mexico*,
116 M.S.P.R. 594 (2011) ..........................................................................46, 47

*Oliver v. Dep't of Health and Human Servs.*,
34 M.S.P.R. 465 (1987) ..........................................................................46

*Siler v. Envtl. Prot. Agency*,
908 F.3d 1291 (Fed. Cir. 2018) ............................................................29, 30, 39

*Smith v. Gen. Servs. Admin.*,
930 F.3d 1359 (Fed. Cir. 2018) ............................................... 29, 30, 32, 39, 43

*Spahn v. Dep't of Justice*,
93 M.S.P.R. 195 (2003) ........................................................................43, 44

*Whitmore v. Dep't of Labor*,
680 F.3d 1353 (Fed. Cir. 2012) ............................................... 16, 27, 29, 44, 47

**STATUTES**

5 U.S.C. § 2302(b)(8)........................................................................1, 39, 45

5 U.S.C. § 2302(b)(8)(A).................................................................................15

5 U.S.C. § 2302(b)(9)..........................................................................................1

5 U.S.C. § 7703 ....................................................................................................2

5 U.S.C. § 7703(c) ..............................................................................................15

38 U.S.C. § 7401 ..........................................................................................3, 35

38 U.S.C. § 7402(c) ..............................................................................................5

38 U.S.C. § 7407 .........................................................................................2, 4, 5

38 U.S.C. § 7407(a) ...........................................................................8, 11, 12, 13

## STATEMENT OF RELATED CASES

There is no other appeal or proceeding in any other court related to this same civil action. There are no known cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in this pending petition.

## STATEMENT OF JURISDICTION

On July 2, 2015, Petitioner Neena Biswas filed an individual right of action (IRA) appeal and hearing request with the Merit Systems Protection Board, submitting her claim of reprisal for whistleblowing, pursuant to 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9). Biswas pled that the United States Department of Veterans Affairs (VA), and the Dallas VA Medical Center (DVAMC) (collectively, "the Agency") violated 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9), when it retaliated against her for making protected disclosures by first reclassifying her as a temporary appointment and then terminating her from her position.

On May 4 – 5, 2016, the Administrative Judge, U. Sidney Cornelius, Jr., held a hearing on the matter and issued an initial decision on October 20, 2016, finding that the Petitioner had made a protected disclosure, that the protected disclosure was a contributing factor in the decision to terminate her employment, but that the Agency showed by clear and convincing evidence that it would have taken the same action notwithstanding her disclosures.

On November 23, 2016, the Petitioner filed a Petition for Review with the Merit Systems Protection Board (the "Board"). On January 4, 2023, the Board issued its Final Order upholding the decision of the Administrative Judge and denying Petitioner her requested relief.

This appeal is from the Final Order issued by the Board on January 4, 2023. Biswas timely filed a Petition for Review with this Court on February 27, 2023. Accordingly, this Court has jurisdiction to review this matter pursuant to 5 U.S.C. § 7703.

## STATEMENT OF THE ISSUES

1. Whether the Board erred in finding that the Agency showed by clear and convincing evidence that it would have converted the Petitioner to a temporary appointment notwithstanding her disclosures.
2. Whether the Board erred in finding that the Agency showed by clear and convincing evidence that it would have terminated Petitioner's appointment with the Agency notwithstanding her disclosures.

## STATEMENT OF THE CASE

This whistleblower case concerns Dr. Neena Biswas' retaliatory termination for reporting illegal hiring practices at the Dallas VA Hospital ("the VA"). The evidence adduced during the hearing of this matter demonstrated that Dr. Biswas reasonably believed that the VA violated 38 U.S.C. § 7407 by hiring non-citizen

doctors to serve as hospitalists when qualified U.S. citizens were available to serve in those positions. The administrative judge found that Dr. Biswas made protected disclosures regarding illegal hiring practices at the VA, and that those disclosures were a contributing factor in her termination. However, the administrative judge also found that the VA carried its heavy burden to establish *by clear and convincing evidence* that Dr. Biswas' termination was related to her *conduct* as opposed to her protected disclosures. In reaching this conclusion, the administrative judge made erroneous findings of material fact, erroneously applied the law to the facts, and abused his discretion by excluding witness testimony and other evidence.

### A. Dr. Biswas Applies For The Chief Hospitalist Position As A Qualified Citizen.

Dr. Biswas is a U.S. citizen who applied for, and was qualified to serve as, Chief Hospitalist at the Dallas VA. (Tr., 8:23-9:8, 11:2-13, Appx92-93).[1] The VA stipulated that Dr. Biswas in fact met the minimum qualifications for the position. (Tr., 17:21-19:11, Appx95); (Appx1173-1176). Even without that stipulation, Dr. Biswas provided unrebutted testimony that she met all of the qualifications listed in

---

[1] Dr. Biswas initially joined the VA in the Geriatrics Department in August 2010. After several months in that position, she became a U.S. citizen and subsequently applied for a new position as a VA hospitalist. (Tr., 15:4-23, 16:19-17:6, Appx94-95). She applied for that position as a U.S. citizen pursuant to 38 U.S.C. § 7401, and was approved for the position as a citizen. Tr., 15:4-23, 304:12-17, Appx94, Appx167); (Appx1173-1176) On April 25, 2012, the VA converted Dr. Biswas from temporary to permanent status, effective January 15, 2012. (Appx426-427)

the VA's job posting for the position, including the requirement that the position be filled by a U.S. citizen. (Tr., 14:20-17:20, 19:12-25, 77:24-78:7, Appx94-95, Appx95, Appx111). Further still, Dr. Biswas' most recent performance evaluation rated her overall "Outstanding," with a "High Satisfactory" rating on overall personal qualities including dependability and relations with staff, and cited her "outstanding clinical leadership." (Tr., 27:3-18, Appx98); (Appx269-271)[2] Dr. Biswas' qualifications were listed on the resume she submitted along with her application for the Chief Hospitalist position. (Appx415-419)

**B. The VA Pre-Selects Dr. Ignatius Oyula, A Non-Citizen, Over Dr. Biswas.**

Despite her qualifications, Dr. Biswas was not interviewed before being notified that she was "not selected" for the Chief Hospitalist position. (Tr., 29:1-25, Appx99); (Appx272-275) The VA selected Dr. Oyula, a non-citizen, instead. (Appx294-295; Appx414) By pre-selecting Dr. Oyula, the VA violated federal law regarding hiring non-citizens. (Tr., 39:1-44:22, 241:11-244:8, Appx101, Appx152); (Appx450-453) According to Dr. Biswas, the VA committed additional violations by hiring non-citizens to serve in other hospitalist positions. (Tr., 42:25-43:15, Appx102). 38 U.S.C. § 7407 provides:

[2] Internal VA communications further acknowledged her "numerous accolades" and the fact that she was the "only triple-specialized physician in the Hospitalist section." (Appx267-268)

> When the Under Secretary for Health determines that it is ***not possible to recruit qualified citizens*** for the necessary services, appointments under sections 7405 and 7406 of this title may be made without regard to the citizenship requirements of Section 7402(c) of this title or of any other law prohibiting the employment of, or payment of compensation to, a person who is not a citizen of the United States.

38 U.S.C. § 7407 (emphasis added) (*see also* Tr., 45:22-46:16, Appx103). 38 U.S.C. § 7402(c) explicitly prohibits the hiring of non-citizens. The requirements of Section 7407 are included in the VA Handbook governing hiring hospitalists, and Dr. Biswas' testimony regarding Section 7407 was unrebutted. (Appx1119) In fact, VA Human Resources Director Barbara Rogers agreed that Dr. Oyula could not be hired over Dr. Biswas if she met the minimum qualifications. (Tr., 272:6-20, 278:5-25, Appx159, Appx161; *see also* Tr., 412:24-413:9, 418:21-419:4, Appx194-195, Appx196).

**C. The VA Fails To Follow Hiring Guidelines When Refusing To Consider Dr. Biswas.**

Upon learning that she was not selected, Dr. Biswas began raising questions about the hiring process and the grounds for her non-selection without even being afforded an interview. Dr. Biswas' first email was sent on May 10, 2012, to Dr. Daniel Goodenberger, the VA's Chief of Medical Services. (Appx272-275) On May 14, 2012, Dr. Goodenberger responded (incorrectly) that Dr. Biswas "did not meet the minimum criteria for selection to interview." (Appx1195)

One week later, on May 21st, Dr. Biswas arrived at Dr. Goodenberger's office for what she had been told by HR would be an interview for the Chief Hospitalist position. (Tr., 172:8-174:20, Appx134-135). To her surprise, Dr. Goodenberger began the "interview" by stating: "this meeting is to stop your emails." (Tr., 172:3-7, Appx134); (Appx276-278) When Dr. Biswas tried to explain that she was there for the scheduled interview, Dr. Goodenberger told her she "had no leadership experience." (Tr., 564:20-23, Appx236); (Appx276-278) Just as he was wrong about Dr. Biswas not meeting the minimum qualifications, Dr. Goodenberger was also wrong about Dr. Biswas' supposed lack of "leadership experience." (Tr., 603:10-21, Appx246); (Appx1176-1176; Appx269-271; Appx415-419) Dr. Goodenberger also lacked a basic understanding of Dr. Biswas' prior work experience. (Tr., 86:6-22, 598:15-24, 600:7-15, Appx113, Appx245, Appx245)); (Appx587-588) ("FYI – her medical director experience was at Grand Island, Nebraska Veterans Home – not a hospital – in extended care and rehabilitation – not hospital medicine. Basically a nursing home."). In fact, Dr. Biswas had extensive prior hospitalist experience at Methodist Hospital and the Grand Island, Nebraska VA Hospital, ***not*** the state-run "Veterans Home" Dr. Goodenberger referenced. (Tr., 149:2-150:7, 253:2-254:24, Appx129, Appx155); (Appx415-419). Ignorant of her qualifications and unwilling to listen to Dr. Biswas, Dr. Goodenberger informed Dr. Biswas that he was not required to interview her, showed her the door, threatened to call the police if she

refused to leave, and put his hand on her arm to make his point. (Tr., 175:1-177:1, 260:12-19, Appx135-136, Appx156); (Appx276-278). Reporting this incident to HR, Dr. Biswas wrote that Dr. Goodenberger was "openly violating the basic principles in the hiring process in a Federal workplace." (Appx276-278)

*Dr. Biswas was right.* The VA acknowledged its own failure to follow federal hiring guidelines in an email exchange three days later. Specifically, Ms. Rogers informed Dr. Goodenberger that he could not pre-select Dr. Oyula without actually conducting interviews. (Tr., 566:22-567:6, Appx237); (Appx665-669). In Ms. Rogers' own words: "Heads up – to select a non-citizen, *this is not going to hold up*, unfortunately. *Interviews should have been done* on the top applicant(s). Oyula – he's not on the referral list." (Appx665-669) (emphasis added).[3] At the hearing, Ms. Rogers attempted to explain away her email by testifying that she only meant that the "documentation supporting that selection needed to be complete." (Tr., 265:11-266:23, Appx158); (Appx292-293) Of course, this is not at all what Ms. Rogers wrote. Ms. Rogers actually told Dr. Goodenberger that "interviews should have been conducted" before hiring a non-citizen for Chief Hospitalist, *not* that "documents"

[3] Dr. Goodenberger responded: "Ok. No, several other citizens were not interviewed. We can re-create." (Appx665-669). Thus, Dr. Goodenberger effectively admitted that he was wrong (again) when he told Dr. Biswas he was not required to interview her before rejecting her application, and all but declared that he had no intention of conducting a meaningful interview process. Instead, he would "re-create" the process that pre-selected Dr. Oyula. *See id.*

were missing. (Tr., 272:6-20, Appx159); (Appx279-280, Appx292-293). The administrative judge ignored this contradiction (along with several others) between Ms. Rogers' emails and her testimony in finding her a credible witness. (Appx12-13).

On May 31, 2012, the VA "re-created" the hiring process by interviewing Dr. Biswas, but not before interviewing Dr. Oyula. (Appx281-283). Dr. Oyula was interviewed even though he did not meet the minimum requirement of U.S. citizenship, and even though the Undersecretary had not made a determination that it was not possible to recruit qualified citizens for the position. (Appx1173-1176); 38 U.S.C. § 7407(a). Despite his lack of minimum qualifications, Dr. Oyula was officially selected on May 31, 2012. (Tr., 557:3-11, Appx235); (Appx414). No one informed Dr. Biswas. (Tr., 177:21-178:12, Appx136). Instead, the VA repeatedly represented to Dr. Biswas that the process was ongoing even though Dr. Oyula had already been selected. *See, e.g.,* (Appx1202, Appx1207-1208, Appx1240).

### D. Dr. Biswas Discloses Illegal Hiring Practices That Are Never Investigated.

In the following months, Dr. Biswas raised increasingly insistent questions about the hiring process. *See, e.g.*, (Appx1208); (*see also* Tr., 56:5-60:18, Appx105-106). Her questions went unanswered, and there is no evidence that the VA investigated whether its hiring process complied with the law. (Tr., 67:4-69:21, Appx108-109). The VA prepared no Report of Investigation, no AIB was convened,

and there is no written record of any *actual* investigation. (Tr., 251:5-252:3, 388:1-23, 616:9-13, Appx154, Appx188, Appx249).

Deputy Chief of Staff Dr. Stephen Holt and Ms. Rogers both testified that they did not investigate Dr. Biswas' complaints, but that they "would have" instructed Dr. Goodenberger to do so. (Tr., 432:19-433:5, Appx199-200).[4] Based on his own testimony, it is clear that Dr. Goodenberger performed no such investigation. In his view, Dr. Biswas was *not* qualified. (Tr., 564:20-23, Appx236). Moreover, Dr. Goodenberger repeatedly stated in emails that he believed the hiring process complied with federal law. (Appx286-287, Appx294-295). The most plausible inference to be drawn from the record is that the VA did *not* investigate Dr. Biswas' claims. (*See* Tr., 542:3-17, 588:11-12, Appx231, Appx242). Feeling stonewalled, Dr. Biswas escalated her reports higher up the chain of command. (Tr., 62:16-63:13, 67:4-69:21, Appx107, Appx108-109); (Appx1240, Appx1247-1249) The administrative judge found that these protected disclosures were a contributing factor in Dr. Biswas' termination. (Appx10-11).

### E. The VA Retaliates By Re-Classifying Dr. Biswas As A "Temporary" Employee.

Shortly before her termination, the VA finally responded to months of

[4] The VA offered no explanation for its apparent decision to charge Dr. Goodenberger with the supposed investigation of *his own conduct* when hiring non-citizens. (*See* Tr., 73:21-74:15, Appx110).

inquiries from Dr. Biswas regarding the VA's compliance with federal law in its hiring practices. (Appx1259-1260) The exchange began on September 2, 2012, with an email from Dr. Biswas to HR asking for clarification on the "reason for Non-selection as per AFGE guidelines." (Appx1260).[5] Two days later, the VA reclassified Dr. Biswas from a "permanent" to a "temporary" employee. (Tr., 146:18-147:2, Appx128). Dr. Biswas was not given advance written notice of the change, as required by AFGE guidelines. (Tr., 145:20-146:1, Appx128); (Appx1123). In her view, she was reclassified as "temporary" simply to make it easier to fire her. (Tr., 141:23-143:9, 147:3-6, Appx127-128). Dr. Biswas' view was corroborated by the VA's own witnesses. Ms. Rogers conceded that the VA did not look into Dr. Biswas' employment classification until *after* it had decided to terminate her. (Tr., 327:8-329:7, Appx173-174; *see also* 497:24-499:23, Appx220); (Appx1123; Appx322-324). Ms. Rogers also conceded that re-classifying Dr. Biswas as "temporary" made it easier to fire her. (Appx631-632).

After reclassifying Dr. Biswas as a temporary employee without written notice, the VA responded to Dr. Biswas' September 2nd email. (Appx1260) In its

[5] AFGE guidelines provide that employees inquiring about "the results of a specific promotion action *will be given* the following information:" "(a) whether they met the minimum qualification requirements; (b) whether they were within the group from which selection was made; (c) who was selected," and "in what areas, if any, they should improve to increase their chances for future promotion." (Appx1122) (emphasis added).

response, the VA (finally) informed Dr. Biswas that Dr. Oyula had been selected, and cited 38 U.S.C. § 7407(a) in support of its assertion that "the selection met all requirements that was [sic] needed in order to hire a non citizen." (Appx1260) Dr. Biswas immediately responded to point out—accurately—that Section 7407(a) only applies "WHEN it is NOT possible to recruit qualified citizens," and noted that the Undersecretary of Health had made no determination that it was not possible to recruit qualified citizens. (Appx1259) Dr. Biswas then reiterated: "Again I am a qualified citizen STILL available to be recruited for this position." (Appx1259). The VA never provided Dr. Biswas with a reason for non-selection, as required by AFGE guidelines. Nor did the VA take issue with Dr. Biswas' interpretation of Section 7407(a). (Tr., 77:24-78:7, Appx111); *see also* (Appx1259).

Hearing no response from HR, on September 11, 2012, Dr. Biswas made yet another disclosure of the "recruiting scam at Dallas VA," this time higher up the chain to Dr. Robert Petzel. (Appx1261-1262) Dr. Biswas' email cited Section 7407(a), then described the "heavily manipulated" process that led to Dr. Oyula's selection. (Appx1261-1262). Dr. Petzel forwarded the disclosure internally, and eventually Dr. Lawrence Biro advised: "We need to get a response. I would not use an IB to respond, a memo or some lower level of communication needs to be used[.]" (Appx1261). Dr. Biswas was terminated later that day. (Tr., 92:7-19, Appx114); (Appx528-530)

The next day, September 12, 2012, the VA generated a memorandum for the Undersecretary of Health. (Appx473-475). In its memo, the VA falsely stated that Dr. Biswas' "allegations regarding hiring practices" (which were not actually described in the memo) "have been investigated and addressed repeatedly in a variety of forums including one-on-one meetings between the physician and the Service Chief, group meetings with the entire Hospitalist physician group, and multiple telephone and email conversations." (Appx473-475).[6] Dr. Biswas testified that no such investigation occurred, and that no one met with her as part of any investigation of illegal hiring practices. (Tr., 69:12-21, 239:24-240:15, Appx109, Appx151). For its part, the VA identified no documents and adduced no testimony regarding any *actual* investigation of illegal hiring practices. Nor did the VA adduce a shred of evidence of any "group meetings" or "telephone and email conversations" to investigate those practices. (Tr., 86:23-89:16, Appx113-114).

Attempting to explain its decision to hire Dr. Oyula over Dr. Biswas, the VA told the Undersecretary in its memo: "Her application was reviewed along with the others, and it was determined that she was not the ***best*** qualified of the applicants." (Appx473-475) (emphasis added). The memo fails to note that "*best* qualified" is not the standard. Rather, Section 7407(a) only permits hiring a non-citizen if no

[6] The day after the VA circulated its memo for the Undersecretary of Health, the VA internally discussed its change of Dr. Biswas' employment status from "permanent" to "temporary." (Appx1268)

"*qualified*" citizen can be recruited for the position. *See* 38 U.S.C. § 7407(a). The VA's memo went on to say Dr. Biswas had been "instructed verbally and in writing on multiple occasions to follow the appropriate chain of command for grievances and/or complaints," then cited Dr. Biswas' protected disclosures as examples of her failure to follow the "chain of command." (Appx473-475) The memo made no mention of the *content* of Dr. Biswas' communications, and failed to inform the Undersecretary that Dr. Biswas' emails were protected disclosures under the WPA. (Appx473-475). Instead, the memo simply reported that Dr. Biswas had been handed her letter of termination. (Appx473-475).

**F. The Administrative Judge's Findings.**

The administrative judge correctly found that Dr. Biswas made protected disclosures of illegal hiring practices at the VA, and that those disclosures were a contributing factor in the VA's decision to reclassify and then terminate her. (Appx9, Appx11). However, the administrative judge went on to find that the VA had proved by clear and convincing evidence that (1) it would have reclassified Dr. Biswas as a temporary employee absent the protected disclosures, and (2) it terminated her for "disruptive and insubordinate conduct." (Appx13, Appx20). This finding involved errors of fact and law, and was the product of an abuse of discretion in refusing to allow Dr. Biswas to present countervailing evidence.

## SUMMARY OF THE ARGUMENT

The Board erred in finding that the Agency proved by clear and convincing that they would have converted from her temporary appointment and terminating her notwithstanding her protected disclosures. In doing so, the Board ignored clear guidance from this Court regarding the proper determination of and sufficiency of proof in whistleblower reprisal cases. The Agency failed to produce any evidence of similarly situated individuals who were also terminated, and indeed Agency witnesses indicated that progressive discipline is the standard for similarly situated employees as Petitioner. Instead, the Administrative Judge and the Board required Petitioner to provide similarly situated individuals and thus shifted the burden of proof to her instead of requiring the Agency to prove by clear and convincing evidence that they would have taken the same actions absent the protected disclosures. Thus, the Board failed to properly consider *Carr* factor 3, "any evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated." *See, Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

Furthermore, the administrative judge and the Board's conclusions regarding Petitioner's alleged misconduct were not supported by substantial evidence, or were also not factors considered by the Agency in terminating her but were considered by the administrative judge in upholding the termination based on

Petitioner's alleged misconduct. Nor were the allegations of misconduct sufficiently severe to warrant the imposed discipline of termination.

## ARGUMENT

### Standard of Review

This Court must set aside the MSPB's decision if it finds it was: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. *See* 5 U.S.C. § 7703(c); *Kewley v. Dep't of Health & Human Serv.*, 153 F.3d 1357, 1361 (Fed. Cir. 1998). Questions of law are reviewed *de novo. See LaChance v. White*, 174 F.3d 1378, 1380 (Fed. Cir. 1999) (citing *Frederick v. Dep't of Justice*, 73 F.3d 349, 351-52 (Fed. Cir. 1996)).

### A. Applicable Legal Principles.

"The purpose of the WPA is to shield employees who are willing to speak out and criticize government management, to 'freely encourage employees to disclose that which is wrong with our government.'" *Greenspan v. VA*, 464 F.3d 1297, 1305 (Fed. Cir. 2006) (citation omitted).[7] "Although wrongful or disruptive conduct is not

[7] The WPA prohibits taking any adverse personnel action because of "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences – (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to health and safety[.]" 5 U.S.C. § 2302(b)(8)(A).

shielded by the presence of a protected disclosure, when the disclosure is protected the burden is on the agency to show, by clear and convincing evidence, that it would have disciplined the employee for reasons unrelated to the protected disclosure." *Greenspan*, 464 F.3d at 1305. "Whether evidence is sufficiently clear and convincing to carry this burden of proof cannot be evaluated by looking only at the evidence that supports the conclusion reached." *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012). Rather, "[e]vidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Id*. As the *Whitmore* court explained:

> Congress decided that we as a people are better off knowing than not knowing about such violations and improper conduct, even if it means that an insubordinate employee like Mr. Whitmore becomes, via such disclosures, more difficult to discipline or terminate. Indeed, it is in the presence of such non-sympathetic employees that commitment to the clear and convincing evidence standard is most tested and is in most need of preservation.

*Whitmore v. Dep't of Labor*, 680 F.3d at 1377.

The Court should reverse the decision of the Board upholding the decision as it contained erroneous findings of material fact, the decision was based on an erroneous application of the law to the facts, and the Board's rulings during the course of the initial decision were not consistent with required procedures or involved an abuse of discretion that affected the outcome of the case.

### B. The Administrative Judge Erroneously Applied the *Carr* Factors.

Here, the administrative judge erroneously applied the *Carr* factors in finding that the VA would have reclassified and then terminated Dr. Biswas regardless of her protected disclosures. *See Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).[8]

#### 1. The administrative judge failed to properly weigh the strength of the evidence in support of the VA's personnel actions.

##### a) The administrative judge misconstrued Dr. Biswas' "conduct."

###### (1) Dr. Biswas never criticized her co-workers' "national origin."

The VA contended that Dr. Biswas' "misconduct" included making "inflammatory" and "defamatory" statements about her co-workers based on their "national origin." *See* (Appx1224) But there was no evidence of any such communications. Dr. Biswas was actually complaining about the illegal hiring and preferential treatment of *non-citizens* in communications that say nothing at all about her co-workers' "national origin." (Tr., 62:16-63:13, 98:8-100:6, 426:9-427:5, 527:23-528:11, Appx107, Appx116, Appx198, Appx227); (Appx1249) The

[8] The *Carr* factors are as follows: "(1) the strength of the agency's evidence in support of its personnel action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated." *Id.*

administrative judge erred by refusing to acknowledge the significance of this distinction. (Appx22).

Also failing to appreciate the distinction, in an "outline for inclusion in letter of termination," Dr. Goodenberger identified a July 12, 2012 email from Dr. Biswas as one of the grounds for her termination. (Appx1251) In that email, Dr. Biswas stated: "Just informing you that anyone and everyone, who is involved in re-appointing Drs. Oyula, Pitafi, Gupta, and Mutua from the hospitalist group, are betraying the US government. Specifications are clear and Dallas VA has to follow the rules like other VAs." (Appx1213)

The VA identified no communication from Dr. Biswas that *actually* criticized a co-worker on the basis of race, gender, or national origin. In fact, as Dr. Holt acknowledged during his examination, Dr. Biswas shares the *same* national origin as Dr. Gupta, one of the physicians Dr. Biswas singled out as receiving favorable treatment in violation of Title 38. (Tr., 528:12-529:2, Appx227-228). The distinction is critical, as the VA's purported basis for conduct-based termination actually proves Dr. Biswas' point: she was terminated for making protected disclosures, not for making "defamatory" and "inflammatory" statements about co-workers based on *national origin*.

**(2) Other hospitalists shared Dr. Biswas' concerns about harassing schedules made to favor non-citizen hospitalists.**

The administrative judge also cited Dr. Biswas' email complaints about unfair scheduling practices as "conduct" that created a "hostile work environment," and thus justified the VA's decision to terminate her. (Appx16). In those emails, Dr. Biswas reported Dr. Oyula's abuse of authority (a protected disclosure under the WPA) in preparing unfair schedules that placed an inordinate burden on some doctors to handle night shifts:

- "I strongly object to what is going on as it has become evident that Dr. Oyula together with a few others have made schedules to suit themselves."
- "A 3 weeks schedule was made on purpose so that Dr. Oyula can show how difficult it is to hire."
- "The non-citizens have prepared a tough schedule to drive out citizens from a Federal job to keep their positions."
- "Let me know who is the 2nd person [to work night shifts along with Dr. Biswas], as this is an uncertain and outrageous schedule now being enforced to harass me."[9]

(Appx1214-1216)

Dr. Goodenberger listed several of these emails in his "outline for inclusion in letter of termination." (Tr., 96:23-98:7, Appx115-116); (Appx1251) There, Dr.

[9] The administrative judge identified this email as an example of Dr. Biswas threatening to take unscheduled days off. (Appx16). It is undisputed that Dr. Biswas never took unscheduled or unapproved leave at any time during her employment at the VA. (Tr., 215:8-216:23, Appx145).

Goodenberger characterized Dr. Biswas' protected disclosures as examples of "insubordination" that would support her termination. *Id*. Recognizing that these were protected disclosures of abuse of authority, Dr. Goodenberger attempted to distance himself from his "outline" at the hearing. Prompted by a series of leading questions, Dr. Goodenberger testified that he did not attempt to prevent Dr. Biswas from making protected disclosures. (Tr., 577:21-578:5, Appx240). The administrative judge relied on this testimony in support of his finding that Dr. Biswas was terminated for her "conduct." (Appx20).

In so finding, the administrative judge ignored the fact that Dr. Goodenberger's testimony cannot be reconciled with his contemporaneous emails. While Dr. Goodenberger testified that he did not deter Dr. Biswas from making protected disclosures, he stated *in writing* that Dr. Biswas' emails reporting protected disclosures were examples of "insubordination" to be cited in her termination letter. (Appx1251); (Appx1243-1244). But, as Ms. Rogers conceded, Dr. Biswas was not bound by instructions from superiors *not* to report hiring violations "outside the chain of command." (Tr., 299:12-20, 302:5-9, Appx166-167).[10] Thus, Dr. Goodenberger's assessment that Dr. Biswas' disclosures were acts

[10] Dr. Holt contradicted Ms. Rogers' testimony on this issue when he testified that Dr. Biswas' reporting of illegal hiring practices outside the chain of command was an act of insubordination. (Tr., 517:11-518:5, Appx225). In so testifying, Dr. Holt failed to acknowledge that Dr. Biswas made no complaints to superiors "outside the

of "insubordination" was (yet again) wrong.

In finding that Dr. Biswas' complaints about unfair scheduling created a "hostile environment," the administrative judge also ignored the fact that several of Dr. Biswas' fellow hospitalists shared her concerns about Dr. Oyula's abusive scheduling practices. (Appx1214-1216) The administrative judge also ignored glaring inconsistencies in the testimony of the VA's witnesses on this issue. For example, Dr. Holt dismissed Dr. Biswas' concerns in an email in which he remarked: "I must point out that, to date, no other Hospitalist has raised these concerns to senior leadership." (Appx1234). Dr. Holt repeated this statement on August 10, 2012: "I must point out that yours are the only complaints that have been raised on scheduling issues." (Appx504-506). On cross-examination, Dr. Holt was forced to admit that, just *two days* before he told Dr. Biswas she was the *only* one complaining, he was copied on an email chain in which *three* other doctors made the *same* complaints. (Tr., 476:12-481:25, Appx214-216); (Appx1214-1216) He further admitted that the difference between Dr. Biswas and the other doctors who complained about the schedule is that only Dr. Biswas also disclosed illegal hiring practices. (Tr., 482:14-483:3, Appx216).

---

chain of command" until *after* he and others lower on the chain had ignored several earlier disclosures. (*See* Tr., 67:4-69:21, Appx108-109).

Ms. Rogers similarly wrote that other doctors had made the same complaints as Dr. Biswas, even "using similar language." (Appx731-735) Here again, the VA was *wrong* on the facts, and its position that Dr. Biswas was a lone voice complaining and creating a "hostile work environment" was unsupported by the actual record. (Tr., 120:14-124:8, 481:17-25, Appx121-122, Appx216).

These inconsistencies between the VA's contemporaneous communications and the testimony of its witnesses made it impossible for the VA to carry its burden of proof by clear and convincing evidence. *Cf. Crowe v. Smith*, 261 F.3d 558, 566 (5th Cir. 2001) (finding that contradictory testimony was not "clear and convincing evidence – evidence so 'clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts'"). The administrative judge erred by ignoring these inconsistencies to find the VA's witnesses credible, and then concluding that Dr. Biswas created a "hostile work environment." (Appx22).

**(3) The July 21st incident.**

The administrative judge also cited an incident between Drs. Biswas and Oyula, during which Dr. Biswas allegedly refused a patient assignment. (Tr., 449-50, Appx208); (Appx1251); (Appx15). As an initial matter, it is undisputed that Dr. Biswas *did* see the *one* patient at issue after she was instructed to do so. (Tr., 101:4-103:3, 621:6-16, Appx117, Appx251); (Appx1251) Nevertheless, to better

understand the genesis of the July 21st incident, an examination of Dr. Oyula's conduct prior to that date is in order. Dr. Biswas testified that, prior to July 21, 2012, Dr. Oyula had made it his practice to include himself on the rotation on days when he was not actually present at the VA. (Tr., 106:1-23, Appx118). Dr. Biswas further testified that Dr. Oyula improperly gave himself "credit" for seeing patients he had not actually seen. (Tr., 106:1-23, Appx118). These practices by Dr. Oyula constitute clear abuses of authority, endanger patient safety, and are critical to an understanding of the July 21st incident.

Dr. Biswas arrived at work that day to find she had been assigned two additional patients that were initially slated for Dr. Oyula. (Tr., 103:16-104:25, Appx117). Dr. Oyula had erased his name off the board that listed patient assignments and wrote Dr. Biswas' name instead, thus giving "his" patients to Dr. Biswas. (Tr., 104:16-105:2, Appx117-118). When Dr. Biswas objected to this inequitable distribution of patient responsibilities, Dr. Oyula represented to her that he took himself off the rotation because he had seen two additional patients the day before. (Tr., 105:3-19, Appx118). Believing he was lying to her to avoid work, Dr. Biswas asked for their names. (Tr., 105:20-106:23, Appx118). Dr. Oyula refused to give her the names, stuck his finger in her face, and shouted at her. (Tr., 107:5-15, Appx118). He then stormed out of the room, then returned for a second encounter. (Tr., 107:15-20, Appx118).

During the second meeting, Dr. Oyula called Dr. Holt at home and asked him to intercede. (Tr., 108:6-9, Appx118). Drs. Oyula and Biswas stated their positions to Dr. Holt, who never asked Dr. Oyula the identity of the "second patient" he had supposedly seen the day before. (Tr., 109:10-15, 463:22-464:7, Appx119, Appx211). Dr. Holt did tell Dr. Biswas she was required to comply with Dr. Oyula's work assignments, and it is undisputed that she did so. (Tr., 108:13-109:9, Appx118-119); (Appx1251).

To prove Dr. Oyula had abused his authority by lying about seeing patients to avoid work, Dr. Biswas investigated whether Dr. Oyula had in fact seen two patients on July 20th. (Tr., 109:16-110:20, Appx119). Two days after the incident, Dr. Biswas emailed Dr. Holt to inform him of the results of her investigation, and her discovery that there was no "second patient":

> I can positively confirm to you that **Dr. Oyula made several inaccurate statements about his admissions.** There was only ONE parecentesis done which was an admission. So in essence, he used this one patient on 7/20 as well as 7/21 to get out of admissions/overnight patients. . . . If you need to confirm data, please ask him the names but also look at notes through CPRS to verify. The end result is that **when he skips out, the others pick up extra patients** which should have been his.

(Appx1225-1226) (emphasis added); (Tr., 113:21-115:5, 467:4-469:25, Appx120, Appx212-213). Dr. Biswas freely conceded that Dr. Oyula had the right as her supervisor to assign patients, even if the distribution of work was inequitable. (Tr., 115:14-19, Appx120). The issue—which was completely lost on the administrative

judge—was whether Dr. Oyula had the right to lie about his own activities when exercising his authority. (Tr., 115:20-116:2, Appx120). The administrative judge erred by focusing solely on whether Dr. Biswas' "conduct" justified termination without considering her conduct in the context of the protected disclosure she making. (Tr., 466:7-467:3, Appx212). Worse, the administrative judge cited Dr. Holt's testimony that Dr. Biswas' initial refusal to see patients was "disruptive to patient care," when Dr. Goodenberger—the chief of the section—was not aware of any danger to patient care caused by the incident, and admitted that to the best of his knowledge *none* of Dr. Biswas' conduct caused any such disruption. (Tr., 621:17-20, 622:5-20, Appx251); (Appx21).

Just as the VA never investigated illegal hiring practices Dr. Biswas disclosed, no one at the VA ever investigated whether Dr. Oyula had abused his authority by lying about seeing patients on July 20, 2012. (Tr., 118:6-14, Appx121). This despite the fact that, as Dr. Holt conceded, Dr. Oyula *did not* have authority as Chief Hospitalist to misrepresent the patients he had seen, and had no authority to be verbally abusive to subordinates. (Tr., 470:4-472:4, Appx213). Rather than investigate the abuse of authority Dr. Biswas reported in her July 23rd email, Dr. Goodenberger listed that email as an example of the "insubordination" that supported terminating her. (Appx1251) ("Accuses Dr. Oyula of intimidating behavior").

The administrative judge cited Dr. Biswas' report of the incident as evidence of misconduct that supported the decision to terminate Dr. Biswas. (Appx15). The administrative judge also relied on Dr. Goodenberger's testimony that Dr. Biswas had made an "accusation against Dr. Oyula," but never addressed the validity of her "accusation" or whether her "disruptive behavior" was actually protected under the WPA. (Appx16).

In his email calling Dr. Biswas' protected disclosure "insubordination," Dr. Goodenberger stated that Dr. Biswas' version of the July 21st incident was not borne out by the VA's subsequent "fact-finding" regarding the incident. (Appx1251). That "fact-finding" consisted solely of talking to Dr. Oyula, Dr. Biswas, and two interns who witnessed a portion of the incident; nothing was done to investigate whether Dr. Oyula had abused his authority by lying about seeing two patients on July 20, 2012. (Tr., 464:2-466:6, Appx211-212); (Appx1184-1190). One of those interns, Mr. Nathaniel Berrios, stated that "he did not witness the original conversation" (where Dr. Oyula shouted at Dr. Biswas and threatened her). (Appx1190) He was only present for the *second* encounter when Dr. Oyula returned and called Dr. Holt.[11] Even though Mr. Berrios *was not there* to witness Dr. Oyula's threatening behavior,

[11] Dr. Holt testified that he did not know whether the two "witnesses" at the center of the VA's "investigation" were actually present for the first encounter. (Tr., 474:10-14, Appx214).

the VA's Ruth Kirkland emphasized in her report: "[Dr. Oyula] did not reach out to her in any way." (Appx1190) (original emphasis).

The other witness, Hunter Rackley, stated he was "staring ahead at the computer," and could not see whether or not Dr. Oyula made threatening gestures toward Dr. Biswas. (Appx1189).[12] Setting aside the question whether the VA's "fact-finding" actually supported the conclusion that Dr. Biswas' version of events was incorrect, it is undisputed that there was *no* "fact-finding" to look into Dr. Biswas' complaint that Dr. Oyula had lied about seeing patients on July 20th, which was the root cause of the entire incident. (Tr., 465:4-467:3, Appx212); *see also* (Appx1184-1190).

In sum, the administrative judge failed to consider all of the pertinent evidence before concluding that the July 21st incident justified the VA's decision to terminate Dr. Biswas, and thus erred in relying on that incident to find that the VA had carried its burden by clear and convincing evidence. *See Whitmore*, 680F.3d at 1368.

[12] Dr. Oyula testified during an EEO hearing that he *did* "shout" at Dr. Biswas, and "may have" put his finger in her face. (Tr., 510:3-20, Appx223). Dr. Goodenberger testified that he did not believe Dr. Oyula ever said he "shouted" at Dr. Biswas, but if true, he would change his view that Dr. Biswas' complaint about intimidating behavior was unfounded. (Tr., 624:22-625:10, Appx251-252). Moments after this testimony, when confronted with Dr. Oyula's testimony that he "shouted" at Dr. Biswas, Dr. Goodenberger reversed himself and said Dr. Biswas' complaint was *still* unfounded. (Tr., 626:22-627:23, Appx252). The administrative judge ignored this obvious—and complete—reversal of course.

**b) The VA never actually investigated Dr. Biswas' complaints.**

Viewed in the proper context, the individuals Dr. Biswas accused of illegal conduct simply decided it would be easier to fire Dr. Biswas than actually look into the illegality she reported. Failing to recognize as much, the administrative judge relied on Dr. Goodenberger's testimony that Dr. Biswas "had already been notified that her complaints had been investigated and found meritless and, therefore, he considered her ongoing emails, including to individuals outside her chain of command, to be inappropriate." (Appx18). In so finding, the administrative judge ignored overwhelming record evidence that no such investigation ever occurred. *See* Part II(D), *supra*; (Tr., 251:5-253:1, Appx154-155); (Appx20).

The administrative judge also ignored the direct contradiction between the VA's stipulation that Dr. Biswas met the minimum qualifications and the testimony of the VA's witnesses, who testified that they did not believe she met those qualifications. (Tr., 278:11-15, 564:20-23, Appx161, Appx236). It is difficult to conceive how the VA could possibly have actually investigated Dr. Biswas' complaints about illegal hiring practices, when at the hearing of this matter the individuals charged with the investigation disagreed with the VA's own conclusion that Dr. Biswas was in fact qualified for the Chief Hospitalist position. (Tr., 438:7-16, Appx201). After all, if the VA had actually investigated, it would have at least found out (as the VA later stipulated) that Dr. Biswas was in fact qualified. These

obvious contradictions between the VA's stipulation and the testimony of the VA's witnesses were completely lost on the administrative judge.

**2. The administrative judge failed to properly weigh evidence of retaliatory motive on the part of the VA officials involved in Dr. Biswas' termination.**

**a) No incremental discipline was imposed before termination despite recommendations for counseling.**

"Since direct evidence of . . . retaliatory motive is typically unavailable (because such motive is almost always denied), federal employees are entitled to rely on circumstantial evidence to prove a motive to retaliate." *See Whitmore*, 680 F.3d at 1371. Here, the VA's departure from established procedure—which called for counseling or other incremental discipline short of termination—is evidence of retaliatory motive. *See id*. "Though we have explained that *Carr* imposes no affirmative burden on the agency to produce evidence for each of the three factors, *see Whitmore*, 680 F.3d at 1374, the Board cannot ignore record evidence relevant to the existence and strength of any motive to retaliate or the treatment of similar employees. Rather, the Board must 'provide an in depth review and full discussion of the facts to explain its reasoning.' *Id*. at 1368." *Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1366 (Fed. Cir. 2018). The *Smith* court also cites to *Siler v. Envtl. Prot. Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018), which held that:

> Once a whistleblower shows that his protected disclosures contributed to adverse action against him, the agency bears the burden of showing that it would have acted in the same way even absent any

> whistleblowing. 5 U.S.C. § 1221(e)(2); *Miller*, 842 F.3d at 1257 (burdening the agency to prove independent causation by clear and convincing evidence). Though an agency need not introduce evidence of every Carr factor to prove its case, the "risk associated with having no evidence on the record" for a particular factor falls on the government. *Miller*, 842 F.3d 1262. The Board "may not simply guess what might happen absent whistleblowing." *Id.*

*Siler v. Envtl. Prot. Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018).

Here, as in *Smith*, 930 F.3d 1359, and, *Siler*, 908 F.3d 1291, the administrative judge failed to properly apply the *Carr* factors in weighing the evidence of retaliatory motive on the part of the VA officials responsible for Dr. Biswas's termination, thereby demonstrating that the Agency repeatedly failed to meet its burden of demonstrating it would have acted in the same way absent any whistleblowing by Dr. Biswas. *See Id.* Dr. Biswas' termination – spearheaded by Dr. Goodenberger and others who had been singled out in her disclosures – was handled contrary to directives the VA received from superiors inside the Department of Health. Jeffrey Milligan, Director of the facility, and Dr. Clark Gregg, Chief of Staff, recommended counseling. (Tr., 645:12-646:2, Appx257); (Appx518-520). Dr. Holt also recommended *counseling*. (Tr. 501:7-504:10, Appx221); (Appx640-641). These recommendations were ignored. (Tr., 294:16-297:15, 378:18-379:1, 641:4-16, 642:13-22, Appx165-166, Appx186, Appx256); (Appx631-632).

Ms. Rogers and Dr. Holt both admitted that no incremental discipline was imposed before termination. (Tr., 347:16-19, 391:18-392:4, Appx178, Appx189; *see*

*also* Tr., 147:7-148:9, Appx128). Also conceding this point, Dr. Goodenberger offered that counseling would have been "useless" because the "myelin sheath" inside Dr. Biswas' brain was fully formed, her conduct could not be changed by counseling, and the very idea that counseling could alter adult behavior was a "false paradigm." (Tr., 647:3-648:11, Appx257). Whatever the state of Dr. Biswas' "myelin sheath," her most recent performance review had rated her "Outstanding" overall, with a "High Satisfactory" rating for emotional stability, dependability, and relations with staff. (Tr., 637:1-20, Appx255). Further still, the VA offered no coherent explanation (other than retaliation) for its decision to terminate Dr. Biswas rather than impose the lesser discipline that was actually recommended by superiors. (Appx640-641).

Even Ms. Rogers testified that she "wouldn't define it as typical" for doctors in Dr. Biswas' position to be immediately terminated rather than have some lesser form of discipline imposed. (Tr., 351:2-12, Appx179). In fact, Ms. Rogers conceded that physicians who had actually refused patient assignments were not terminated, but were instead reprimanded. (Tr., 406:19-407:12; 409:17-410:16, Appx193-194); (Appx1113-1116). Such a statement is incompatible with third *Carr* factor, i.e., evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated, and the Board erred in failing to properly consider it. *Carr,* at 1393. As this Court has opined numerous times, the

"Where whistleblowing is at issue, however, the proper inquiry is not whether the agency action is justified; it is whether the agency would have acted in the same way absent the whistleblowing." *Smith v. Gen. Servs. Admin.,* 930 F.3d 1359, 1365 (Fed. Cir. 2018).

In this case the Administrative Judge acknowledged that physicians were not terminated for failing to see patients, but erroneously concluded that Petitioner had refused to see patients – which is totally refuted by the evidence as outlined above. But then the Administrative Judge turned this third *Carr* factor on its head by saying that since the other physicians were not permanent employees, they were not comparable and thus Appellant has somehow failed to show a comparator employee. The Administrative Judge's argument is confusing but undeniably it is the Agency's burden to demonstrate a comparator – not Appellant. As this Court explained in *Smith,* "To the extent the agency failed to introduce evidence on how this employee or other similarly situated employees were treated, *Carr* factor 3 cannot support the agency." *Id.,* at 1367. This Court then opined that where an agency failed to provide comparator evidence, they did so at their peril. The Respondent here failed to provide comparator evidence and the case should be reversed and remanded.

The facts in this case are indeed quite similar to the *Smith* case where Mr. Smith also was charged with 5 instances of disrespectful conduct – similar to Petitioner here. In that case, the Court also required the Board to analyze the penalty

under the *Douglas* factors, and to carefully analyze each of the charges against him. In this matter though, Petitioner was never charged with wrongdoing – she was simply reverted to the status of a temporary employee and then terminated without notice as to what she had precisely done wrong. The allegations of misconduct have always been vague and unclear because none were specifically made against her at the time of her termination.

While the administrative judge did acknowledge that Dr. Biswas had adduced some evidence of retaliatory motive, he did not address any of the evidence of the VA's failure to follow its own disciplinary guidelines in finding that the VA did not fire Dr. Biswas as retaliation for making protected disclosures. This despite the fact that, viewed together, Dr. Biswas' emails were no doubt a source of irritation for the superiors she singled out in those disclosures, specifically Dr. Goodenberger and the HR department headed by Ms. Rogers.

**b) The VA's failure to investigate Dr. Biswas' complaints is circumstantial evidence of retaliatory motive.**

The VA's troubling pattern of failing to investigate Dr. Biswas' complaints constitutes circumstantial/inferential evidence of a retaliatory motive. (*See* Tr., 84:5-86:5, Appx112-113). The VA's testimony on this issue amounted to an epic case of buck passing. Dr. Holt admitted he did not investigate Dr. Biswas' reports, saying it would have been "inappropriate" for him to do so. (Tr., 529:25-532:10, Appx228). Ms. Rogers also admitted she did no investigation, but asked Dr. Goodenberger to

conduct one. (Tr., 279:1-280:16, 428:3-13, Appx161, Appx198). Dr. Goodenberger testified that an investigation was conducted, but cited only the HR investigation of the July 21st incident with Dr. Oyula. He said nothing about an investigation of ***his own*** illegal hiring practices. (Tr., 583:21-585:23, Appx241-242).

If, between all the finger-pointing, an actual investigation of illegal hiring practices occurred, there is no written record of it. (Tr., 428:17-24, Appx198). Ms. Rogers admitted there was no Report of Investigation, and no AIB review either. (Tr., 281:21-282:23, 427:13-428:2, Appx162, Appx198).[13] The only written document that could possibly be characterized as a report of an investigation is the VA's September 12, 2012 memorandum to the Undersecretary (which repeats almost verbatim the contents of an internal "Issue Brief" prepared in August 2010). (Appx473-475). As explained in Part II(E), *supra*, that memo is rife with what can be charitably described as factual *errors*. The memo does not describe with any specificity the "hiring practices" that were supposedly investigated, much less the results of any such "investigation." *See* (Appx473-475).

[13] Ms. Rogers testified that no AIB was necessary because there were no disputed fact issues on the question whether Dr. Oyula had discouraged citizens from applying for the Chief Hospitalist position. (Tr., 427:19-428:2, Appx198). The administrative judge refused to allow Dr. Biswas to call Dr. Rex Moss, who would have testified that he was discouraged from applying for the position. *See* (Appx1110-1112) This abuse of discretion is addressed in Part III(D)(1), *infra*.

The memo does, however, bolster Dr. Biswas' contention that she was terminated as retaliation for making protected disclosures. The memo identifies the same emails Dr. Goodenberger cited as examples of "insubordination" in his "outline for inclusion in letter of termination," and reports that Dr. Biswas continued to make disclosures even after she was instructed not to go outside the chain of command. (Appx473-475). The VA's memo thus contradicts the testimony of its witnesses that Dr. Biswas' disclosures did not prompt her termination.

**c) The VA reclassified Dr. Biswas as a temporary employee to make it easier to fire her.**

Waving away criticisms of the VA's termination decision, Ms. Rogers testified that the VA had no obligation to explore lesser discipline before terminating a temporary employee. (Tr., 353:20-354:3, 355:23-356:4, Appx180).[14] On this point, it is undisputed that the VA did not begin looking into Dr. Biswas' employment classification until *after* it had decided to terminate her. (Tr., 327:8-329:7, Appx173-174). Ms. Rogers acknowledged that converting Dr. Biswas back to temporary status deprived her of certain rights, and VA officials discussed internally the benefits of reclassifying her as "temporary" in advance of a termination.[15] (Tr., 320:2-10,

[14] Elsewhere, Ms. Rogers testified that Dr. Biswas was terminated for her "conduct," yet another inconsistency that made it impossible to rely on her as a credible witness. (Tr., 317:21-318:1, Appx171).

[15] It is not at all clear that Dr. Biswas should have ever been converted back to "temporary" status. Dr. Biswas applied for the hospitalist position as a citizen for a full time appointment under 38 U.S.C. § 7401. Indeed, that is how the VA

321:14-18, Appx171); (Appx631-632). The VA did not treat any other doctors this way. Not coincidentally, those other doctors had not made protected disclosures of illegal hiring practices. (Tr., 364:9-13, Appx182).

Despite this evidence, the administrative judge found that the VA clearly and convincingly proved that the reclassification of Dr. Biswas as a temporary employee was simply done to correct the VA's "error" in classifying Dr. Biswas as a permanent employee in the first place. (Appx12-13). Completely lost in the administrative judge's analysis was any consideration of the VA's error in reclassifying Dr. Biswas as a temporary employee. In addition to advance written notice, AFGE guidelines mandate that any change in Dr. Biswas' employment status had to be conducted through a Professional Standards Board. (Tr., 327:8-24, Appx173); (Appx1123) The VA adduced no evidence that a PSB was convened prior to reclassifying Dr. Biswas as a temporary employee.

Yet, the administrative judge accepted Ms. Rogers' testimony that the VA was simply fixing "errors" in the process without acknowledging that the VA's "fix" was an error in itself. Had the VA actually followed the process in reclassifying Dr. Biswas (by giving her prior written notice and convening a PSB), then perhaps its excuse could withstand scrutiny. But the reality is the VA reclassified Dr. Biswas as

---

characterized the appointment in Dr. Biswas' SF-50 signed by Ms. Rogers herself. (Appx570)

"temporary" only *after* it decided to fire, and did so knowing that doing so would limit Dr. Biswas' rights. (Appx631-632) The VA's failure to actually follow the correct process in reclassifying Dr. Biswas makes it *impossible* to conclude (by clear and convincing evidence) that the VA was actually motivated by concern for correcting "errors" in the "process," when the fact is the VA knew that its "fix" would make it easier to terminate Dr. Biswas. (*See* Tr., 225:7-226:18, Appx148).[16] In sum, the VA's conduct raises serious questions about the veracity of the excuses it raised at the hearing of this case. This conduct also renders it impossible to conclude that the VA carried its burden to prove by clear and convincing evidence that Dr. Biswas' reclassification was not retaliation for making protected disclosures.

**d) The administrative judge ignored evidence that Dr. Goodenberger had retaliated against other VA hospitalists.**

In finding Dr. Goodenberger's testimony credible, the administrative judge also ignored Dr. Goodenberger's history of inventing "insubordinate" conduct to justify improperly terminating VA physicians. (Appx1113-1116) (Tr., 129:4-140:25, Appx124-126). The administrative judge ignored Dr. Biswas' testimony

[16] In the Initial Decision, the administrative judge pointed out that a VA employee named Daniel Harper was reprimanded for incorrectly changing Dr. Biswas' appointment to "permanent." However, he made no mention of the fact that Ms. Rogers' signature, *not* Mr. Harper's, appears on the document converting Dr. Biswas to a permanent employee. The scapegoating of Mr. Harper to protect Ms. Rogers is hardly clear and convincing evidence that the VA was not retaliating against Dr. Biswas by converting her back to "temporary" status immediately before her termination. (Appx13; Appx570)

that, as he had done so many times before, Dr. Goodenberger orchestrated her retaliatory termination in September 2012 on trumped up charges of "insubordination." (Appx1265-1266) The administrative judge's failure to recognize as much was error.

#### 3. The administrative judge failed to consider evidence that the VA did not take similar actions against non-whistleblowers.

The decision to terminate Dr. Biswas over several recommendations for counseling was apparently unprecedented. Dr. Holt could not identify a single instance in which Dr. Goodenberger did not follow Dr. Holt's recommendation regarding employee discipline. (Tr., 501:7-504:10, Appx221). Not coincidentally, Dr. Holt also could not recall any incident involving employee discipline when potentially protected disclosures were in issue. (Tr., 504:11-16, Appx221). Nor was there any testimony from the VA identifying any instance in which a non-whistleblowing doctor was reclassified as "temporary" from "permanent" contemporaneously with a termination.

Ms. Rogers testified that other VA employees were also reclassified as temporary around the same time as Dr. Biswas. (Tr., 312:21-313:5, Appx169-170). While the administrative judge cited this testimony in support of his finding, it is undisputed that the VA did not terminate any of those employees. (Tr., 313:6-11, Appx170). Those employees were all reclassified as permanent after the VA corrected its "mistake." (Tr., 313:24-314:12, Appx170). Of course, none of those

employees had raised complaints about illegal hiring practices and abuse of authority at the VA. (Tr., 364:9-13, Appx182). Despite these admissions, Ms. Rogers insisted that Dr. Biswas' re-classification was simply done to correct a "mistake" in classifying her as a permanent employee. (Tr., 362:3-9, Appx182).

Whether or not Ms. Rogers' testimony is remotely credible, the timing of Dr. Biswas' reclassification as "temporary" only *after* the VA had already decided to terminate her cannot be chalked up to a mere coincidence. *See* 5 U.S.C. § 2302(b)(8) (prohibiting an agency from penalizing its employees for whistleblowing); *see Smith v. Gen. Servs. Admin.*, 930 F.3d 1359 (Fed. Cir. 2019)(vacating the Board's decision and remanding for reconsideration, in relevant part, for failing to consider the Agency's failure to introduce evidence relevant to *Carr* factor 3 pertaining to treatment of non-whistleblowers who engaged in similar misconduct as the whistleblower); *see also, Siler v. EPA*, 908 F.3d 1291, 1299 (Fed. Cir. 2018). In this case, Dr. Biswas should have been at least been given a Professional Standards Board as the other doctors were; and as a PSB only reviews *professional standards,* as opposed to allegations of misconduct, she would have been made a permanent doctor and giving her substantial more rights and abilities to challenge her termination. Given this record, the administrative judge and the Board erred in finding that the VA's reclassification was not done in retaliation for Dr. Biswas' protected disclosures.

### C. The Administrative Judge Erroneously Applied The Law To The Facts.

#### 1. The VA cannot support its termination decision based on "conduct" not set forth in Dr. Biswas' termination letter.

"The Board cannot change the agency's grounds from those Noticed by the agency at the time of the discipline." *Greenspan*, 464 F.3d at 1305 (citing *King v. Nazelrod*, 43 F.3d 663, 666 (Fed. Cir. 1994)). In *Greenspan*, Dr. Greenspan bluntly criticized management for nepotism and other illegal practices at an open staff meeting. *Greenspan*, 464 F.3d at 1300-01. The VA defended the case on the ground that Dr. Greenspan was not disciplined for the *content* of his words, but instead for "derogatory, inappropriate, and disrespectful 'conduct'" in the *manner* in which he criticized his superiors. *Id*. at 1303-04. The VA further contended that it would have disciplined Dr. Greenspan for that "conduct" even if his statements were not protected disclosures. *Id*. Dr. Greenspan maintained that "the present posture that he was properly disciplined for 'disrespect' cannot be separated from the content of his whistleblowing criticisms of management." *Id*.

The administrative judge agreed with the VA, deemed it "irrelevant" that the "conduct" the VA contended supported the discipline was not set forth in Dr. Greenspan's letter of reprimand, and dismissed Dr. Greenspan's appeal. *Id*. The administrative judge's ruling was reversed on appeal to the Federal Circuit. *Id*. at 1306. The *Greenspan* Court reasoned:

> When a disclosure is of protected subject matter, it is more likely than not to be critical of management, perhaps highly critical. The WPA protects those employees who are willing to speak out on subjects that could incur retaliation if unshielded. We have not been shown substantial evidence in support of the agency's burden to establish by clear and convincing evidence that it would have taken these disciplinary actions absent the protected disclosures.

*Id*. at 1305-06. The *Greenspan* Court pointed out that Dr. Greenspan was not initially charged with "disrespect," and noted that "the Board cannot change the agency's grounds from those Noticed by the agency at the time of discipline." *Id*. at 1304.

In light of *Greenspan*, the VA's attempt to carry its burden of proof was doomed from the start. While the VA contended that Dr. Biswas was terminated because of her "conduct," the VA failed to include any of that conduct in her actual termination letter. (Appx528-530) Having failed to provide required notice of Dr. Biswas' right to appeal a conduct-based termination, the VA cannot rely on that conduct to support its decision to terminate her. *See*, *e.g.*, *King*, 43 F.3d at 666; *Greenspan*, 464 F.3d at 1305; *Hawkins v. Smithsonian Institution*, 73 M.S.P.R. 397, 401 (1997).

The administrative judge erroneously distinguished these cases on the ground that they all dealt with *permanent* employees, not *temporary* employees like Dr. Biswas. (Appx22). However, the cases themselves make no such distinction between *permanent* and *temporary* employees, and the administrative judge cites no authority

for the proposition that an agency can terminate a *temporary* employee for grounds not stated in a termination letter.[17]

The administrative judge also made this finding despite testimony from Dr. Holt that the termination letter was the "critical" document to reference for the grounds of termination. (Tr., 515:12-24, Appx224). Dr. Biswas' termination letter stated no grounds for termination, and further provided that *if* the termination were conduct-related, Dr. Biswas would receive a "separate notice" regarding her appeal rights. (Appx528-530) Dr. Biswas testified that she never received any "separate notice"; nor was any such notice produced in this case. (Tr., at 92:20-94:2, Appx114-115).

In sum, the VA's stated position – that Dr. Biswas was terminated for her conduct as opposed to her protected disclosures – cannot be reconciled with her actual termination letter. (Appx528-530) The administrative judge erroneously applied case law that precludes the VA from justifying its termination based on "conduct" that is not included in a termination letter. Setting aside these errors, the administrative judge's reasoning actually proves Dr. Biswas' point: the VA retaliated by reclassifying her as a temporary employee to make it easier to fire her.

---

[17] In *Hawkins*, the appellant was only identified as a "GS-12 Contract Specialist," with no indication whether the appellant served in that role on a temporary or permanent basis. *See Hawkins*, 73 M.S.P.R. at 399; *see also King*, 43 F.3d at 664 (identifying appellant only as an "employee").

**2. Dr. Biswas was similarly situated to permanent employees who were not terminated for the same "conduct."**

The administrative judge cited Dr. Biswas' refusal to accept patient assignments as an example of the conduct that justified termination even though Dr. Biswas never actually refused a patient assignment. (Appx23-24). Worse, Dr. Biswas adduced evidence that non-whistleblowers who *did* refuse to see assigned patients were treated more favorably. (Tr., 409:17-410:12, Appx194); (Appx1113-1116). To avoid finding that Dr. Biswas was in fact treated differently than non-whistleblowers, the administrative judge reasoned that "unlike the appellant, those physicians were permanent employees. . . . I do not find that they are similarly situated to the appellant." (Appx24).

This was error on several grounds. As argued above, it is the Agency's burden to prove by clear and convincing evidence that they would have taken the same action notwithstanding the protected disclosures. Thus, it is the Agency's burden to demonstrate comparators, as this Court opined in *Smith v. Gen. Servs. Admin, supra*.

This is also not a correct way to look at similarly situated employees regardless. "For other employees to be deemed similarly situated, the Board has held that all relevant aspects of the appellant's employment situation must be 'nearly identical' to those of comparative employees." *Spahn v. Dep't of Justice*, 93 M.S.P.R. 195, 202 (2003). As quoted in *Spahn*, the EEOC "has stated the matter in the following way: 'To be similarly situated, comparative employees must have

reported to the same supervisor, been subjected to the same standards governing discipline, and engaged in conduct similar to complainant's without differentiating or mitigating circumstances.'" *Id*. (quotation omitted); *see also Whitmore*, 680 F.3d at 1373 ("*Carr*, however, requires the comparison employees to be 'similarly situated'—not identically situated—to the whistleblower.").

Here, as hospitalists in the same VA, Dr. Biswas and the permanent employee hospitalists were all supervised by the same Chief Hospitalist. Regardless of whether the hospitalists were temporary or permanent employees, they were subjected to the same standards governing discipline. As for "differentiating or mitigating circumstances," the hospitalists who were *not* terminated behaved *worse*. They actually refused to see patients, yet they were only reprimanded. The administrative judge cited no authority for the proposition that VA hospitalists on temporary appointments are somehow not similarly situated to hospitalists who are permanent employees, and Ms. Rogers was unable to identify any statute or regulation that justified treating Dr. Biswas any differently from those permanent hospitalists who refused to see patients. Nor did the VA adduce any evidence of non-whistleblowing physicians being terminated for similar conduct. For all these reasons, the administrative judge erred in finding that Dr. Biswas was not similarly situated to permanent employee hospitalists.

**3. The administrative judge erroneously applied case law describing the severity of misconduct required to justify termination.**

Cases in which *conduct* rather than *content* actually justified the discipline demonstrate that the conduct must be egregious indeed to remove whistleblower protection. *See*, *e.g., Durr v. Dept. of Veterans Affairs*, 104 M.S.P.R. 509, 512 (2007) ("The fact that the appellant was blunt or intemperate, standing alone, does not bring this disclosure outside the protection of 5 U.S.C. § 2302(b)(8)."); *see also Greenspan*, 464 F.3d at 1305-06. In this case, the administrative judge and the Board erroneously applied cases in which egregious conduct removed whistleblower protection in order to find for the VA just as in *Greenspan*.

In *Church v. Dept. of Army*, the appellant did little work, and spent nearly all of his time complaining. 6 M.S.P.R. 737, 739 (1981) (finding that the appellant's behavior was "grossly insubordinate and provocative"). Here, Dr. Biswas was an "Outstanding" employee. While she was charged with "insubordination" for making protected disclosures outside the chain of command, Ms. Rogers conceded Dr. Biswas was *not* bound by any instructions from superiors not to make such disclosures. The VA further conceded that Dr. Biswas' complaints did not disrupt patient care, and it is undisputed that she saw all the patients assigned to her. On this record, Dr. Biswas' conduct can hardly be characterized as "highly insubordinate or provocative," as was the case in *Church*. *See id*. Indeed, even the

administrative judge made no finding that Dr. Biswas was "grossly insubordinate" or "provocative" in the Initial Decision. *See* (Appx23).

The administrative judge also relied on *Oliver v. Dep't of Health and Human Servs.*, a case decided twelve years before *Carr*. 34 M.S.P.R. 465 (1987). The Board in *Oliver* (obviously) did not apply the *Carr* factors; nor did *Oliver* apply the clear and convincing evidentiary standard applicable to WPA cases. *See id*. at *12 ("What is required is a weighing of the motive to retaliate against the gravity of the misconduct charged."). Even so, the Board in *Oliver* noted the Board's previous holdings that "while simply rude or impertinent conduct in the course of presenting a grievance provides no basis for discipline, gross insubordination or threats of physical harm do." *Oliver*, 34 M.S.P.R. at 17. Again, the administrative judge made no finding that Dr. Biswas was "grossly insubordinate," and the "unprofessional" behavior he cited is precisely the kind of "rude or impertinent conduct" that even the *Oliver* Board recognized would not support a termination. *See id*.

The administrative judge next relied on *McCarthy v. Int'l Boundary and Water Comm: U.S. and Mexico.* 116 M.S.P.R. 594 (2011) (citing *LaChance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)); (Appx23). In *McCarthy*, the appellant's termination letter provided that he was "unfit" for continued employment. *Id*. at *598. Finding the agency had carried its burden of proof, the Board in *McCarthy* relied on agency testimony that the appellant's protected disclosures did not "cause

the deterioration" of the appellant's relationship with his employer. *Id*. at 601. Here, Dr. Biswas' disclosures *did* cause the deterioration: the "conduct" cited by the VA in support of its termination decision consists entirely of the disclosures themselves and conduct that supposedly occurred after or in connection with those disclosures. (Appx1251) Moreover, the agency in *McCarthy* justified the termination on the grounds that the appellant—an attorney—was terminated for circulating incorrect legal advice in contentious memoranda. *McCarthy*, 116 M.S.P.R. at 620. Here, the VA adduced no evidence that Dr. Biswas was a bad doctor. *See* (Appx269-271) Further still, the agency in *McCarthy* drafted the appellant's termination letter ten days prior to being notified of the appellant's protected disclosures. *Id*. at 622. Here, the VA drafted Dr. Biswas' termination letter *after* the protected disclosures, and only handed it to her after reclassifying her as a temporary employee to facilitate the termination.

To support his decision, the administrative judge erroneously relied on all of these cases, and ignored guiding authority set forth in cases that track the facts at issue in this appeal. *See*, *e.g.*, *Whitmore*; *Greenspan*.

#### 4. Making protected disclosures "outside the chain of command" is not "insubordination."

The WPA does not permit an agency to discipline an employee for disclosing protected information merely because that information has been reported outside the chain of command. *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1351 (Fed.

Cir. 2001). Despite this clear authority, the administrative judge found that Dr. Biswas made protected disclosures outside the chain of command that were "disruptive to the work environment" and thus grounds for the VA's decision to terminate Dr. Biswas. (Appx20).[18] Even assuming Dr. Biswas *had* made disclosures outside the chain of command, that conduct would not support a finding of "insubordination" that justified her termination. *Huffman*, 263 F.3d at 1351. The administrative judge's failure to correctly apply the law on this issue was error.

## CONCLUSION

The record demonstrates the Agency did not meet its burden to show by clear and convincing evidence it would have taken the same personnel actions in the absence of Biswas's disclosures, and the Board erred in not considering or analyzing whether the Agency met this heavy burden.

As such, Biswas respectfully requests this Court reverse and vacate the Board's Final Order, and find that she engaged in protected activity when she complained about the selection of non-citizens over U.S. Citizens; find that Biswas was subject to covered personnel actions when the Agency first rescinded her permanent status and second terminated her; find that Biswas's protected disclosures were a contributing factor in the adverse actions taken against her; find the Agency

[18] Again, Dr. Biswas never actually made disclosures outside the chain of command. She simply continued to report higher up the chain when her earlier disclosures were ignored. (*See* Tr., 66:18-68:6, 69:22-70:16, Appx108-109).

failed to prove by clear and convincing evidence it would have taken the same actions in the absence of Biswas's protected whistleblowing; and remand this matter to the Board for judgment in Biswas's favor and all appropriate remedies, including compensatory damages for the emotional distress and reputational harm caused by the Agency, and her attorney's fees. In the alternative, Biswas respectfully requests that the Court vacate the Board's Final Decision and remand for reconsideration of the Agency's chosen penalty of termination.

Respectfully submitted,

/s/ Sterling L. Deramus
STERLING L. DERAMUS
2229 First Avenue North
Birmingham, Alabama 35203
(205) 504-0189 (Tel)
(205) 449-7392 (Fax)
Email: sderamus@deramuslaw.com

*Counsel for Petitioner*

# CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief contains [11,390] words.

[ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Office Professional Plus 2016 in 14-pointTimes New Roman; *or*

[ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

/s/ Sterling L. Deramus
STERLING L. DERAMUS
2229 First Avenue North
Birmingham, Alabama 35203
(205) 504-0189 (Tel)
(205) 449-7392 (Fax)
Email: sderamus@deramuslaw.com

*Counsel for Petitioner*

# ADDENDUM

**23-1552**

## ADDENDUM INDEX


| Filing Date | Description | Page No. |
|---|---|---|
| 10/20/2016 | Initial Decision | Appx1 |
| 01/04/2023 | Final Order | Appx30 |

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**DALLAS REGIONAL OFFICE**

| | |
|---|---|
| NEENA BISWAS,<br>Appellant,<br><br>v.<br><br>DEPARTMENT OF VETERANS AFFAIRS,<br>Agency. | DOCKET NUMBER<br>DA-1221-15-0471-W-2<br><br><br><br>DATE: October 20, 2016 |

Todd J. Harlow, Esquire, Dallas, Texas, and Sterling L. DeRamus, Esquire, Birmingham, Alabama, for the appellant.

Jeffrey T. Reeder, Esquire, Dallas, Texas, for the agency.

**BEFORE**
U. Sidney Cornelius, Jr.
Administrative Judge

## INITIAL DECISION

## INTRODUCTION

On July 2, 2015, the appellant filed an individual right of action (IRA) appeal, contending that the Department of Veterans Affairs retaliated against her for engaging in protected whistleblowing. Initial Appeal File, Docket No. DA-1221-15-0471-W-1 (IAF1), Tab 2. Her appeal was dismissed without prejudice on February 26, 2016. *Id.*, Tab 15. The appellant re-filed her appeal on March 25, 2016. Initial Appeal File, Docket No. DA-1221-15-0471-W-2 (IAF2), Tab 1. The Board has jurisdiction to review the appellant's allegations of reprisal. *See* 5 U.S.C. § 1221(a); 5 C.F.R. § 1209.2(b)(1) (2016); *see Rusin v.*

*Department of the Treasury*, 92 M.S.P.R. 298, 304 (2002). A hearing was held on May 4 and 5, 2016. IAF2, Tab 12.

Based on the following analysis and findings, the appellant's request for corrective action is DENIED.

## ANALYSIS AND FINDINGS

Background

Effective August 1, 2010, the appellant was hired as a Title 38 Physician in the Extended Care Unit at the agency's Dallas, Texas facility under an excepted appointment, not to exceed July 30, 2012. *See* IAF2, Tab 5 at 39-40. She transferred to the Hospitalist Section in the same facility in January 2012. IAF2, Tab 12 (Hearing CD) at 17 (testimony of appellant). On April 25, 2015, the agency converted the appellant's appointment from a "not to exceed" or "NTE" appointment to a permanent excepted appointment, effective retroactively to the date of her transfer to the Hospitalist Section, January 15, 2012. IAF2, Tab 10, Exhibit 55, Exhibit 90.

At the time of the appellant's transfer, Dr. Ignatius Oyula was the Chief of the Hospitalist Section, serving under a three-year appointment that would expire in 2012. *Id.* at 370 (testimony of Barbara Rogers). The agency advertised the Hospitalist Section Chief position in or around April 2012, and the appellant applied for the appointment. *See* IAF2, Tab 6, Exhibit A; IAF2, Tab 10, Exhibit 50. On May 8, 2012, Dr. Daniel Goodenberger, Chief of the Medical Service, sent the appellant an e-mail stating that she had not been selected for the Hospitalist Section Chief position (*see* IAF2, Tab 9, Exhibit 4), and the appellant was formally notified of her non-selection by letter dated August 17, 2012. IAF2, Tab 6, Exhibit C. Dr. Oyula was re-appointed to the Hospitalist Section Chief position. IAF2, Tab 10, Exhibit 65.

On September 4, 2012, the agency converted the appellant's status back to a temporary appointment, with a not to exceed date of February 14, 2013. IAF2,

Tab 5 at 36. The appellant was then terminated from her position at the agency effective September 25, 2012. IAF1, Tab 9 at 5-6.

The appellant filed a complaint with the Office of Special Counsel (OSC) alleging that the agency retaliated against her because she had made a protected disclosure. IAF1, Tab 2. By letter dated April 21, 2015, OSC notified the appellant that it concluded its inquiry into her allegations. *Id.* This appeal followed.

I conducted status and prehearing conferences on April 12 and 26, 2016, wherein I defined the issues for hearing and set forth applicable law and burden of proof requirements. IAF2, Tab 8. The following issues were identified: (A) whether the appellant made any disclosure protected by the Whistleblower Protection Act when, in May 2012, she reported that Dr. Ignatius Oyula, a non-U.S. citizen, was selected for re-appointment to the position of Hospitalist Section Chief in violation of Federal personnel laws requiring priority hiring for U.S. citizens; (B) whether the appellant's whistleblowing activity was a contributing factor in: (1) the agency's decision to return the appellant's status back from permanent employee to the status of temporary employee; and (2) the agency's decision on September 25, 2012, to remove the appellant from her temporary employment as a Physician at the Dallas Veterans Affairs Medical Center; and (C) whether the agency would have taken the above two actions, even absent the disclosure. *Id.* Neither party objected to or sought to clarify those issues. Hearing Transcript at 2.

<u>The Board has jurisdiction over the appeal.</u>

The appellant bears the burden of proof on the issue of jurisdiction. 5 C.F.R. § 1201.56(b)(2)(i)(A) (2016). In order to establish Board jurisdiction

over an IRA appeal,[1] the appellant must raise non-frivolous allegations that: (1) she engaged in whistleblowing activity by making a protected disclosure under 5 U.S.C. § 2302(b)(8), *i.e.*, that she disclosed information that she reasonably believed evidenced a violation of law, rule, or regulation, gross mismanagement, a gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety, or that she engaged in "protected activity," as defined in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), (D)[2]; and (2) the appellant's disclosure or activity was a contributing factor in the agency's decision to take a personnel action as defined by 5 U.S.C. § 2302(a)(2). *Yunus v. Department of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed. Cir. 2001); *Reed v. Department of Veterans Affairs*, 122 M.S.P.R. 165, ¶ 12 (2015), *vacated on other*

---

[1] An "employee" as defined at 5 U.S.C. § 7511(a) may appeal an adverse action, such as a removal, to the Board. *See* 5 U.S.C. § 7513. Specifically excluded from the definition of an "employee" eligible to file such an appeal is an individual "who holds a position within the Veterans Health Administration which has been excluded from the competitive service by or under a provision of Title 38, unless such employee was appointed to such position under section 7401(3) of such title." 5 U.S.C. § 7511(b)(10). The appellant was appointed under 38 U.S.C. § 7405(a)(1), and as such is excluded from definition of an "employee" eligible to appeal an adverse action. Accordingly, this appeal is limited to a determination of whether the alleged personnel actions were taken in reprisal for whistleblowing or protected activity covered by 5 U.S.C. § 2302(b)(8) or 5 U.S.C. § 2302(b)(9).

[2] Pursuant to the Whistleblower Protection Enhancement Act of 2012 (WPEA), Pub.L. No. 112-19, 126 Stat. 1465, which became effective on December 27, 2012, Congress expanded the grounds on which an appellant may file an IRA appeal with the Board. *See Hooker v. Department of Veterans Affairs*, 120 M.S.P.R. 629, ¶ 9 (2014); WPEA § 101(b)(1)(A). Prior to the enactment of the WPEA, an appellant could file an IRA appeal with the Board only based on allegations of whistleblower reprisal under 5 U.S.C. § 2302(b)(8). *See Wooten v. Department of Health & Human Services*, 54 M.S.P.R. 143, 146 (1992), *superseded by statute as stated in Carney v. Department of Veterans Affairs*, 121 M.S.P.R. 446, ¶ 5 (2014). Following the WPEA's enactment, an appellant also may file an IRA appeal with the Board concerning alleged reprisal based on certain other classes of protected activity as defined in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), and (D). 5 U.S.C. § 1221(a); *Hooker*, 120 M.S.P.R. 629, ¶ 9. The disclosures and personnel actions at issue here preceded the effective date of the WPEA, and the appellant has not alleged that she engaged in any protected activities as defined in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), and (D).

*grounds*, 611 Fed.Appx. 719 (Fed. Cir. June 23, 2015); *Rusin*, 92 M.S.P.R. at 304. The question of whether the appellant has made a nonfrivolous allegation is determined based on the written record, without holding a jurisdictional hearing. *See Spencer v. Department of the Navy*, 327 F.3d 1354, 1356 (Fed. Cir. 2003); *Iyer v. Department of the Treasury*, 95 M.S.P.R. 239, ¶ 4 (2003), *aff'd*, 104 F. App'x. 159 (Fed. Cir. 2004).

In addition, the appellant must also demonstrate that she raised the whistleblowing activity before OSC, and proceedings before OSC have been exhausted. 5 U.S.C. § 1214(a)(3); 5 C.F.R. § 1209(b)(1); 5 C.F.R. § 1201.57(c)(2) (2016). The Board may only review those disclosures and personnel actions that were raised before the OSC. *Ellison v. Merit Systems Protection Board*, 7 F.3d 1031, 1037 (Fed. Cir. 1993); *Lewis v. Department of the Army*, 58 M.S.P.R. 325, 332 (1993).

The record reflects that the appellant filed a complaint with OSC in which she alleged that the agency removed her from her Physician position because she reported in May 2012 that Dr. Oyula, a non-U.S. citizen, was selected for re-appointment to Hospitalist Section Chief in violation of Federal personnel laws requiring priority hiring of U.S. citizens. IAF1, Tab 2. On April 21, 2015, OSC informed the appellant that it was closing its inquiry into her complaint. *Id.* OSC's letter to the appellant also addressed her claim that the decision to change her status from permanent back to temporary was retaliatory. *Id.* Accordingly, I find that the appellant has shown that she first sought corrective action from OSC regarding both personnel actions at issue here, and she exhausted OSC's procedures before seeking relief from the Board.

Furthermore, after reviewing the appellant's submissions, I find that she has made a non-frivolous allegation that the disclosures she reported in her OSC complaint were whistleblowing activity that a reasonable person in her position could have believed evidenced one of the situations specified in 5 U.S.C. § 2302(b)(8). I also find that the appellant has made a non-frivolous allegation

that the whistleblowing activity was a contributing factor in her termination and the change to her status by satisfying the knowledge-timing test. That is, the appellant non-frivolously alleged that Goodenberger and agency Human Resources personnel had knowledge of the protected activity, were involved in the personnel actions, and that the actions took place within a relatively short period after the whistleblowing activity. IAF1, Tab 2.

Based on the above, I find that the Board has jurisdiction over the appellant's claim that her status was changed and she was terminated in retaliation for protected whistleblowing activity.

The appellant proved that she made a protected disclosure.

Though jurisdiction may be established by nonfrivolous allegations, corrective action may be ordered only if the appellant proves by preponderant evidence[3] that she made protected disclosures and that the disclosures were a contributing factor in the personnel actions taken against her. 5 U.S.C. § 1221(e)(1); *Spencer*, 327 F.3d at 1356-57. The appellant's asserted disclosures will be analyzed to determine whether she disclosed a violation of law, rule or regulation, gross mismanagement, abuse of authority, and/or a substantial and specific danger to public health or safety as the appellant claimed.[4]

In order to show that the appellant made a protected disclosure, the test is whether the appellant had a "reasonable belief that [her] disclosure evidenced a violation of law, rule, or regulation" or one of the other conditions set out in 5 U.S.C. § 2302. *See Tuten v. Department of Justice*, 104 M.S.P.R. 271, 276 (2006). To determine whether an appellant had a reasonable belief that her

[3] A preponderance of the evidence is that degree of relevant evidence that a reasonable person, considering the record as a whole, would accept as sufficient to find that a contested fact is more likely to be true than untrue. 5 C.F.R. § 1201.4(q) (2016).

[4] Again, the appellant has not alleged, and no evidence was presented to show, that she engaged in protected activity as defined in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), and (D).

disclosure evidenced a violation of law, rule, or regulation, the test is whether a disinterested observer with knowledge of the essential facts known and readily ascertainable by the employee could reasonably conclude that the actions evidence a violation of law, rule, or regulation. *Id.*; *see also* 5 U.S.C. § 2302(b)(8).

The record shows that the appellant first questioned why she had not been hired for the Hospitalist Section Chief position on May 10, 2012. On that date, she sent an e-mail to Human Resources Specialist Daniel Harper, stating that Goodenberger told her that she had not been selected for the Hospitalist Section Chief position, yet she had not been interviewed, her references had not been called, and she was not provided a reason for her non-selection. IAF2, Tab 9, Exhibit 4. She informed Harper that she sought to be treated "equitably" to other candidates and asked for a review of her application following "rightful protocol." *Id.* The appellant sent another e-mail to Harper on May 21, 2012, describing a meeting she had with Goodenberger. IAF2, Tab 9, Exhibit 5. Among other things, the appellant reported, "[Goodenberger] openly is violating the basic principles in the hiring process in a Federal workplace. … I have the basic and many more requirements, including being a US citizen and permanent employee…." *Id.*

On July 7, 2012, the appellant sent a more pointed e-mail to Harper and Human Resources Management Services Chief Barbara Rogers, copying Chief of Staff Dr. Clark Gregg, Director Jeffery Milligan, and Deputy Chief of Staff Dr. Stephen Holt.[5] *See* IAF2, Tab 6 at 46-47. In that e-mail, she characterized the recruitment process for hospitalist positions as a "sham" intended to "cheat

---

[5] As discussed above, the appellant provided evidence that she exhausted her administrative remedies with regard to her May 2012 disclosures. *See* IAF1, Tab 2. Because the appellant's later communications provide context for those disclosures, I have discussed them here. I find, however, that the appellant's May 2012 disclosures were sufficiently detailed to constitute protected disclosures.

deserving US citizen candidates for employment in a Federal institution." *Id.* She explained her belief that there were qualified candidates for the positions and, therefore, the agency had no basis for renewing the temporary appointments of non-citizen physicians. *Id.*

On August 5, 2012, the appellant sent an e-mail to Goodenberger, copying Holt and Gregg, with the subject line "Section Chief position." IAF2, Tab 6 at 77. She wrote, "Dr. Oyula with an NTE status, being a non-citizen cannot be re-appointed according to Federal regulations, if there is an appropriately qualified citizen candidate willing to accept the job." *Id.* Goodenberger responded that the appellant should direct her concerns to Human Resources.

On August 7, 2012, the appellant sent an e-mail to Oyula and Goodenberger, copying, among others, General Eric Shinseki, who was then the Secretary of Veterans Affairs. IAF2, Tab 11, Exhibit 142. The appellant again objected to the hiring process for open hospitalist positions, including the Hospitalist Section Chief position, referenced the "Strong Federal policy on job priority to citizens," and asserted that the Dallas facility was "openly in violation of basic principles of a federal job." *Id.* (grammar and punctuation as in original).

By e-mail dated September 2, 2012, the appellant asked Human Resources Supervisor Wanda Jackson for an explanation of her non-selection for the Hospitalist Section Chief position, stated that she was a qualified citizen candidate, and asked who had been appointed. IAF2, Tab 10, Exhibit 65. Jackson responded that Dr. Oyula was selected and that "Per human resources guidelines, the selection met all requirements that was needed in order to hire a non citizen." *Id.* (grammar and punctuation as in original). Jackson then cited to 38 U.S.C. § 7407, which provides that appointments under sections 7405 and 7406 of Title 38 may be made without regard to the citizenship requirements of section 7402(c) when the Under Secretary for Health determines that it is not possible to recruit qualified citizens for the necessary services. *Id.* The appellant

responded to Jackson on September 6 and again on September 10, 2012, seeking an explanation for her non-selection, stating that she was a qualified citizen candidate for the position, and asserting her belief that the selection of Dr. Oyula "violates all guidelines." IAF2, Tab 10, Exhibit 65.

I find that the appellant had a reasonable belief that her May 2012 disclosures regarding the agency's selection process for the Hospitalist Section Chief position evidenced a violation of law, rule, or regulation. Consistent with 38 U.S.C. § 7402(c), the agency Handbook provides that, to be eligible for appointment in the Veterans Health Administration (VHA), "an applicant must be a citizen of the United States (U.S.), except as provided in 38 U.S.C. 7407(a) …." IAF2, Tab 11, Exhibit 147. Pursuant to 38 U.S.C. § 7407(a), necessary personnel may be appointed on a temporary basis under authority of 38 U.S.C. § 7405 without regard to the citizenship requirements of 38 U.S.C. § 7402(c) when the Under Secretary for Health determines that it is not possible to recruit qualified citizens.

The appellant testified that she is a United States citizen, and the parties stipulated that she was minimally qualified for the Hospitalist Section Chief position. Hearing Transcript at 15, 18. The appellant testified that, to her knowledge, the Under Secretary for Health had not made any determination that it was not possible to recruit qualified citizens for the Hospitalist Section Chief position. *Id.* at 80. Nonetheless, it is undisputed that the agency extended the temporary appointment of Oyula, who is not a United States citizen, for the position. Based on these facts known to the appellant, I find that a disinterested observer could reasonably conclude that the agency's actions violated the regulations pertaining to appointments in the VHA. Therefore, I find that the appellant satisfied her burden to show her May 2012 disclosures regarding the hiring process for the Hospitalist Section Chief position were protected.

<u>The appellant proved by preponderant evidence that her disclosure was a contributing factor in the identified personnel actions.</u>

To prevail on a claim under the WPA/WPEA, an appellant must prove by preponderant evidence that her protected disclosure was a contributing factor in a personnel action. *Wadhwa v. Department of Veterans Affairs*, 110 M.S.P.R. 615, ¶ 12, *aff'd*, 353 Fed. Appx. 435 (Fed. Cir. 2009). The most common way of proving the contributing factor element is the "knowledge/timing" test. *Id.* Under that test, an appellant can prove the contributing factor element through evidence that the official taking the personnel action knew of the whistleblowing disclosure and took the personnel action within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action. *Id.* If the appellant fails to satisfy the knowledge/timing test, the Board shall consider other evidence, such as that pertaining to the strength or weakness of the agency's reasons for taking the personnel action, whether the whistleblowing was personally directed at the proposing or deciding officials, and whether those officials had a desire or motive to retaliate against the appellant. *Stiles v. Department of Homeland Security*, 116 M.S.P.R. 263, ¶ 24 (2011).

I found that the appellant's May 2012 disclosures regarding her belief that the agency failed to comply with applicable Federal hiring procedures, are protected. The record reflects that the appellant directed those disclosures to, among others, Chief of the Medical Service Goodenberger and Human Resources Management Services Chief Rogers. *See, e.g.*, IAF2, Tab 9, Exhibit 4; IAF2, Tab 6 at 46-47. Following the appellant's disclosures, the agency converted the appellant's status from a permanent to a temporary appointment on September 4, 2012, and terminated her from her position at the agency effective September 25, 2012. Rogers was the approving official for the conversion of the appellant's status (IAF2, Tab 10, Exhibit 90), and Goodenberger was the deciding official regarding the appellant's termination. Hearing Transcript at 293-94 (testimony of

Rogers). I find that the appellant has satisfied the knowledge/timing test and shown that her whistleblowing disclosures were a contributing factor in the identified personnel actions. *See Schnell v. Department of the Army*, 114 M.S.P.R. 83, ¶ 22 (2010) (a personnel action taken within approximately one to two years of the appellant's disclosures satisfies the knowledge/timing test).

The agency showed by clear and convincing evidence that it would have converted the appellant to a temporary appointment notwithstanding her disclosures.

Where, as here, an appellant shows by preponderant evidence that she made protected disclosures and that those disclosures were a contributing factor in the decision to take a personnel action, the Board will order corrective action unless the agency shows by clear and convincing evidence that it would have taken the personnel action in the absence of the whistleblowing. In determining whether an agency has shown by clear and convincing evidence that it would have taken the same personnel action in the absence of whistleblowing, the Board generally considers the agency's evidence in support of its action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Chavez v. Department of Veterans Affairs*, 120 M.S.P.R. 285, ¶ 28 (2013), citing *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). The personnel actions identified by the appellant as taken in retaliation for her protected disclosures were the agency's decision to return her status back from permanent employee to temporary employee and the agency's decision on September 25, 2012, to remove the appellant from her temporary employment as a Physician at the Dallas Veterans Affairs Medical Center.

The agency contends that the April 2012 change in the appellant's status from temporary to permanent was made in error. Human Resources Management

Services Chief Rogers testified that in order to convert a physician's appointment from temporary to permanent, the service chief (here, Goodenberger) must request the conversion and the Professional Standards Board must review the conversion. Hearing Transcript at 359. Rogers recounted that in July 2012, Goodenberger and Administrative Officer Ruth C. Kirkland approached her about removing the appellant from her appointment due to conduct issues. *Id.* at 360. She said that she reviewed the appellant's personnel file and saw that the appellant had been converted to a permanent appointment. *Id.* When she reported that information to Goodenberger and Kirkland, Goodenberger told her that he had not recommended the conversion and a Professional Standards Board had not been held. *Id.* Rogers said that she confirmed that those records were not in the appellant's personnel file and, therefore, the conversion had not been legally made. *Id.* at 360-61. Rogers said that the appellant's status was then corrected back to a temporary appointment. *Id.* at 361.

The appellant presented some evidence of a motive to retaliate on the part of the agency officials who were involved in the decision to convert her status to a temporary appointment. The appellant's disclosures of purported regulatory violations in the hiring process for the Hospitalist Section Chief position implicated the Human Resources department, which Rogers supervised. In addition, the appellant directly accused Goodenberger, who provided input to Rogers regarding the conversion, of violating Federal hiring principles. *See* IAF2, Tab 9, Exhibit 5. However, I found Rogers and Goodenberger to be credible in denying any retaliatory motive. *See Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987). Rogers testified without hesitation and in a straightforward and clear manner regarding the correct process for converting the status of employees, and how the initial conversion of the appellant to a permanent appointment was contrary to that process and, therefore, illegally made. I carefully observed Rogers and Goodenberger at hearing. Neither appeared to be emotionally upset by the appellant or resentful because of her

accusations. Rogers and Goodenberger answered questions calmly, and did not express or indicate retaliatory animus against the appellant based on her protected disclosures.

At hearing, evidence was presented that the agency took similar actions to convert similarly situated physicians who were not whistleblowers to temporary appointments. Rogers testified that Human Resources Specialist Harper incorrectly converted five other physicians from temporary to permanent positions at the same time he incorrectly converted the appellant's status. Hearing Transcript at 312-13, 361. She said that all six, including the appellant, were then retroactively converted back to temporary appointments.[6] *Id.* at 314, 364. Rogers testified that she is unaware of any whistleblowing activity by the other physicians. *Id.* at 364. Further, the record reflects that Harper received a written admonishment for negligent workmanship due to his failure in April 2012 to follow the proper procedure and ensure than the physicians were reviewed by a Professional Standards Board, as required for a conversion. IAF2, Tab 6, Exhibit E.

Based on the *Carr* factors and the record as a whole, I find that the agency presented clear and convincing evidence that it would have converted the appellant's status to a temporary appointment absent the appellant's protected disclosures. The agency presented very strong evidence that its initial conversion of the appellant's status to a permanent appointment was erroneous and that its conversion of her status back to a temporary appointment in September 2012 was made to correct that error. The agency took similar actions with regard to the

---

[6] Rogers testified that, after the appointments of the other five physicians were converted to temporary status, the agency followed the correct process to place them in permanent appointments. Hearing Transcript at 314. While the ultimate outcomes for these physicians differed from that of the appellant, who was terminated, I do not find that this undercuts the fact that the agency treated them similarly with regard to the correction of their status in September 2012.

status of other physicians whose status had also been erroneously changed, and the appellant presented no evidence in support of her claim that the agency converted the status of the other doctors back to temporary appointments solely for the purpose of retaliating against her. Hearing Transcript at 227. Consequently, the appellant's request for corrective action regarding the conversion must be denied.

The agency showed by clear and convincing evidence that it would have terminated the appellant's appointment notwithstanding her disclosures.

The agency contends that the appellant was removed from her employment in September 2012 due to her conduct. Goodenberger, who was then the Chief of the Medical Service at the Dallas facility, testified that he first developed concerns about the appellant's conduct prior to her protected disclosures. He recounted that in March 2012, approximately two months after the appellant transferred to the Hospitalist section and before she applied for the Hospitalist Section Chief position, the appellant complained to him about having to work nights. Hearing Transcript at 545. He said that the appellant came to him again in April 2012 and "insisted" that the schedule be changed so that she would not be assigned night shifts. *Id.* at 548. Goodenberger described the appellant's demeanor during that meeting as aggressive and said that he had to direct her to leave his office several times. *Id.* He testified that interpersonal skills were very important for the Hospitalist Section Chief position, and based on her behavior during those meetings he did not consider her to be an appropriate candidate for that appointment. *Id.* at 566, 551.

Goodenberger testified that he met with the appellant on May 21, 2012 to explain the reasons for her non-selection, including that her behavior was not suitable for a leadership position. Hearing Transcript at 561, 565. He said that the discussion became heated, and the appellant raised her voice and became visibly angry. *Id.* at 562. He stated that she refused to leave the room after he

told her the meeting was over, and she left only when he began to call the police. *Id.* at 563-64.

Goodenberger testified that after the appellant was not selected for the Hospitalist Section Chief position, she engaged in conduct that was insubordinate and disruptive to the service, and that created a hostile environment for her coworkers; he testified that this conduct led to the appellant's termination. *See, e.g.*, Hearing Transcript at 573-75, 595-96; IAF2, Tab 10, Exhibit 105; IAF2, Tab 6 at 86. Goodenberger stated that the appellant's conduct on July 21, 2012, was one factor in the decision to terminate her appointment. Hearing Transcript at 582-83; IAF2, Tab 6 at 86. Deputy Chief of Staff Holt testified that he received a phone call from Oyula on the morning of July 21, 2012, during which Oyula reported that the appellant was refusing to accept assigned patients. Hearing Transcript at 449-50. Holt recounted that he directed Oyula to get the appellant and call him using a conference phone. *Id.* at 450-51. Holt explained that the appellant told him that she believed the distribution of patients among hospitalists was not fair and she refused to see patients until Oyula told her the names of the patients he had treated. *Id.* at 451-53. He asked her whether the assignments were causing a patient safety issue, and she confirmed they were not. *Id.* at 451-52. Holt testified that he then told the appellant that Oyula, as a supervisor, had the authority to assign work, and he directed the appellant to see her assigned patients. *Id.* at 452. Holt said that the appellant's conduct during the phone call was "highly inappropriate" and argumentative, and that the situation was disruptive to patient care. *Id.* at 453, 456, and 457.

Following the July 21, 2012 incident, the appellant sent an e-mail to Holt, copying Goodenberger and Chief of Staff Gregg. IAF2, Tab 6 at 60-61. In that e-mail, she accused Oyula of engaging in threatening and unprofessional behavior, including pointing his finger very close to her face prior to their call to Holt. *Id.* Goodenberger testified that two students witnessed the interaction between the appellant and Oyula, and they did not corroborate her version of

events. Hearing Transcript at 627-68. Goodenberger testified that he considered the incident on July 21, 2012, including the appellant's subsequent accusation against Oyula, to be part of a pattern of disruptive behavior that culminated in the appellant's termination.[7] *Id.* at 624, 628.

Goodenberger also referenced an August 10, 2012 e-mail from the appellant to Oyula, Goodenberger, and others, objecting to the scheduling of hospitalists. Hearing Transcript at 592-94. The appellant wrote that another hospitalist was receiving preferential schedules, and the appellant was scheduled to work alone for night shifts. IAF2, Tab 6 at 85-86. She stated, "Let me know who is the 2nd person, as this is an uncertain and outrageous schedule now being enforced to harass me. If I am not informed who the 2nd person is, I will be doing day shifts and taking the appropriate number of off days to compensate for the hours worked as what is happening is not fair." *Id.* (punctuation and grammar as in original). Goodenberger testified that he understood the appellant to be threatening not to come to work as scheduled. Hearing Transcript at 593. The appellant denied at hearing that she was threatening to take unscheduled days off but she did not offer an alternative explanation for her statement in the e-mail. *Id.* at 215-16.

Goodenberger testified that the appellant sent e-mails about colleagues, including Oyula, that he considered inflammatory and defamatory. Among others, he cited a July 10, 2012 email that the appellant sent to all Dallas facility hospitalists, in which the appellant accused Oyula of moonlighting and claiming

[7] The appellant testified extensively as to the basis for her belief in the truthfulness of her disclosures and her other accusations against Oyula and justified her conduct based on the sincerity of that belief. *See, e.g.*, Hearing Transcript at 106-18. However, the Board has recognized that "in an IRA appeal, the relevant inquiry is not whether the appellant committed any actual misconduct, but whether the agency had strong evidence to support its personnel action." *McCarthy v. International Boundary & Water Commission*, 116 M.S.P.R. 594, ¶ 61 (2011), citing *Phillips v. Department of Transportation*, 113 M.S.P.R. 73, ¶ 15 (2010) and *Yunus*, 84 M.S.P.R. 78, ¶ 12.

to work when he was not in fact present. Hearing Transcript at 585-88; IAF2, Tab 6 at 49. She also wrote that Oyula made "stupid schedules to suit himself" and was "a total failure at running this group as he is more interested in getting his visa renewal to keep his position for 3 more years…" IAF2, Tab 6 at 49. Goodenberger testified that there is no prohibition against moonlighting. Hearing Transcript at 540. However, he said the agency investigated the appellant's claim that Oyula was falsifying his work schedule, and found it to be invalid. *Id.* at 540-41.

As another example of an inflammatory communication, Goodenberger cited a July 12, 2012 e-mail the appellant sent to all Dallas facility hospitalists, in which she stated, "the following Drs., Oyula, Pitafi, Gupta and Mutua should not be re-appointed as they are the reason the rest of the group is being subjected to harassing schedules. They are in silent approval as they stand to gain another 3 year extension." IAF2, Tab 11, Exhibit 131 (grammar and punctuation as in original); IAF2, Tab 6 at 86. Hospitalist Dr. Shubham Gupta forwarded that e-mail chain to Goodenberger, copying Rogers and others. IAF2, Tab 6 at 56. He objected to the appellant's remarks as "inappropriate and baseless" and reported that he considered the appellant's "citizenship/nationality remarks to be personal and discriminatory." *Id.* He further indicated that the appellant's comments were generating hostility in the working environment. *Id.* Dr. Ali Pitafi also contacted Goodenberger and objected to what he considered the appellant's "baseless accusations" against him; Pitafi indicated that the allegations were harmful to the work environment. *Id.* at 55.

Goodenberger testified that another reason for his decision to terminate the appellant's appointment was her failure to comply with directives to follow the chain of command with complaints and to cease sending inflammatory e-mails regarding colleagues. IAF2, Tab 6 at 86; Hearing Transcript at 617-21. On July 12, 2012, the appellant sent an e-mail to Rogers, Goodenberger, and others, in which she wrote, in part, "Just informing you that anyone and everyone, who is

involved in re-appointing Drs Oyula, Pitafi, Gupta, and Mutua from the hospitalist group, are betraying the US government." IAF2, Tab 6 at 48 (punctuation as in original). In response, Goodenberger instructed the appellant "not to disseminate inflammatory and accusatory e-mails regarding your colleagues and superiors. … Failure to follow this instruction will result in appropriate disciplinary action." *Id.*

Goodenberger testified that the appellant continued to send inappropriate e-mails after his directive to cease. Hearing Transcript at 617-21. These included an e-mail describing the advertisement for the Hospitalist Section Chief as a "scam" intended to retain Oyula. IAF2, Tab 6 at 75; Hearing Transcript at 618. Goodenberger acknowledged that he was not aware of e-mails from the appellant to the entire hospitalist group after his instruction to cease, but he stated she continued to send e-mails to individuals outside her chain of command. Hearing Transcript at 620-21. He stated that the appellant had already been notified that her complaints had been investigated and found meritless and, therefore, he considered her ongoing e-mails, including to individuals outside her chain of command, to be inappropriate. *Id.* at 619-20.

Goodenberger stated that the appellant also failed to comply with a directive to cease direct contact with then-Secretary Shinseki. Hearing Transcript at 611. As discussed above, appellant copied General Shinseki on an August 7, 2012 email to Goodenberger in which she discussed, among other things, her concerns about the hiring process for the Hospitalist Section Chief position. The next day, Administrative Officer Kirkland sent the appellant an e-mail, stating, "attached is a memo that was distributed to all [North Texas Health Care System] staff on December 11, 2011. It outlines the proper procedure for grievance and/or complaint processes. Please keep this memo for your future reference." IAF2, Tab 6 at 92. In the memorandum and attachment, employees were reminded to follow the grievance and complaint processes in place in the agency, including complaining to the Office of Inspector General, and told that contacting

General Shinseki directly may compromise his role as the ultimate decision-maker. *Id.* at 88-89, 92. At hearing, the appellant acknowledged receiving that e-mail as well as attached memorandum and listing of grievance processes. Hearing Transcript at 210-11, 213. The record shows that the appellant sent another e-mail directly to General Shinseki later the same day. IAF2, Tab 6 at 82-83. She acknowledged in that e-mail that she had been told to follow complaint processes, but was not doing so. *Id.*

The appellant testified that she never received a substantive response from Goodenberger or Human Resources personnel with regard to her concerns about the hiring process for the Hospitalist Section Chief position or her other complaints. Hearing Transcript at 69, 118. She acknowledged, however, that Goodenberger told her that her complaints had been investigated and were not substantiated. *Id.* at 191, 194-95; *see also* IAF2, Tab 6 at 48, 90. She testified that she did not believe him and felt that she was being stonewalled. Hearing Transcript at 195, 69. The appellant also acknowledged that Human Resources Supervisor Wanda Jackson informed her that the selection of Oyula complied with the agency's human resources guidelines and applicable Federal law. Hearing Transcript at 236-38; *see also* IAF2, Tab 10, Exhibit 65. The appellant testified that she considered herself more knowledgeable than Jackson and disagreed with Jackson's determination. Hearing Transcript at 238. The appellant indicated that in the face of what she perceived to be the agency's inaction, she did not consider her continued e-mails, including to General Shinseki, to be insubordinate. *Id.* at 70, 97-98.

It is clear that the appellant's protected activity is related to the agency's action. The appellant's complaints regarding, among other things, the hiring process for the Hospitalist Section Chief position triggered Goodenberger's instruction to cease sending inflammatory communications and to follow the chain of command. Goodenberger acknowledged that the appellant's ongoing complaints in violation of his directive contributed to his decision to terminate

her appointment. I find, however, that the agency clearly and convincingly showed that the appellant's appointment was terminated due to her disruptive and insubordinate conduct and not due to her whistleblowing.

Goodenberger testified credibly and convincingly that his intent in directing the appellant to cease disseminating inflammatory e-mails and to follow the appropriate chain of command and grievance processes was not to prevent the appellant from whistleblowing. Hearing Transcript at 577-78. He stated that the appellant could have continued to pursue her complaints through appropriate channels, including Office of Inspector General. Hearing Transcript at 578. However, he explained that his intent in directing her to cease was to avoid further disruption of the workplace. *Id*. Goodenberger's testimony that the appellant's conduct was disruptive to the work environment was supported by the complaints of other hospitalists, who reported that they were upset by the appellant's e-mails. IAF2, Tab 6 at 55-56.

As discussed above, the appellant presented evidence that Goodenberger had some motivation to retaliate against her in that Goodenberger was directly implicated in the appellant's allegations of hiring improprieties. However, I credit Goodenberger's testimony that his decision to terminate the appellant's appointment was based on her disruptive and insubordinate conduct rather than on her whistleblowing. I closely observed Goodenberger at hearing. He testified in a direct and straightforward manner, demonstrated no animosity, and did not appear resentful because of the appellant's complaints against him. While it was apparent that Goodenberger did not have a favorable opinion of the appellant, his testimony was clear that he based that opinion on her conduct, some of which predated her protected disclosures, and he did not express or indicate a retaliatory animus against the appellant based on her whistleblowing. *Hillen*, 35 M.S.P.R. at 458.

The agency presented strong evidence in support of its action. The appellant acknowledged that on July 21, 2012, she asked her supervisor Oyula

why he did not have any patients that day and to name the patients he saw the prior day. Hearing Transcript at 105. She said that she thought patient assignment was not fair and that she did not believe Oyula when he told her how many patients he had seen the prior day. *Id.* at 105-6. The appellant testified, and the agency did not dispute, that the appellant saw all her assigned patients on July 21, after Oyula contacted Deputy Chief of Staff Holt. However, she acknowledged that when Oyula refused to tell her the names, she responded, "well, I'm just going to see my one patient," rather than all the patients that had been assigned to her. *Id.* at 104-5. Although the appellant downplayed this incident due to her ultimate agreement to see her assigned patients, I credit Holt's testimony that the appellant's conduct in initially refusing to see patients was "highly inappropriate" and disruptive to patient care. *Id.* at 453, 456. His testimony at hearing, including his characterizations of the severity of her conduct, was direct and unequivocal and consistent with his contemporaneous documentation of the incident. *See* IAF2, Tab 6 at 67-69.

The agency convincingly showed the appellant engaged in other unprofessional and improper acts following her non-selection for the Hospitalist Section Chief position. These included sending group e-mails to all Dallas facility hospitalists calling Oyula a "total failure at running this group" and calling his scheduling decisions "stupid." IAF2, Tab 6 at 49. The appellant also accused Goodenberger and Human Resources staff of "betraying the US government," threatened to take unscheduled leave, and continued to contact

General Shinseki directly with her complaints after being instructed not to do so.[8] *Id.* at 48, 85, 82-83. And, in another e-mail to all facility hospitalists, the appellant identified Oyula and three other hospitalists by name as the "reason the rest of the group is being subjected to harassing schedules" and called for the non-renewal of those physicians' appointments. *Id.* at 56-57. I am unpersuaded by the appellant's argument that that e-mail cannot have created a hostile environment because she singled out those physicians based on their citizenship rather than their national origin. *See* IAF2, Tab14 at 11-12, 28. Despite the legal significance of this distinction, it is undisputed that two of the hospitalists complained to their supervisors about the appellant's e-mails and reported that her conduct was leading to hostility in the workplace, and their concerns were referred to the agency's EEO. IAF2, Tab 6 at 55-56; Hearing Transcript at 525 (testimony of Goodenberger).

The appellant testified that she believed her communications were true and neither inflammatory nor defamatory. Hearing Transcript at 184-91. She further suggested that she should not be sanctioned for her e-mails and other conduct because they were related to her protected disclosures regarding the hiring

[8] The appellant argued that the agency cannot rely on her conduct as grounds for her termination because it did not set forth those reasons in her termination letter. *See* IAF2, Tab 10, Exhibit 86. Instead, the termination letter stated only that the appellant's time-limited appointment was being terminated effective September 25, 2012 and that she would receive additional information regarding appeal rights if a determination was made that the reasons for her termination resulted from substandard care, professional misconduct, or professional incompetence. *Id.* The cases cited by the appellant, all of which were challenges by permanent employees of removal actions, do not require that the agency explain its reasons for terminating the appointment of a temporary employee. *See* Appellant's Post-Hearing Brief, IAF2, Tab 14 at 28. I do not find that the agency's failure to provide the bases for its action in the termination letter undermines the strength of its evidence at hearing. Similarly, the appellant suggests that the agency's failure to implement incremental discipline undermines the strength of the agency's reasons. I find otherwise. Rogers credibly testified that it is not unusual for the agency not to attempt lesser sanctions prior to terminating a physician, and there is no requirement that it do so, particularly for a temporary employee. Hearing Transcript at 351-52.

process for the Hospitalist Section Chief position. The Board recognizes, however, that not all statements made in the course of alleged whistleblowing are unconditionally protected, "no matter the degree of invective employed." *See Oliver v. Department of Health & Human Services*, 34 M.S.P.R. 465, 475 (1987), *aff'd*, 847 F.2d 842 (Fed. Cir. 1988) (Table), and *superseded by statute* as stated in *Rychen v. Department of the Army*, 51 M.S.P.R. 179, 181-82 (1991). For example, in *Oliver*, the Board held that the appellant was not immunized from sanction where "her apparent interest in causing office disruption, as evidence by insubordination, and her obvious desire to malign the targets of her disclosures, as evidenced by her caustic style, substantially overshadowed the alleged waste, fraud, or mismanagement addressed." *Id.* at 474; *see also McCarthy*, 116 M.S.P.R. 594, ¶ 61, citing *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999) ("The WPA is not a weapon in arguments over policy or a shield for insubordinate conduct); *Church v. Department of the Army*, 6 M.S.P.R. 737, 739 (1981) (rejecting whistleblower defense where removal was motivated by appellant's "grossly insubordinate and provocative behavior" rather than by protected disclosures). I find that the tone and content of the appellant's communications, including name-calling, demands for the non-renewal of colleagues' appointments disseminated throughout the practice group, and accusations of a betrayal of the government, are unprofessional on their face, and provide strong support for the agency's action.

With regard to the third *Carr* factor, evidence was presented at hearing that other hospitalists who complained about scheduling, but who did not complain about allegedly illegal hiring practices or otherwise engage in protected activities, were treated more favorably. *See* Hearing Transcript at 482-83 (testimony of Holt); IAF2, Tab 10, Exhibit 81. However, there is no evidence that any other hospitalist engaged in the full range of conduct that formed the basis of the agency's decision to terminate the appellant's appointment. In particular, there is no evidence that other hospitalists refused to see patients, as

the appellant did, and disregarded a directive from a superior.[9] Accordingly, the evidence does not support a finding that hospitalists who were not whistleblowers were otherwise similarly situated to the appellant. *See Carr*, 185 F.3d at 1326-27.

For the reasons described above, and based on the *Carr* factors, I find that the agency's decision to terminate the appellant's appointment was supported by clear and convincing evidence. While there was some motive to retaliate on the part of relevant agency officials, evidence of that motive is significantly outweighed by the strength of the evidence in support of the agency's termination decision. In addition, there is no evidence that similarly situated employees who were not whistleblowers were treated more favorably. After careful review, I am left with the firm conviction the agency would have taken the same action absent the appellant's protected disclosures.

## DECISION

The appellant's request for corrective action is DENIED.[10]

FOR THE BOARD: ________/S/______________________
U. Sidney Cornelius, Jr.
Administrative Judge

## NOTICE TO APPELLANT

This initial decision will become final on **November 24, 2016**, unless a petition for review is filed by that date. This is an important date because it is

---

[9] Rogers testified that one or two emergency room physicians refused to see patients and were disciplined but not terminated. Hearing Transcript at 406-7, 409-10. Rogers stated that, unlike the appellant, those physicians were permanent employees. *Id.* at 410. Accordingly, I do not find that they are similarly situated to the appellant.

[10] The appellant objected to Exhibits J and K filed with the agency's Post-Hearing Brief. IAF2, Tab 15. Those exhibits were not considered in this decision.

usually the last day on which you can file a petition for review with the Board. However, if you prove that you received this initial decision more than 5 days after the date of issuance, you may file a petition for review within 30 days after the date you actually receive the initial decision. If you are represented, the 30-day period begins to run upon either your receipt of the initial decision or its receipt by your representative, whichever comes first. You must establish the date on which you or your representative received it. The date on which the initial decision becomes final also controls when you can file a petition for review with the Court of Appeals. The paragraphs that follow tell you how and when to file with the Board or the federal court. These instructions are important because if you wish to file a petition, you must file it within the proper time period.

**BOARD REVIEW**

You may request Board review of this initial decision by filing a petition for review.

If the other party has already filed a timely petition for review, you may file a cross petition for review. Your petition or cross petition for review must state your objections to the initial decision, supported by references to applicable laws, regulations, and the record. You must file it with:

The Clerk of the Board
Merit Systems Protection Board
1615 M Street, NW.
Washington, DC 20419

A petition or cross petition for review may be filed by mail, facsimile (fax), personal or commercial delivery, or electronic filing. A petition submitted by electronic filing must comply with the requirements of 5 C.F.R. § 1201.14, and may only be accomplished at the Board's e-Appeal website (https://e-appeal.mspb.gov).

**Criteria for Granting a Petition or Cross Petition for Review**

Pursuant to 5 C.F.R. § 1201.115, the Board normally will consider only issues raised in a timely filed petition or cross petition for review. Situations in which the Board may grant a petition or cross petition for review include, but are not limited to, a showing that:

(a) The initial decision contains erroneous findings of material fact. (1) Any alleged factual error must be material, meaning of sufficient weight to warrant an outcome different from that of the initial decision. (2) A petitioner who alleges that the judge made erroneous findings of material fact must explain why the challenged factual determination is incorrect and identify specific evidence in the record that demonstrates the error. In reviewing a claim of an erroneous finding of fact, the Board will give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing.

(b) The initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case. The petitioner must explain how the error affected the outcome of the case.

(c) The judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case.

(d) New and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. To constitute new evidence, the information contained in the documents, not just the documents themselves, must have been unavailable despite due diligence when the record closed.

As stated in 5 C.F.R. § 1201.114(h), a petition for review, a cross petition for review, or a response to a petition for review, whether computer generated, typed, or handwritten, is limited to 30 pages or 7500 words, whichever is less. A reply to a response to a petition for review is limited to 15 pages or 3750 words, whichever is less. Computer generated and typed pleadings must use no less than

12 point typeface and 1-inch margins and must be double spaced and only use one side of a page. The length limitation is exclusive of any table of contents, table of authorities, attachments, and certificate of service. A request for leave to file a pleading that exceeds the limitations prescribed in this paragraph must be received by the Clerk of the Board at least 3 days before the filing deadline. Such requests must give the reasons for a waiver as well as the desired length of the pleading and are granted only in exceptional circumstances. The page and word limits set forth above are maximum limits. Parties are not expected or required to submit pleadings of the maximum length. Typically, a well-written petition for review is between 5 and 10 pages long.

If you file a petition or cross petition for review, the Board will obtain the record in your case from the administrative judge and you should not submit anything to the Board that is already part of the record. A petition for review must be filed with the Clerk of the Board no later than the date this initial decision becomes final, or if this initial decision is received by you or your representative more than 5 days after the date of issuance, 30 days after the date you or your representative actually received the initial decision, whichever was first. If you claim that you and your representative both received this decision more than 5 days after its issuance, you have the burden to prove to the Board the earlier date of receipt. You must also show that any delay in receiving the initial decision was not due to the deliberate evasion of receipt. You may meet your burden by filing evidence and argument, sworn or under penalty of perjury (*see* 5 C.F.R. Part 1201, Appendix 4) to support your claim. The date of filing by mail is determined by the postmark date. The date of filing by fax or by electronic filing is the date of submission. The date of filing by personal delivery is the date on which the Board receives the document. The date of filing by commercial delivery is the date the document was delivered to the commercial delivery service. Your petition may be rejected and returned to you if you fail to provide a statement of how you served your petition on the other party. *See* 5 C.F.R.

§ 1201.4(j). If the petition is filed electronically, the online process itself will serve the petition on other e-filers. *See* 5 C.F.R. § 1201.14(j)(1).

A cross petition for review must be filed within 25 days after the date of service of the petition for review.

**NOTICE TO AGENCY/INTERVENOR**

The agency or intervenor may file a petition for review of this initial decision in accordance with the Board's regulations.

**NOTICE TO THE APPELLANT REGARDING YOUR FURTHER REVIEW RIGHTS**

You have the right to request review of this final decision by the United States Court of Appeals for the Federal Circuit.

The court must receive your request for review no later than 60 calendar days after the date this initial decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed. *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of this decision concerning your claims of prohibited personnel practices under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request review of this decision only after it becomes final by filing in the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction. The court of appeals must receive your petition for review within 60 days after the date on which this decision becomes final. *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012). If you choose to file, be very careful to file on time. You may choose to request review of the Board's decision in the

United States Court of Appeals for the Federal Circuit or any other court of appeals of competent jurisdiction, but not both. Once you choose to seek review in one court of appeals, you may be precluded from seeking review in any other court.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the United States Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11. Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

If you are interested in securing pro bono representation for your court appeal, that is, representation at no cost to you, the Federal Circuit Bar Association may be able to assist you in finding an attorney. To find out more, please click on this link or paste it into the address bar on your browser:

https://fedcirbar.org/Pro-Bono-Scholarships/Government-Employees-Pro-Bono/Overview-FAQ

The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

NEENA BISWAS,
Appellant,

v.

DEPARTMENT OF VETERANS AFFAIRS,
Agency.

DOCKET NUMBER
DA-1221-15-0471-W-2

DATE: January 4, 2023

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Todd J. Harlow, Esquire, Dallas, Texas, for the appellant.

Sterling L. DeRamus, Esquire, Birmingham, Alabama, for the appellant.

Jason C. Green, Esquire, Dallas, Texas, for the agency.

**BEFORE**

Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

## FINAL ORDER

¶1 The appellant has filed a petition for review of the initial decision, which denied her request for corrective action in connection with her individual right of

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

action appeal. On petition for review, the appellant disputes the administrative judge's findings and conclusions and challenges certain of his rulings. Generally, we grant petitions such as this one only in the following circumstances: the initial decision contains erroneous findings of material fact; the initial decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the administrative judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed. Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115). After fully considering the filings in this appeal, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review. Therefore, we DENY the petition for review and AFFIRM the initial decision, which is now the Board's final decision.[2] 5 C.F.R. § 1201.113(b).

[2] On review, the appellant argues that the administrative judge improperly excluded the testimony of one of her proposed witnesses. Petition for Review (PFR) File, Tab 1 at 35-36. After the administrative judge's ruling, he afforded the appellant an opportunity to submit a written objection, but she did not do so. Therefore, she failed to preserve the issue for review. *Sanders v. Social Security Administration*, 114 M.S.P.R. 487, ¶ 9 (2010). The appellant also argues on review that she was denied the opportunity to call a rebuttal witness. PFR File, Tab 1 at 36. Again, the appellant did not object to the administrative judge's ruling and therefore she did not preserve that ruling for review. *Sanders*, 114 M.S.P.R. 487, ¶ 9. Moreover, the administrative judge's ruling was well within his discretion to control the proceedings, which includes the authority to exclude testimony he believes would be irrelevant, immaterial, or unduly repetitious, and the appellant has not shown that, by his ruling, the administrative judge abused that discretion. *Guerrero v. Department of Veterans Affairs*, 105 M.S.P.R. 617, ¶ 20 (2007).

## NOTICE OF APPEAL RIGHTS[3]

You may obtain review of this final decision. 5 U.S.C. § 7703(a)(1). By statute, the nature of your claims determines the time limit for seeking such review and the appropriate forum with which to file. 5 U.S.C. § 7703(b). Although we offer the following summary of available appeal rights, the Merit Systems Protection Board does not provide legal advice on which option is most appropriate for your situation and the rights described below do not represent a statement of how courts will rule regarding which cases fall within their jurisdiction. If you wish to seek review of this final decision, you should immediately review the law applicable to your claims and carefully follow all filing time limits and requirements. Failure to file within the applicable time limit may result in the dismissal of your case by your chosen forum.

Please read carefully each of the three main possible choices of review below to decide which one applies to your particular case. If you have questions about whether a particular forum is the appropriate one to review your case, you should contact that forum for more information.

**(1) Judicial review in general**. As a general rule, an appellant seeking judicial review of a final Board order must file a petition for review with the U.S. Court of Appeals for the Federal Circuit, which must be received by the court within **60 calendar days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(A).

If you submit a petition for review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

[3] Since the issuance of the initial decision in this matter, the Board may have updated the notice of review rights included in final decisions. As indicated in the notice, the Board cannot advise which option is most appropriate in any matter.

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

**(2) Judicial or EEOC review of cases involving a claim of discrimination**. This option applies to you only if you have claimed that you were affected by an action that is appealable to the Board and that such action was based, in whole or in part, on unlawful discrimination. If so, you may obtain judicial review of this decision—including a disposition of your discrimination claims—by filing a civil action with an appropriate U.S. district court (*not* the U.S. Court of Appeals for the Federal Circuit), within **30 calendar days** after you receive this decision. 5 U.S.C. § 7703(b)(2); *see Perry v. Merit Systems Protection Board*, 582 U.S. ____ , 137 S. Ct. 1975 (2017). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the district court no later than **30 calendar days** after your representative receives this decision. If the action involves a claim of discrimination based on race, color, religion, sex, national origin, or a disabling condition, you may be entitled to representation by a court-appointed lawyer and

to waiver of any requirement of prepayment of fees, costs, or other security. *See* 42 U.S.C. § 2000e-5(f) and 29 U.S.C. § 794a.

Contact information for U.S. district courts can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

Alternatively, you may request review by the Equal Employment Opportunity Commission (EEOC) of your discrimination claims only, excluding all other issues. 5 U.S.C. § 7702(b)(1). You must file any such request with the EEOC's Office of Federal Operations within **30 calendar days** after you receive this decision. 5 U.S.C. § 7702(b)(1). If you have a representative in this case, and your representative receives this decision before you do, then you must file with the EEOC no later than **30 calendar days** after your representative receives this decision.

If you submit a request for review to the EEOC by regular U.S. mail, the address of the EEOC is:

Office of Federal Operations
Equal Employment Opportunity Commission
P.O. Box 77960
Washington, D.C. 20013

If you submit a request for review to the EEOC via commercial delivery or by a method requiring a signature, it must be addressed to:

Office of Federal Operations
Equal Employment Opportunity Commission
131 M Street, N.E.
Suite 5SW12G
Washington, D.C. 20507

**(3) Judicial review pursuant to the Whistleblower Protection Enhancement Act of 2012.** This option applies to you only if you have raised claims of reprisal for whistleblowing disclosures under 5 U.S.C. § 2302(b)(8) or other protected activities listed in 5 U.S.C. § 2302(b)(9)(A)(i), (B), (C), or (D). If so, and your judicial petition for review "raises no challenge to the Board's

disposition of allegations of a prohibited personnel practice described in section 2302(b) other than practices described in section 2302(b)(8), or 2302(b)(9)(A)(i), (B), (C), or (D)," then you may file a petition for judicial review either with the U.S. Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.[4] The court of appeals must receive your petition for review within **60 days** of the date of issuance of this decision. 5 U.S.C. § 7703(b)(1)(B).

If you submit a petition for judicial review to the U.S. Court of Appeals for the Federal Circuit, you must submit your petition to the court at the following address:

U.S. Court of Appeals
for the Federal Circuit
717 Madison Place, N.W.
Washington, D.C. 20439

Additional information about the U.S. Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, 10, and 11.

If you are interested in securing pro bono representation for an appeal to the U.S. Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for information regarding pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.

---

[4] The original statutory provision that provided for judicial review of certain whistleblower claims by any court of appeals of competent jurisdiction expired on December 27, 2017. The All Circuit Review Act, signed into law by the President on July 7, 2018, permanently allows appellants to file petitions for judicial review of MSPB decisions in certain whistleblower reprisal cases with the U.S. Court of Appeals for the Federal Circuit or any other circuit court of appeals of competent jurisdiction. The All Circuit Review Act is retroactive to November 26, 2017. Pub. L. No. 115-195, 132 Stat. 1510.

Contact information for the courts of appeals can be found at their respective websites, which can be accessed through the link below:

http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

FOR THE BOARD: /s/ for

Jennifer Everling
Acting Clerk of the Board

Washington, D.C.

**U.S. MERIT SYSTEMS PROTECTION BOARD**

**Office of the Clerk of the Board**

**1615 M Street, N.W.**
**Washington, D.C. 20419-0002**

Phone: 202-653-7200; Fax: 202-653-7130; E-Mail: mspb@mspb.gov

2023-1552

# ATTESTATION

I HEREBY ATTEST that the attached index represents a list of the documents comprising the administrative record of the Merit Systems Protection Board in the appeal of Neena Biswas *v.* Department of Veterans Affairs, MSPB Docket No. DA-1221-15-0471-W-2, and that the administrative record is under my official custody and control on this date

on file in this Board

| | |
|---|---|
| March 13, 2023 | /s/ for |
| Date | Jennifer Everling<br>Acting Clerk of the Board |

CERTIFICATE OF SERVICE

I hereby certify that the attached Document(s) was (were) sent as indicated this day to each of the following:

| | |
|---|---|
| | Counsel For Petitioner |
| Electronic Mail<br>(via mspb@mspb.gov) | Sterling L. DeRamus<br>sderamus@deramuslaw.com |
| | Counsel For Petitioner |
| Electronic Mail<br>(via mspb@mspb.gov) | Todd J. Harlow<br>tharlow@cowlesthompson.com |
| | Respondent |
| Electronic Mail<br>(via mspb@mspb.gov) | Martin F. Hockey, Jr., Acting Director<br>Commercial Litigation Branch<br>Civil Division Classification Unit<br>U.S. Department of Justice<br>c/o Thee Matthews<br>thee.matthews@usdoj.gov |

March 13, 2023
(Date)

/s/
Dinh Chung
Case Management Specialist