2023-1552

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

NEENA BISWAS,
Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,
Respondent.

---

Petition for Review from the Merit Systems Protection Board
(Docket Number DA-1221-15-0471-W-2)

# BRIEF FOR RESPONDENT

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

REGINALD T. BLADES, JR.
Assistant Director

KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Washington, DC 20530
Tel: (202) 305-7571
Email:kara.m.westercamp@usdoj.gov

September 20, 2023

Attorneys for Respondent

# TABLE OF CONTENTS


TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ................................................................. iv

STATEMENT OF THE ISSUES ...................................................................... 1

STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS ............ 1

I. Nature Of The Case ........................................................................ 1

II. Statement Of Facts And Course Of Proceedings Below ...................... 3

A. Dr. Biswas Alleged Illegal Hiring Practices After She Was Not Selected For The Hospitalist Section Chief Position ................ 3

1. Dr. Biswas's Appointment To The Dallas VA ............... 3

2. The May 2012 Meeting With Dr. Diswas ....................... 4

B. After A July 21, 2012 Confrontation Between Dr. Diswas And Oyula, Dr. Diswas Escalated Her Complaints About The DallasVA's Alleged Illegal Hiring Practices ............................ 8

1. Dr. Oyula Called The Deputy Chief Of Staff For Dr. Biswas To Agree To See Her Assigned Patients ........... 8

2. Dr. Biswas Included Secretary Shinseki On Emails About Alleged Illegal Hiring Practices Based On Dr. Oyula's Selection As Hospitalist Chief .......................... 9

3. The Dallas VA Corrected Dr. Biswas's Conversion To A Temporary Appointment And Then Removed Dr. Biswas ....................................................................... 11

III. Proceedings Before The Board ......................................................... 12

SUMMARY OF THE ARGUMENT ........................................................ 17

ARGUMENT ........................................................................................ 18

I. Standards Of Review ........................................................................ 18

A. MSPB Appeals Generally ................................................................ 18

B. The Whistleblower Protection Enhancement Act .................... 19

1. Substantial Evidence Supports The Board's Decision That The Agency Would Have Converted Dr. Biswas To A Temporary Appointment Absent Her Protected Disclosures .......................................................... 22

II. Substantial Evidence Supports The Board's Decision That The Agency Would Have Terminated Dr. Biswas Absent Her Protected Disclosures ........................................................................ 27

A. Substantial Evidence Supports The Administrative Judge's Determination That Dr. Biswas Was Removed For Her Conduct .............................................................................. 28

1. Dr. Biswas's Conduct Disrupted The Workplace ......... 28

2. Dr. Biswas's Challenges To Her Termination Are Meritless ............................................................................ 34

B. The Administrative Judge Properly Determined That There Was Sufficient Evidence Of Some Motive To Retaliate Against Dr. Biswas .......................................................................... 40

C. The Absence Of Any Evidence Of An Analogous Comparator Properly Excludes This Factor From The Administrative Judge's Analysis ...................................................................... 43

CONCLUSION .................................................................................... 46

# TABLE OF AUTHORITIES

## CASES

*Bieber v. Dep't of the Army*,
287 F.3d 1358 (Fed. Cir. 2002) .......... 19

*Bolton v. Merit Sys. Prot. Bd.*,
154 F.3d 1313 (Fed. Cir. 1998) .......... 19

*Brewer v. U.S. Postal Serv.*,
647 F.2d 1093 (Ct. Cl. 1981) .......... 19

*Briley v. Nat'l Archives & Records Admin.*,
236 F.3d 1373 (Fed. Cir. 2001) .......... 39

*Carr v. Social Security Administration*,
185 F.3d 1318 (Fed. Cir. 1999) .......... 21, 40, 43

*Clipse v. Dep't of Homeland Sec.*,
640 F. App'x. 986 (Fed. Cir. 2016) .......... 19

*Edison Co. v. NLRB*,
305 U.S. 197 (1938) .......... 19

*Flynn v. Dep't of Veterans Affairs*,
830 Fed. App'x 658 (Fed. Cir. Dec. 7, 2020) .......... 38

*Grissom v. Department of Veterans Affairs*,
No. 2021-2124, 2022 WL 17334715 (Fed. Cir. Nov. 30, 2022) .......... 37

*Harris v. Dep't of Veterans Affairs*,
142 F.3d 1463 (Fed. Cir. 1998) .......... 19

*Hayes v. Dep't of the Navy*,
727 F.2d 1535 (Fed. Cir. 1984) .......... 18

*Kewley v. Dep't of Health & Human Servs.*,
153 F.3d 1357 (Fed. Cir. 1998) ........ 20, 21

*Lachance v. White*,
174 F.3d 1378 (Fed. Cir. 1999) ........ 37

*Lallis v. Dep't of Veterans Affairs*
848 F. App'x 894 (Fed. Cir. Mar. 4, 2021) ........ 37, 38

*Lowenstein v. Dep't of Veterans Affairs*
719 F. App'x 1004 (Fed. Cir. Dec. 18, 2017) ........ 38

*Parker v. U.S. Postal Serv.*,
819 F.2d 1113 (Fed. Cir. 1987) ........ 18

*Pearson v. Dep't of Veterans Affairs*,
465 F. App'x 925, 2011 WL 6157349 (Fed. Cir. Dec. 13, 2011) ........ 38

*Pope v. United States Postal Serv.*,
114 F.3d 1144 (Fed. Cir. 1997) ........ 19, 26

*Rickel v. Dep't of the Navy*,
31 F.4th 1358 (Fed. Cir. 2022) ........ 43, 44, 46

*Robinson v. Dep't of Veterans Affairs*,
923 F.3d 1004 (Fed. Cir. 2019) ........ 43

*Sacco v. Dep't of Justice*,
317 F.3d 1384 (Fed. Cir. 2003) ........ 18

*Skrettas v. Dep't of Veterans Affairs*,
No. 2022-2175, 2023 WL 2881309 (Fed. Cir. Apr. 11, 2023) ........ 38

*Smith v. Gen. Servs. Admin.*,
930 F.3d 1359 (Fed. Cir. 2019) ........ 22

*Watkins v. Dep't of Defense*,
2023 WL 1376354 (M.S.P.B., 2023) ........ 45

*Whitmore v. Dept. of Labor*,
680 F.3d 1353 (Fed. Cir. 2012) .............................................................. 21, 22, 43

*Young v. Merit Sys. Prot. Bd.*,
961 F.3d 1323 (Fed. Cir. 2020) ......................................................................39

*Yunus v. Dep't of Veterans Affairs*,
242 F.3d 1367 (Fed. Cir. 2001) ........................................................................

**STATUTES**

5 U.S.C. § 1221(e) ..............................................................................................20

5 U.S.C. § 1221(e)(1)..............................................................................................

5 U.S.C. § 2302(b)(8)(A)........................................................................................20

5 U.S.C. § 7703(c) ..................................................................................................18

38 U.S.C. § 7402(c) ................................................................................................13

38 U.S.C. § 7405 .......................................................................................................3

**REGULATIONS**

5 C.F.R. § 1209.4(b) ...............................................................................................20

5 C.F.R. § 1209.4(e).................................................................................................21

5 C.F.R. § 1209.4(e)(1) ...........................................................................................20

5 C.F.R. § 1209.4(e)(4) ...........................................................................................22

## **STATEMENT OF RELATED CASES**

No appeal from this civil action was previously before this or any other appellate court. Counsel is unaware of any case pending before this or any other court or agency that directly will affect or be affected directly by this Court's decision in the pending appeal.

BRIEF FOR RESPONDENT

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT

---

2023-1552

---

NEENA BISWAS,
Petitioner,

v.

DEPARTMENT OF VETERANS AFFAIRS,
Respondent.

---

## STATEMENT OF THE ISSUES

1. Whether the board's determination that the agency demonstrated by clear and convincing evidence that it would have converted the petitioner to a temporary appointment in the absence of her whistleblowing is supported by substantial evidence on the record.

2. Whether the board's determination that the agency demonstrated by clear and convincing evidence that it would have terminated the petitioner in the absence of her whistleblowing is supported by substantial evidence on the record.

## STATEMENT OF THE CASE SETTING FORTH RELEVANT FACTS

### I. Nature Of The Case

Dr. Biswas appeals the decision of the Merit Systems Protection Board

(MSPB or board) in *Biswas v. Department of Veterans Affairs*, No. DA-1221-15-0471-W-2 (MSPB Jan. 4, 2023). *See* Appx1-31. At the time of her termination, Dr. Biswas was employed as a physician in the Hospitalist Section at the Department of Veterans Affairs (VA) Dallas, Texas facility (Dallas VA). Appx2.

In or around April 2012, the Dallas VA announced the Hospitalist Section Chief position. Dr. Biswas applied, but she was not selected for the position. *Id.* Dr. Biswas then alleged that the agency violated Federal personnel laws requiring priority hiring for U.S. citizens when it re-appointed Dr. Ignatius Oyula to the position, who was a non-citizen and had been serving as the hospitalist section chief on a time-limited appointment. Appx3, Appx8. Dr. Biswas reported this alleged illegal hiring activity to her chain of command, but she also complained about Dr. Oyula's re-appointment to other Dallas VA hospitalists, and on certain emails, even included the then-VA Secretary, Eric Shinseki. Appx8.

Despite being instructed to cease direct contact by the Dallas VA Chief of the Medical Services, Dr. Biswas continued copying Secretary Shinseki on her emails about Dr. Oyula's selection and his alleged mismanagement of the hospitalists' schedules. Appx18-19. Dr. Biswas also engaged in conduct that was insubordinate and disruptive, including her refusal to see patients until the unprecedented intervention of the Dallas VA Deputy Chief of Staff. Appx15.

In early September 2012, the Dallas VA discovered that Dr. Biswas's excepted appointment had been unlawfully converted to a permanent appointment and corrected the mistake, returning Dr. Biswas to a temporary appointment. Appx2. Dr. Biswas was then terminated from her appointment effective September 25, 2012. Appx3.

Dr. Biswas challenged her removal before the MSPB, following the conclusion of the VA's Office of Special Counsel's investigation in April 2015. *Id.* In July 2015, Dr. Biswas filed an individual right of action (IRA) appeal, alleging that the VA retaliated against her for engaging in protected whistleblowing. Appx1. Following an evidentiary hearing, in an initial decision dated October 20, 2016, the board found that the agency met its burden to show by clear and convincing evidence that it would have both converted Dr. Biswas to a temporary appointment and terminated her appointment in the absence of her whistleblowing. Appx11-24. Dr. Biswas appealed the initial decision and on January 4, 2023, the full MSPB board affirmed the initial decision. Appx30-31.

## II. Statement Of Facts And Course Of Proceedings Below

### A. Dr. Biswas Alleged Illegal Hiring Practices After She Was Not Selected For The Hospitalist Section Chief Position

#### 1. Dr. Biswas's Appointment To The Dallas VA

Effective August 1, 2010, the Dallas VA hired Dr. Biswas as a Title 38 (38 U.S.C. § 7405) physician under an excepted appointment not-to-exceed July 30,

2012, in the Patient Extended Care Service (Geriatrics) section. Appx50, Appx82. Effective January 15, 2012, Dr. Biswas transferred from Geriatrics to Medicine Service to work in the Hospitalist section. Appx50, Appx80. On April 25, 2012, Dr. Biswas's appointment was erroneously converted from a not-to-exceed appointment to a permanent excepted appointment, to be effective retroactively to January 15, 2012. Appx50. At the time of her transfer, Dr. Oyula was the Chief of the Hospitalist section, with an appointment that would expire later in 2012. *Id.*

### 2. <u>The May 2012 Meeting With Dr. Biswas</u>

In or around April 2012, the Dallas VA advertised the position of Chief, Hospitalist section, and both Drs. Biswas and Oyula applied for the position, among others. *Id.* Dr. Daniel Goodenberger, Chief of Medicine Service, met with Dr. Biswas on May 21, 2012, to discuss her non-selection. Appx77. Ruth Kirkland, the administrative officer of the Medical Service, also attended the meeting. *Id.*

At the meeting, Dr. Goodenberger explained that he had not selected Dr. Biswas because she had no prior leadership in a hospitalist position. *Id.* Although Dr. Biswas argued that she was qualified for the position and that she was a qualified U.S. citizen, Dr. Goodenberger stated that his decision was final. *Id.* Dr. Goodenberger then asked Dr. Biswas several times to leave his office, but she refused because she wanted to interview for the position. *Id.* Dr. Biswas

finally left Dr. Goodenberger's office after he asked Ms. Kirkland to call the VA police to remove her from his office. *Id.*

Following the meeting, on May 24, Dr. Biswas emailed Daniel Harper, a human resources specialist, about whether a selection had been made for hospitalist chief. Appx668-669. In Dr. Biswas's email, she stated that since she was "not aware of any other candidates, and I meet all criteria with qualifications, please let me know when my appointment will be confirmed." Appx669. Mr. Harper responded that a candidate had not yet been selected. Appx668.

Internal discussion then occurred about the position as various human resources personnel had been copied on this correspondence. Appx667. After reviewing the case folder regarding the position, Barbara Rogers, Chief of Human Resources Management, explained that Dr. Goodenberger's selection process of Dr. Oyula would not "hold up" for a non-citizen. Appx666. Dr. Goodenberger responded that there had been several U.S. citizen candidates but the only one with relevant leadership experience had withdrawn his application. *Id.* Ms. Rogers explained that there needed to be documentation for his decision and Dr. Goodenberger responded that he could "re-create" his decision and that he believed Dr. Biswas had applied for the position so that she could schedule herself to not work night shifts. *Id.*

On May 31, 2012, Dr. Goodenberger selected Dr. Oyula to serve as Hospitalist Section Chief. Appx50. Despite the selection of Dr. Oyula, even into July, Dr. Biswas continued to pester human resources about the selection to the extent that Ms. Rogers elected to "ignor[e] her future communications unless there is a direct HR question." App664.

For example, in a July 6 email to all Dallas VA hospitalists, Dr. Biswas complained that night shifts were being intentionally assigned to U.S. citizens because "[t]he non-citizens have prepared a tough schedule to drive out citizens from a Federal job to keep their positions." Appx74. In a follow-up email, Dr. Biswas claimed that "Dr. Oyula is a total failure at running this group as he is more interested in getting his visa renewal to keep his position for 3 more years in a place like Dallas where tons of qualified physicians abound." *Id.* She reiterated two days later that four non-citizen physicians were "in silent approval as they stand to gain another 3 year extension" and that they "should not be re-appointed as they are the reason the rest of the group is being subjected to harassing schedules." Appx73. After receiving this email, Dr. Gupta (one of the four named non-citizen physicians) emailed Dr. Goodenberger and said that he "consider[ed] citizenship/nationality remarks to be personal and discriminatory" and that such remarks "generate work place hostility." *Id.*

On July 7, Dr. Biswas escalated her complaints about the selection of Dr. Oyula for the position in an email entitled "recruitment sham" to both senior hospital and human resources personnel. Appx522-524. In her email, Dr. Biswas complained about Dr. Oyula's night shift scheduling and that the Dallas VA was denying U.S. citizens "jobs either by late replies or giving other excuses." Appx524. After Ms. Rogers responded to her concerns, Dr. Biswas responded that the Dallas VA was violating hiring practices because it was placing non-citizens over citizens in selecting the hospitalist chief. Appx522. In his response to various human resources personnel, Dr. Goodenberger stated that Dr. Biswas was an "unacceptable candidate" and that "even if there were no other applicants," he would have re-opened the search to avoid selecting Dr. Biswas for the position. *Id.*

In a separate email to human resources personnel and Dallas VA leadership, Dr. Biswas claimed that "anyone and everyone" who was involved with re-appointing four non-U.S. citizens "are betraying the U.S. government." Appx608. Dr. Goodenberger responded that he was investigating her complaints about the hiring process for hospitalist section chief and he urged her to send her complaints to the "appropriate chain of command." Appx606. He also instructed her "not to disseminate inflammatory and accusatory e-mails regarding [her] colleagues and superiors" because "[i]nvestigation has shown at least some of them to be incorrect and damaging." *Id.* In response, Dr. Biswas stated that it was her understanding

that the selection process was not complete and that she was "still awaiting confirmation for position of Hospitalist Section Chief as I am an appropriate candidate." *Id.*

### B. After A July 21, 2012 Confrontation Between Drs. Biswas And Oyula, Dr. Biswas Escalated Her Complaints About The Dallas VA's Alleged Illegal Hiring Practices

#### 1. Dr. Oyula Called The Deputy Chief Of Staff For Dr. Biswas To Agree To See Her Assigned Patients

On July 21, 2012, Dr. Biswas's dissatisfaction with the selection of Dr. Oyula as hospitalist section chief came to a head. Appx51. Specifically, on a Saturday morning, Dr. Biswas confronted Dr. Oyula and refused to see her assigned patients unless he told her the names of the two patients he had seen the previous day. Appx70. Dr. Oyula reminded Dr. Biswas that he assigned the schedule, but she insisted that she would not see her assigned patients unless he answered her question. *Id.*

In order to defuse the situation, Dr. Oyula called Dr. Stephen Holt, acting chief of staff, and Dr. Holt explained that Dr. Oyula had "both the right and authority, per hospital regulations, to assign patients to providers" and that Dr. Biswas could later complain to Dr. Goodenberger. *Id.* Dr. Biswas refused to back down and "reiterated" her position "almost 10 times" that she needed to know the names of the patients that Dr. Oyula had seen. *Id.* After approximately 30 minutes

and Dr. Holt questioning whether her refusal to see the patients was a "patient safety issue," Dr. Biswas "finally agreed to see her assigned patients." Appx71.

Dr. Holt recorded the interaction that same day in an email to Dr. Biswas, among others. Appx599. In it, he recounted the phone call and that Dr. Oyula had the authority to schedule hospitalists. *Id.* He also explained that "[w]hen an interaction has such a concerning nature that a supervisor feels he must call the Acting [Chief of Staff], this is very concerning" and when "senior leadership has to get involved, it is a sign of significant disruption." *Id.*

Several days later, the hospitalist section's administrative officer interviewed witnesses from the July 21 incident. In her notes from her interview with Dr. Oyula, he claimed that "something has to change" due to Dr. Biswas's behavior and he would "step aside and let someone else lead the Hospitalist group if that is what needs to happen." Appx63. Although Dr. Biswas claimed that Dr. Oyula pointed his finger in her face during the confrontation, a witness stated that "he did not reach out to her in any way." Appx65, Appx67-68.

#### 2. Dr. Biswas Included Secretary Shinseki On Emails About Alleged Illegal Hiring Practices Based On Dr. Oyula's Selection As Hospitalist Chief

The July 21 encounter between Drs. Biswas and Oyula appeared to be a turning point of increasingly aggressive behavior from Dr. Biswas. To wit, three days later, Dr. Biswas emailed senior hospital personnel and complained about the

incident and alleged that his behavior was "threatening and unprofessional" and should be investigated. Appx594-595. Dr. Holt responded that his guidance from the telephone call remained the same: Dr. Oyula "has the authority and right to assign work" and that there is "no mandatory reason that management has to be equitable." Appx593. He also cautioned Dr. Biswas that she was making "very serious allegations" and that she had to "substantiate those allegations and not [] be evasive." Appx592.

In an August 9, 2012, Dallas VA issue brief, it was recorded that Dr. Biswas had sent an email "outlining grievances to her section and service chiefs" as well as Secretary Shinseki. Appx472. The issue brief explained that Dr. Biswas's allegations had been addressed "multiple times over the past few months" and also investigated and that none of her claims "have been corroborated or validated." *Id.* Also, that Dr. Biswas had been "instructed verbally and in writing on multiple occasions to follow the appropriate chain of command for grievances and/or complaints," and she was also provided again with the VA's complaint grievance process. *Id.* Despite being counseled on how to report grievances, on August 8, Dr. Biswas sent an email to Secretary Shinseki about her concerns and did so again on August 17 and 19. *Id.*, Appx627.

To wit, in an August 17 email to Dr. Goodenberger, Dr. Biswas copied Secretary Shinseki with her grievances about the selection of Dr. Oyula and the

overall "poor staffing" and "horrible leadership" at the Dallas VA. Appx627. She urged him to "take this seriously instead of doing the hanky panky of trying to renew non-citizens" and that "Dr. Oyula has played a nice game and it looks like he is your boss at this time in getting what he wants." *Id.* Dr. Goodenberger responded and again counseled her not to directly contact Secretary Shinseki's office and it was insubordination to do so. Appx626. He also explained that the "wide dissemination of inflammatory, inaccurate e-mails personally attacking individuals based on national origin or citizenship constitutes the creation of a hostile work environment" and she was "instructed to cease." *Id.*

### 3. The Dallas VA Corrected Dr. Biswas's Conversion To A Temporary Appointment And Then Removed Dr. Biswas

In August 2012, the Dallas VA began Dr. Biswas's termination process. Appx653. In an August 13 email, Dr. Goodenberger recorded that Dr. Biswas had repeatedly engaged in insubordination because she refused to follow chain of command with complaints, was instructed to cease inflammatory and defamatory emails about colleagues, and refused patient assignment. *Id.* Dr. Biswas had also created a hostile work environment after defaming four other hospitalist physicians on the "basis of non-citizenship" and her "repeated attacks" on Dr. Oyula. *Id.*

On September 4, 2012, Dr. Biswas's erroneous permanent excepted appointment was corrected to a not-to-exceed February 14, 2013 appointment to be effective retroactively to January 15, 2012. Appx51, Appx79. In the process of

considering Dr. Biswas's termination, Ms. Rogers explained in an email that Dr. Biswas was a temporary employee and they are "usually given opportunities to improve via counseling, and then let go." Appx632. Dr. Goodenberger responded that Dr. Biswas has "been counseled and instructed in writing, with continued insubordination. It's time to let her go." *Id.*

On September 11, 2012, Jeffery Milligan, the Director of the Dallas VA, informed Dr. Biswas via letter that her excepted appointment was terminated effective September 25, 2012. Appx60-61, Appx57. The letter stated that Dr. Biswas was not entitled to have her involuntary termination reviewed, but if an initial determination was made that the reason for termination "resulted from substandard care, professional misconduct or professional incompetence," she would receive a separate notice regarding her opportunity for a fair hearing. Appx60. Reviews by Professional Standards Boards or disciplinary boards do not apply to temporary employees. App85. As stated in the notification of personnel action, the reason for removal was "[c]onduct does not reflect the necessary level required for successful government service." Appx57.

## III. Proceedings Before The Board

On July 2, 2015, Dr. Biswas filed an appeal with the board, alleging that her removal from Federal service was the result of unlawful retaliation against her as a result of her protected disclosures. Appx1. After a two-day hearing, on October

20, 2016, the administrative judge issued an initial decision affirming the agency's removal of Dr. Biswas from Federal service. Appx24.

As an initial matter, the administrative judge determined that Dr. Biswas proved by a preponderance of the evidence that she had made protected disclosures and the disclosures were a contributing factor in the personnel actions taken against her. Appx6. The administrative judge determined that Dr. Biswas had a reasonable belief that her disclosures regarding the Dallas VA's selection for the Hospitalist Section Chief evidenced a violation of law, rule, or regulation. Appx9 (citing 38 U.S.C. § 7402(c)). Moreover, the administrative judge observed that Dr. Biswas was "minimally qualified" for the position and that to her knowledge, the VA Under Secretary for Health had not made a determination that it was not possible to recruit U.S. citizens for the position. *Id.* Thus, the administrative judge found that "a disinterested observer could reasonably conclude that the agency's actions violated the regulations pertaining to appointments" at the Dallas VA. *Id.*

Second, the administrative judge determined that Dr. Biswas also showed by preponderant evidence that her protected disclosures were a contributing factor in the personnel actions. Appx10. To wit, the administrative judge found that her protected disclosures were made to, among others, Dr. Goodenberger and Ms. Rogers. *Id.* Importantly, after Dr. Biswas made her disclosures, the administrative judge found that her status was changed from permanent back to

temporary status. *Id.* Thus, the administrative judge determined that Dr. Biswas "satisfied the knowledge/timing test" and that she showed that "her whistleblowing actions were a contributing factor in the identified personnel actions." Appx11. The administrative judge then determined that clear and convincing evidence demonstrated that the Dallas VA would have both converted Dr. Biswas back to a temporary status and terminated her employment, in the absence of her disclosures. Appx11-24.

Regarding the status of her appointment from temporary to permanent, Dr. Goodenberger testified that he "had not recommended the conversion and a Professional Standards Board had not been held." Appx12. Ms. Rogers confirmed that there was no documentation of the conversion in Dr. Biswas's personnel file. *Id.* As a result, once this error was discovered, Dr. Biswas was converted back to her temporary appointment. Appx13. Indeed, the incorrect conversion of Dr. Biswas from temporary to permanent status was not an isolated incident as a human resources specialist had also incorrectly converted five other physicians at the same time that he had incorrectly converted Dr. Biswas's status. *Id.* Thus, the administrative judge determined that the agency presented clear and convincing evidence that it would have converted Dr. Biswas's status to a temporary appointment absent her protected disclosures. Appx13-14.

Next, the administrative judge determined that the agency proved by clear and convincing evidence that it would have terminated Dr. Biswas's appointment despite her disclosures. Appx14-24. For example, Dr. Goodenberger testified that Dr. Biswas was dissatisfied about working nights even before the hospitalist section chief job advertisement (approximately four months after she transferred from geriatrics to hospitalists), and that she "insisted" her schedule be changed to not work nights. Appx14. Dr. Biswas's conduct during the May 2012 meeting with Dr. Goodenberger and the July 2012 incident with Dr. Oyula reinforced a pattern of disruptive and inflammatory behavior. Appx15-16. The administrative judge also credited Dr. Goodenberger's testimony that Dr. Biswas had made "inappropriate and baseless" comments on an email to all Dallas VA hospitalists. Appx17. And despite Dr. Goodenberger's direction to cease sending inappropriate emails outside of her chain of command, Dr. Biswas "failed to comply with a directive to cease direct contact with then-Secretary Shinseki." Appx18.

The administrative judge then determined that, although Dr. Biswas's protected activity was relevant, he found that Dr. Goodenberger "testified credibly and convincingly that his intent in directing [Dr. Biswas] to cease disseminating inflammatory e-mails and to follow the appropriate chain of command and grievance processes was not to prevent [her] from whistleblowing." Appx20. For example, the administrative judge credited Dr. Holt's testimony that it was "highly

inappropriate" and disruptive to patient care when Dr. Biswas refused to see patients in July 2012. *Id.* Indeed, the administrative judge found that "the tone and content" of Dr. Biswas's "communications, including name-calling, demands for the non-renewal of colleagues' appointments disseminated throughout the practice group, and accusations of a betrayal against the government, are unprofessional on their face." Appx23. Finally, the administrative judge determined that there was no evidence that any other hospitalist engaged in the full range of conduct that Dr. Biswas did. *Id.* Thus, the administrative judge held that there was no evidence that there were any similarly situated employees who were not whistleblowers who were treated more favorably. Appx24.

After careful consideration of the *Carr* factors, the administrative judge determined that the removal decision was supported by clear and convincing evidence. *Id.* And while some agency officials had "some motive to retaliate," "evidence of that motive is significantly outweighed by the strength of the evidence in support of the agency's termination decision." *Id.* Moreover, the administrative judge determined that there was no evidence that similarly situated employees who were not whistleblowers were treated more favorably than Dr. Biswas. *Id.* The administrative judge, thus, concluded with "firm conviction" that the Dallas VA would have taken the same action absent Dr. Biswas's protected disclosures. *Id.*

Dr. Biswas then appealed the initial decision to the full MSPB board. Appx30-31. The full MSPB board affirmed the initial decision on January 4, 2023. *Id.*

## SUMMARY OF ARGUMENT

Substantial evidence supports the board's determination that the agency would have taken the same personnel action notwithstanding Dr. Biswas's disclosures, and denied her request for corrective action. To wit, the administrative judge correctly determined that the agency demonstrated by clear and convincing evidence that it would have converted Dr. Biswas's permanent appointment back to a temporary appointment notwithstanding her disclosures, because the original conversion to a permanent appointment was unlawful. Indeed, the agency also corrected the unlawful conversion of five other employees from permanent status back to temporary status at the same time as Dr. Biswas.

Likewise, the administrative judge correctly determined that the agency would have removed Dr. Biswas from Federal service notwithstanding her disclosures is also supported by substantial evidence. The agency demonstrated by clear and convincing evidence that Dr. Biswas's behavior was insubordinate and disruptive to service, and that her conduct was leading to hostility in the workplace. None of Dr. Biswas's arguments demonstrate that the board's decision

was unreasonable, unlawful, or unsupported by substantial evidence. Accordingly, the Court should affirm the board's decision.

# ARGUMENT

## I. Standards Of Review

### A. MSPB Appeals Generally

The scope of judicial review of MSPB decisions is narrowly defined and is limited by statute. An MSPB decision must be affirmed unless it is found to be:

> (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
>
> (2) obtained without procedures required by law, rule, or regulation having been followed; or
>
> (3) unsupported by substantial evidence.

5 U.S.C. § 7703(c); *Hayes v. Dep't of the Navy*, 727 F.2d 1535, 1537 (Fed. Cir. 1984). The burden of establishing deficiencies in the administrative decision rests with Dr. Biswas. *Sacco v. Dep't of Justice*, 317 F.3d 1384, 1386 (Fed. Cir. 2003).

Under this standard of review, the question "is not what the court would decide in a *de novo* appraisal, but whether the administrative determination is supported by substantial evidence on the record as a whole." *Parker v. U.S. Postal Serv.*, 819 F.2d 1113, 1115 (Fed. Cir. 1987).

The Court will not reverse an MSPB decision "if it is supported by 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Brewer v. U.S. Postal Serv.*, 647 F.2d 1093, 1096 (Ct. Cl. 1981) (quoting *Con. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The burden of establishing reversible error rests upon the petitioner. *See Harris v. Dep't of Veterans Affairs*, 142 F.3d 1463, 1467 (Fed. Cir. 1998).

In addition, a court is "bound by the [administrative judge's] factual determinations unless those findings are not supported by substantial evidence." *Bolton v. Merit Sys. Prot. Bd.*, 154 F.3d 1313, 1316 (Fed. Cir. 1998). Further, "the credibility determinations of an administrative judge are virtually unreviewable on appeal." *Bieber v. Dep't of the Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002). Indeed, this Court has stated on various occasions that it will not set aside or cast into doubt an administrative judge's credibility determinations unless they are "inherently improbable or discredited by undisputed fact." *Pope v. United States Postal Serv.*, 114 F.3d 1144, 1149 (Fed. Cir. 1997).

### B. The Whistleblower Protection Enhancement Act

To establish a *prima facie* case of whistleblower retaliation, an individual must establish by preponderant evidence that he or she made a protected disclosure and that the disclosure was a "contributing factor" in the agency's decision to take a personnel action. 5 U.S.C. § 1221(e); *see Yunus v. Dep't of Veterans Affairs*, 242 F.3d 1367, 1371 (Fed. Cir. 2001). A disclosure is protected if the employee reasonably believes that it involves (i) a violation of law, rule or regulation, or

(ii) gross mismanagement, a gross waste of funds, an abuse of authority, or substantial and specific danger to public health or safety. 5 U.S.C. § 2302(b)(8)(A); 5 C.F.R. § 1209.4(b).

An employee may demonstrate that a disclosure was a contributing factor in a personnel action by proving by a preponderance of the evidence that (1) "the official taking the personnel action knew of the disclosure," and (2) "the personnel action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the personnel action." 5 U.S.C. § 1221(e)(1); *see also Kewley v. Dep't of Health & Human Servs.*, 153 F.3d 1357, 1363 (Fed. Cir. 1998).

Once an employee has proven by preponderant evidence that a protected disclosure was a contributing factor in the challenged personnel action, the agency may rebut the employee's claim by showing, by clear and convincing evidence, "that it would have taken the action even in the absence of the protected disclosure." *Kewley*, 153 F.3d at 1363. "Clear and convincing evidence is that measure or degree of proof that produces in the mind of the trier of fact a firm belief as to the allegations sought to be established." 5 C.F.R. § 1209.4(e). The analysis includes evidence regarding three "relevant factors" prescribed by the Court in *Carr v. Social Security Administration*, 185 F.3d 1318 (Fed. Cir. 1999):

> (1) the strength of the agency's evidence in support of its action;

> (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and
>
> (3) any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

185 F.3d at 1323. This Court has determined that "*Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the *Carr* factors to weigh them individually each in the agency's favor." *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1374 (Fed. Cir. 2012). Rather, "[t]he factors are merely appropriate and pertinent considerations for determining whether the agency carries its burden of proving by clear and convincing evidence that the same action would have been taken absent the whistleblowing." *Id.*

*Carr* factor three examines whether the agency takes similar actions against similarly situated non-whistleblowers. *Id.* at 1372. "Differences in kinds and degrees of conduct between otherwise similarly situated persons within an agency can and should be accounted for[.]" *Id.* at 1374. "[T]he absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis." *Id.* But if there *is* record evidence of relevant comparators, "[t]o the extent the agency failed to introduce evidence on how this employee or other similarly situated employees were treated, *Carr* factor three cannot support the agency."

*Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1367 (Fed. Cir. 2019). Accordingly, "[f]ailure to [introduce comparator evidence] may be at the agency's peril," *Whitmore*, 680 F.3d at 1374, but overall, "evidence [. . .] clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record and despite the evidence that fairly detracts from that conclusion. *Id.* at 1368; *see also* 5 C.F.R. § 1209.4(e)(4).

## II. Substantial Evidence Supports The Board's Decision That The Agency Would Have Converted Dr. Biswas To A Temporary Appointment Absent Her Protected Disclosures

Substantial evidence supports the administrative judge's finding that the Dallas VA's conversion of Dr. Biswas's status back to a temporary appointment in September 2012 was made to correct an error and was not for the purpose of retaliating against her. Appx13-14. Dr. Biswas's arguments to the contrary are meritless. Pet. Br. at 35-39.

First, under *Carr* factor one, the administrative judge determined that the agency's case for correcting the erroneous conversion was "very strong." Appx13. Although the erroneous conversion came to light in the process of reviewing Dr. Biswas's personnel file in anticipation of her removal, the administrative judge held that the testimony of Human Resources Management Services Chief Rogers was credible in that there must be a recommendation from the service chief and a Professional Standards Board must then approve the conversion from a temporary

to permanent appointment. Appx12, Appx181, Appx461-465. Ms. Rogers also testified that Dr. Goodenberger's recommendation for a conversion and the accompanying decision from a Professional Standards Board had never occurred. Appx181-182. Because the conversion had not been legally made, Ms. Rogers testified that Dr. Biswas was returned to a temporary appointment because "by law you're not entitled to that permanent appointment or conversion" without a request for conversion and the approval of a Professional Standards Board. Appx182.

Second, under *Carr* factor two, the administrative judge considered that some motive for retaliation was present for both Ms. Rogers and Dr. Goodenberger because Dr. Biswas's disclosures concerned alleged illegal hiring practices by Dr. Goodenberger, which implicated the human resources department, which Ms. Rogers supervised. Appx12. But the administrative judge explained that he "carefully observed" Ms. Rogers and Dr. Goodenberger's testimony and found them to be "credible in denying any retaliatory motive." *Id.* For example, Ms. Rogers was "straightforward" and testified in a "clear manner" about the correct process for converting employees from temporary to permanent status, "and how the initial conversion" was "contrary to that process and, therefore, illegally made." *Id.*; Appx181 (Ms. Rogers testifying as to the conversion process). Moreover, the administrative judge found that neither Ms. Rogers nor

Dr. Goodenberger appeared to "express or indicate retaliatory animus" against Dr. Biswas. Appx13.

Third, under *Carr* factor three, the Dallas VA presented evidence that similarly situated physicians who were not whistleblowers had also been erroneously converted to permanent status. Appx169-170, Appx173. In total, six physicians (including Dr. Biswas) had been incorrectly converted, and Ms. Rogers testified that all six were retroactively converted at the same time back to temporary appointments. *Id.* The human resources specialist who had made the wrongful conversions also received a written admonishment for negligent workmanship due to his failure to follow proper procedure and ensure that physicians were reviewed by a Professional Standards Board. Appx51, Appx182-183.

However, Dr. Biswas largely challenges the administrative judge's credibility findings and argues that the Dallas VA only converted Dr. Biswas back to temporary status in order to make it easier to "fire her." Pet. Br. at 35-37. Dr. Biswas posits that the conversion back to temporary status "was an error in itself" and that "the VA's conduct raises serious questions about the veracity of the excuses it raised at the hearing of this case." *Id.* at 36.

This completely ignores Ms. Rogers's thorough testimony about how conversions are processed and that Dr. Biswas was at no time legally a permanent

employee. Appx181-182. Dr. Biswas's argument that a Professional Standards Board should have nonetheless been convened to *correct* the illegal conversion is also unsupported, Pet. Br. at 36, 39, because Ms. Rogers testified that when a personnel action is erroneous to begin with, then the error is simply corrected. Appx190, Appx79 (personnel form reflecting that her status was "corrected"). Although Dr. Biswas is correct that a permanent employee has more rights and abilities to challenge a termination, Pet. Br. at 39; Appx170, Dr. Biswas's suggestion that she was returned to temporary status in order to make termination easier ignores the *five* other physicians who were also returned to temporary status at the same time. Appx169-170, Appx173. Her argument that she was treated differently than the five other physicians, Pet. Br. at 39, is also puzzling because they were only given Professional Standards Boards *after* the conversion back to temporary status. Appx182. Rather, when a temporary employee is involuntarily separated, the procedural requirement of reviews by Professional Standards Boards "do not apply." Appx85. The administrative judge also expressly found that "[w]hile the *ultimate outcomes* for these physicians differed from that of [Dr. Biswas], who was terminated, [he did] not find that this undercuts the fact that the agency treated them similarly with regard to the correction of their status in September 2012." Appx13 n.6 (emphasis added).

Moreover, Dr. Biswas argues that Ms. Rogers's testimony was not credible because it was her signature on the notification of personnel action converting Dr. Biswas to a permanent appointment, Pet. Br. at 37 n.16, but Ms. Rogers testified that she delegates authority to sign personnel documents. Appx168. Dr. Biswas also argues that the reclassification "cannot be chalked up to a mere coincidence" because the Dallas VA had already decided to terminate her. Pet. Br. at 39. But again, the administrative judge found Ms. Rogers's testimony to be credible as to how she discovered the erroneous conversion and the process for correcting the conversion. Appx12. In any event, the Court should reject these challenges to the administrative judge's credibility determinations. *See, e.g.*, *Pope*, 114 F.3d at 1149 (explaining that this Court will not disturb the board's credibility determinations unless they are "inherently improbable or discredited by undisputed fact").

Finally, none of Dr. Biswas's arguments undermine the administrative judge's determination that the "agency presented clear and convincing evidence that it would have converted [Dr. Biswas's] status to a temporary appointment" absent her disclosures. Appx13. And that it had presented "very strong evidence" that the initial conversion "was erroneous" and the "conversion of her status back to a temporary appointment in September 2012 was made to correct that error." *Id.* He also determined Dr. Biswas failed to present evidence that the agency's

conversion of the other five doctors' status back to temporary appointments was "solely for the purpose of retaliating against her." Appx14, Appx148. Thus, substantial evidence supports the administrative judge's determination that the agency proved by clear and convincing evidence that it would have converted Dr. Biswas's appointment from permanent back to temporary notwithstanding her protected disclosures, which the full board affirmed. Appx11-14, Appx30-31.

## III. Substantial Evidence Supports The Board's Decision That The Agency Would Have Terminated Dr. Biswas Absent Her Protected Disclosures

Substantial evidence supports the administrative judge's finding that as to Dr. Biswas's removal, although there was some motive to retaliate, "evidence of that motive is significantly outweighed by the strength of the evidence in support of the agency's termination decision." Appx24. As the administrative judge's detailed decision reflects, and as discussed below, he considered the voluminous record evidence, made numerous credibility determinations, and properly evaluated the *Carr* factors in reaching his conclusion to deny Dr. Biswas's IRA appeal, Appx1-24, which the full MSPB affirmed. Appx30-31.

Dr. Biswas's primary challenge is that the administrative judge did not adopt her viewpoint on the evidence, and nearly all of her other arguments challenge the administrative judge's credibility determinations and the weight assigned to the evidence presented. Pet. Br. at 17-47. This Court cannot, of course, substitute Dr. Biswas's judgment for that of the board. As explained below, the board's

determination is sustained by substantial evidence on the record and should be affirmed.

### A. Substantial Evidence Supports The Administrative Judge's Determination That Dr. Biswas Was Removed For Her Conduct

#### 1. Dr. Biswas's Conduct Disrupted The Workplace

The agency proved by clear and convincing evidence that it would have terminated Dr. Biswas's appointment. Appx14-24. The genesis of Dr. Biswas's conduct stems from being passed over as hospitalist section chief and Dr. Goodenberger's explanation of why he did not select her at a May 21, 2012, meeting. Appx14. At the May 21 meeting, Dr. Goodenberger testified that he told Dr. Biswas "her behavior was unsuitable" to "hold a leadership position" and that she did not have relevant leadership experience.[1] Appx236-237. He testified that Dr. Biswas initially refused to leave his office until he threatened to call VA police. *Id.* His testimony was corroborated by a contemporaneous report of contact written by a witness attending the meeting. Appx77.

The administrative judge determined that, after the meeting, Dr. Biswas engaged in conduct that was insubordinate and disruptive to the service, including

[1] Dr. Biswas insisted on being interviewed for the position, and a disinterested third-party, Dr. Robert Cronin, later interviewed her on May 29 and also thought she was not an acceptable candidate. Appx237-238. Nonetheless, Dr. Biswas believed that she had the position as she emailed human resources and said she was "ready to start anytime." Appx436.

sending disparaging and inflammatory emails to all the Dallas VA hospitalists and hospital leadership. Appx15-18. Among other things, Dr. Biswas alleged in her emails that Dr. Oyula was abusing his power as then-hospitalist section chief and that he should not be re-appointed because he was a non-citizen and she was a qualified U.S. citizen. Appx73-75. In a July 7 email, Dr. Biswas also alleged that hospital leadership was engaging in illegal hiring practices with non-citizens being given preference for open hospitalist positions over U.S. citizens. Appx522-524.

Although Dr. Holt at first recommended counseling for Dr. Biswas, he testified that "her behavior appeared to be escalating, aimed at ensuring that Dr. Oyula was not selected as section chief" and he viewed her emails as increasingly "inflammatory." App225-226. And on July 13, Dr. Goodenberger stated the following in an email to Dr. Biswas:

> I have investigated some of your complaints; and am in the process of auditing records regarding others. In the meantime, I am instructing you not to send additional e-mails to Ms. Rogers, her staff, or the executive office with your accusations and complaints. Any complaints must ascend the appropriate chain of command. Moreover, I am instructing you not to disseminate inflammatory and accusatory e-mails regarding your colleagues and superiors. Investigation has shown at least some of them to be incorrect and damaging. Failure to follow this instruction will result in appropriate disciplinary action.

Appx606. Dr. Goodenberger testified that he wanted Dr. Biswas to use the chain of command for reporting her complaints, *i.e.*, the Office of Inspector General

(OIG), instead of sending "emails to each and every person." Appx248. Dr. Holt also testified that reporting protected disclosures is not insubordination, but "if she's directed to use alternative, appropriate channels, and persists in doing it, that is insubordination." Appx225.

On July 21, however, a confrontation between Drs. Biswas and Oyula occurred, which Dr. Goodenberger testified "was part of an ongoing pattern of disruptive behavior that made it insupportable for her to continue [as a hospitalist]." Appx252. At 9:55am, Dr. Biswas refused her patient assignments for the day from Dr. Oyula on the basis that he did not provide her with information regarding his own clinical activity. Appx653. Dr. Oyula was forced to call Dr. Holt to resolve the disagreement, and in a "charged discussion" lasting about 30 minutes, Dr. Holt informed Dr. Biswas that Dr. Oyula had the right to make work assignments because he was her supervisor. Appx70-71. Dr. Biswas backed down and finally agreed to see her patients. *Id.* Dr. Holt testified that it was "unprecedented" and "highly inappropriate" that an issue of patient care needed to be escalated to the "top physician for a 4,400 person plus hospital[.]" Appx209. Two days later, however, Dr. Biswas accused Dr. Oyula of intimidating behavior, which was not corroborated by a fact-finding investigation. Appx592-595.

In August, Dr. Biswas then escalated her complaints about the hospitalist workload and alleged illegal hiring activities by contacting Secretary Shinseki directly. Appx653. She contacted Secretary Shinseki on August 8, after acknowledging receipt of a directive not to do so. *Id.* On August 17, she copied Secretary Shinseki on another email directed to senior hospital leadership. Appx627. Dr. Goodenberger responded the following day to her:

> You received and acknowledge[d] receipt of the attached document instructing you not to contact Secretary Shinseki's office. This was sent from the Secretary's office following your first communication, and was not initiated by anyone at this facility to suppress your rights. Since receipt, you have contacted Secretary Shinseki's office directly on several occasions. This is insubordination. You are instructed once again to cease.
>
> You were instructed by me on July 13 to direct your complaints through the chain of command. You have ignored that instruction on multiple occasions. This is insubordination. You are instructed once again to cease.
>
> I have investigated your complaints in the past and have found them to be, for those whose investigation is complete, without foundation without exception.
>
> . . .
>
> You are not and have not been a permanent employee. I am informed by the HR department that that classification was an error, as it was never presented to nor passed by the Professional Standards Board of the Executive Committee of the Medical Staff.
>
> The wide dissemination of inflammatory, inaccurate e-mails personally attacking individuals based on national

> origin or citizenship constitutes the creation of a hostile workplace environment. You are instructed to cease.
>
> Dr. Biswas, your methods of communication are neither persuasive nor useful, and effectively achieve a result different from what you wish. I sincerely suggest you examine and re-think your behavior, method, and interpersonal style.

Appx626. Dr. Goodenberger testified that her behavior was "so outrageous" that it was likely around the July 21 incident that the thought of termination "began to enter [his] mind," but like "water on limestone, it's hard to tell when the final event occurs." Appx241. He testified that he wanted to go straight to termination because he did not see her behavior changing. Appx256-257. Dr. Holt also testified that termination was appropriate because Dr. Biswas "had displayed numerous disruptive behaviors" and her unsubstantiated allegations against Dr. Oyula were "very aggressive." Appx211.

In weighing the evidence, the administrative judge found that Dr. Goodenberger "acknowledged that [her] ongoing complaints in violation of his directive contributed to his decision to terminate her appointment," but that the agency "clearly and convincingly showed that [her] appointment was terminated due to her disruptive and insubordinate conduct and not due to her whistleblowing." Appx19-20. Although Dr. Biswas attempts to paint this matter as an employee removed for reporting protected disclosures through her chain of command, and escalating her complaints as she deemed appropriate, the

administrative judge heard testimony that Dr. Biswas's behavior was disruptive to patient care and "highly inappropriate." Appx209; *see also* Appx208 (Dr. Holt testifying that the July 21, 2012 confrontation was a "highly unusual incident"), Appx239-241 (Dr. Goodenberger testifying that he received complaints from other hospitalists that she was creating a hostile work environment), Appx165 (Ms. Rogers testifying that Dr. Biswas refused to follow instructions). It is undisputed that Dr. Biswas never filed an OIG complaint about the alleged illegal practices, either, which she was repeatedly counseled to do. Appx189, Appx224, Appx243, Appx248.

Further, the administrative judge found the agency "convincingly showed" that Dr. Biswas "engaged in other unprofessional and improper acts following her non-selection for the Hospitalist Section Chief position" with the various emails she sent to the other hospitalists and hospital leadership. Appx21-22. Indeed, Dr. Goodenberger testified that "the purpose of this wide dissemination [of the emails] seems undoubtedly to have been to cause disruption." Appx244. As the foregoing discussion demonstrates, substantial evidence supports the administrative judge's finding that any retaliation motive "is significantly outweighed by the strength of the evidence in support of the agency's termination decision." Appx24. This determination is supported by substantial evidence on the record.

### 2. <u>Dr. Biswas's Challenges To Her Termination Are Meritless</u>

Dr. Biswas makes several arguments challenging the legitimacy of her termination, but they are all meritless. *See* Pet. Br. at 17-29, 40-42, 45-48.

First, Dr. Biswas argues that the administrative judge misconstrued her "conduct" because she never criticized her co-workers' "national origins" and the VA "identified no communication from Dr. Biswas that *actually* criticized a co-worker on the basis of race, gender, or national origin." *Id.* at 18 (emphasis in original). This is contradicted in an email where Dr. Biswas expressly singled out four, non-citizen co-workers. Appx73. The administrative judge was "unpersuaded" by Dr. Biswas's argument that the email "cannot have created a hostile environment because she singled out those physicians based on their citizenship" and it is undisputed that two hospitalists complained "and reported that her conduct was leading to hostility in the workplace." Appx22.

Second, Dr. Biswas argues that her complaints about Dr. Oyula's abuse of authority with scheduling citizens for "unfair" schedules were protected disclosures and should not have been considered "insubordination." Pet. Br. at 19-22. Dr. Biswas, however, cherry-picks the excerpts from her emails and omits her own inflammatory and defamatory remarks about Drs. Oyula and Goodenberger. For example, while it is true that other hospitalists complained about the scheduling, Dr. Biswas responded to all the hospitalists in a July 10, 2012 email

that "Dr Oyula is a total failure at running this group as he is more interested in getting his visa renewal to keep his position for 3 more years in a place like Dallas where tons of qualified physicians abound." Appx74. In the same email, she claimed that "Dr Oyula has also openly denied citizen candidates together with Dr. Goodenberger and HR to keep his and his buddies job secure." *Id.* She directed further ire at Dr. Oyula with her comment that "[h]e keeps his name on the schedule when he is not present, that is called AWOL in the VA." Appx73. And in a different email, while she referred to "an uncertain and outrageous schedule now being enforced to harass me," she also threatened to not show up for work. The administrative judge acknowledged that Dr. Biswas denied in her testimony "that she was threatening to take unscheduled days off but she did not offer an alternative explanation for her statement in the e-mail." Appx16.

Moreover, he found that Dr. Biswas's emails "including name-calling, demands for the non-renewal of colleagues' appointments disseminated throughout the practice group, and accusations of a betrayal of the government, are unprofessional on their face." Appx23. He also found Dr. Goodenberger's testimony to be credible that "his intent in directing [Dr. Biswas] to cease disseminating inflammatory emails" was "to avoid further disruption of the workplace." Appx20, Appx238-243. Dr. Goodenberger also testified that Dr. Biswas's "acting out" and "unique" behavior "severely impaired" even

Dr. Oyula's ability to run the hospitalist section and was affecting morale. Appx239, Appx244.

Relatedly, Dr. Biswas argues that making protected disclosures outside the chain of command is not insubordination and claims that she simply "continued to report higher up the chain when her earlier disclosures were ignored." Pet. Br. at 47-48 & n.18. This argument completely *ignores* that Dr. Biswas repeatedly included Secretary Shinseki on emails after *repeatedly* being ordered not to do so. For example, Dr. Goodenberger ordered Dr. Biswas on July 13, 2012, to make her complaints in the chain of command, Appx606-610, but despite this order, on August 8, 2012, she made a complaint directly to Secretary Shinseki. Appx380-381. Ten days later, she copied Secretary Shinseki on another email. Appx626-627. Indeed, Dr. Goodenberger testified that "[t]he appropriate routes of claims for waste, fraud, and abuse is through the OIG" and he would have "welcomed" an investigation because it would have shown no wrongdoing. Appx240.

Third, Dr. Biswas argues that the administrative judge erred when he found it "irrelevant" that the termination letter did not list misconduct. Pet. Br. at 40-42. Dr. Biswas again misapprehends the distinction between permanent and temporary employees. The administrative judge explained that, although an agency *does* have to explain its reasons for removing a permanent employee, it does *not* have to "explain its reasons for terminating the appointment of a temporary employee."

Appx22 n.8. Indeed, Ms. Rogers's testimony confirmed this. Appx178-179, *see also* Appx85.

Likewise, Dr. Biswas argues that her conduct was not as egregious as the cases the administrative judge cited when her conduct was the protected disclosures themselves. Pet. Br. at 45-47. But the administrative judge correctly found that not all statements and conduct made during the course of whistleblowing are protected. Appx22-23 (citing, *e.g.*, *Lachance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999) ("The WPA is not a weapon in arguments over policy or a shield for insubordinate conduct.")). For example, in *Grissom v. Department of Veterans Affairs*, this Court recently affirmed the removal of a whistleblower because the administrative judge "pointed to undisputed evidence that Mr. Grissom resisted following instructions from his supervisor and refused to recognize his supervisor as his superior." No. 2021-2124, 2022 WL 17334715, at *6 (Fed. Cir. Nov. 30, 2022). And in *Lallis v. Department of Veterans Affairs*, a probationary orthopedic surgeon was removed, despite his protected disclosures, because the "VA presented extensive evidence that Lalliss treated other agency employees in a rude and unprofessional manner" and "VA employees testified that Lalliss behaved in a way that led colleagues to distrust him and to avoid interacting with him.'" 848 F. App'x 894, 897-98 (Fed. Cir. Mar. 4, 2021); *see also Skrettas v. Dep't of Veterans Affairs*, No. 2022-2175, 2023 WL 2881309, at *1-2 (Fed. Cir.

Apr. 11, 2023) (affirming agency's re-assignment of whistleblower after he was accused of creating a hostile work environment in the clinical unit); *Flynn v. Dep't of Veterans Affairs*, 830 F. App'x 658, 659 (Fed. Cir. Dec. 7, 2020) (affirming removal for employee's "inappropriate and angry conduct"); *Lowenstein v. Dep't of Veterans Affairs*, 719 F. App'x 1004, 1006–07 (Fed. Cir. Dec. 18. 2017) (affirming removal of whistleblower, a chiropractor, where he had "unprofessional conduct" toward another doctor and "insubordination toward his superiors," and although "supervisors and representatives from Human Resources made repeated attempts to intervene, [ ] substantial evidence shows that this pattern of behavior continued from August 2014 until his termination."); *Pearson v. Dep't of Veterans Affairs*, 465 F. App'x 925, 930, 2011 WL 6157349, at *5 (Fed. Cir. Dec. 13, 2011) (affirming removal of whistleblower probationary employee because "Pearson sent inappropriate communications to managers and repeatedly refused to follow the chain of command").

Fourth, Dr. Biswas challenges how the administrative judge weighed the testimony regarding the July 21 incident. Pet. Br. at 22-27. This is wide of the mark because the Dallas VA extensively investigated the incident, the administrative officer of the medical service interviewed the witnesses, and Dr. Oyula also drafted a report of contact immediately following it. Appx63-71. Immediately following the call, Dr. Holt also sent an email to Dr. Biswas

documenting the incident, explained that "[w]hen an interaction has such a concerning nature that a supervisor feels he must calling the Acting [Chief of Staff], this is very concerning." Appx599. The administrative judge found that Dr. Biswas "downplayed this incident due to her ultimate agreement to see her assigned patients" in her testimony, but he "credit[ed] [Dr.] Holt's testimony that [her] conduct in initially refusing to see patients was 'highly inappropriate' and disruptive to patient care." Appx21. The Court should find "no basis in the record to set aside the administrative judge's conclusion that the testimony of VA employees, such as [Dr. Holt], regarding [Dr. Biswas's] conduct was more persuasive than h[er] own account of h[er] actions in the period prior to h[er] removal." *Lallis*, 848 F. App'x at 897-98.

Relatedly, Dr. Biswas complains that the VA "never actually investigated" her complaints and if they had, then it would have found out that she was qualified for the chief hospitalist position. Pet. Br. at 28-29. This seems to challenge the non-selection of Dr. Biswas for the hospitalist section chief position; this is outside the scope of the WPEA and is not the proper subject for inclusion in an IRA appeal. *Young v. Merit Sys. Prot. Bd.*, 961 F.3d 1323, 1329 (Fed. Cir. 2020).

Thus, this Court should find that Dr. Biswas's disagreement with the weight that the administrative judge afforded the evidence is not sufficient to establish that the judge's decision is illogical or unsupported by substantial evidence. *See Briley*

*v. Nat'l Archives & Records Admin.*, 236 F.3d 1373, 1377 (Fed. Cir. 2001) (emphasizing that it is not this Court's function to "retry[ ] factual issues decided . . . by the [b]oard").

### B. The Administrative Judge Properly Determined That There Was Sufficient Evidence Of Some Motive To Retaliate Against Dr. Biswas

The administrative judge thoroughly considered all the evidence and properly determined that there was sufficient evidence of "some motive" to retaliate against Dr. Biswas as a result of her protected disclosures (*Carr* factor 2). Appx20, Appx24. Substantial evidence supports the administrative judge's determination.

To begin with, Dr. Biswas argues that the administrative judge ignored relevant record evidence to the "existence and strength" of the motive to retaliate. Pet. Br. at 29. Essentially, Dr. Biswas accuses the administrative judge of failing to assign more weight to management's reaction to her protected disclosure. *Id.* Specifically, Dr. Biswas asserts that the administrative judge failed to consider that no incremental discipline (such as counseling) was imposed, the Dallas VA failed to investigate her complaints, her conversion back to a temporary employee was retaliatory, and that the administrative judge ignored evidence that Dr. Goodenberger had retaliated against other hospitalists. *Id.* at 29-38.

However, the board's purview is to evaluate the strength of any retaliatory motive and to determine how much weight should be assigned. *Carr*, 185 F.3d at 1323. Contrary to Dr. Biswas's position, Pet. Br. at 29-32, the administrative judge acknowledged that the Dallas VA could have considered a lesser sanction such as counseling, but he credited Ms. Rogers's testimony that lesser sanctions are not required for terminating a temporary employee. Appx22 n.8, Appx179, Appx192. Moreover, Dr. Goodenberger explained in an email to Dr. Holt and Ms. Rogers that Dr. Biswas had already been "counseled and instructed in writing, with continued insubordination," Appx632; *see also* Appx641, and he testified that he considered "the many emails she received to be acceptable as written counseling[.]" Appx257. Ms. Rogers also testified that Dr. Biswas had received "several direct instructions from both [Dr. Oyula] and Dr. Goodenberger." Appx165. And "[i]f you give someone an order and you ask them repeatedly to do the same thing," it becomes more of a "conduct issue" in which counseling may not "garner different results." *Id.* Ms. Rogers also testified that it was "not uncommon" to terminate temporary employees. Appx192.

Additionally, Dr. Biswas's allegation that the Dallas VA's failure to investigate her complaints is "circumstantial evidence of retaliatory motive" is completely belied by the record. Pet. Br. at 33-35. The administrative judge found that the Dallas VA investigated Dr. Biswas's allegations about Dr. Oyula

falsifying his work schedule and found it to be invalid. Appx17, Appx230-231. Dr. Biswas was also informed that her complaints about illegal hiring practices were found to be invalid and meritless. Appx18, Appx249, Appx474-475. Indeed, the administrative judge considered Dr. Biswas's testimony that she *acknowledged* that Dr. Goodenberger told her that investigations found her complaints to be unsubstantiated, but that she felt "stonewall[ed]" and considered herself more knowledgeable about Federal hiring practices than the VA's human resources department. Appx19, Appx109, Appx150-151. Although Dr. Biswas may believe that a different outcome was warranted on the basis of her complaints, her complaints *were* investigated and do not amount to "circumstantial evidence" of retaliation. Appx474-475.

Also, although Dr. Biswas conflates the separate personnel action of her conversion to a temporary employee with retaliation for her removal, Pet. Br. at 35-37, as explained above, substantial evidence supports the agency's reasoning for correcting the erroneous conversion. Appx11-14. Dr. Biswas's allegation that the administrative judge ignored her own testimony about how Dr. Goodenberger "orchestrated" her termination and that her behavior was not "insubordination," Pet. Br. at 37-38, is also baseless. The administrative judge expressly found that Dr. Goodenberger *did* have "some motivation" to retaliate in that he was "directly implicated" in the alleged illegal hiring practices, but he credited

Dr. Goodenberger's "testimony that his decision to terminate [Dr. Biswas's] appointment was based on her disruptive and insubordinate conduct rather than on her whistleblowing." Appx20. It was even "apparent" that Dr. Goodenberger did not have a "favorable opinion" of her, but he "testified in a direct and straightforward manner, demonstrated no animosity, and did not appear resentful" due to the allegations against him. *Id.*

Thus, despite Dr. Biswas's assertions, the administrative judge readily and explicitly considered management's embarrassment likely caused by her protected disclosures to Secretary Shinseki outside of her chain of command. Although Dr. Biswas disagrees with the weight assigned to the evidence and the conclusions that the administrative judge reached, that is insufficient to demonstrate reversible error. *Carr*, 185 F.3d at 1323.

### C. The Absence Of Any Evidence Of An Analogous Comparator Properly Excludes This Factor From The Administrative Judge's Analysis

Regarding the third *Carr* factor, Dr. Biswas argues that the administrative judge failed to conduct an appropriate comparator analysis. Pet. Br. at 38-39. Dr. Biswas also argues that she was similarly situated to permanent employees who were not terminated for actually refusing to see patient assignments, and that the administrative judge interpreted "similarly situated" too narrowly. *Id.* at 43-44. These arguments are meritless.

First, "*Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three *Carr* factors to weigh them each individually in the agency's favor." *Whitmore*, 680 F.3d at 1374. "[T]he absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis," *id.*, as occurred in this case. Appx23-24. Indeed, this Court affirmed that "[t]he [agency] need not produce evidence with regard to each of these factors, nor must each factor weigh in favor of the agency for the [agency] to carry its burden." *Robinson v. Dep't of Veterans Affairs*, 923 F.3d 1004, 1018-19 (Fed. Cir. 2019); *Rickel v. Dep't of the Navy*, 31 F.4th 1358, 1365-66 (Fed. Cir. 2022) ("The lack of evidence on the third *Carr* factor appears neutral[.]" (internal citation omitted)).

Second, although Dr. Biswas argues that the administrative judge ignored evidence that Dr. Goodenberger failed to follow Dr. Holt's recommendation to counsel her, Pet. Br. at 38, that goes to the *substance* of the personnel action and not whether other employees were similarly situated. Moreover, the administrative judge addressed Dr. Biswas's incremental discipline argument when he found that Ms. Rogers "credibly testified that it is not unusual for the agency not to attempt lesser sanctions prior to terminating a physician, and there is no requirement that it do so, particularly for a temporary employee." Appx22 n.8, Appx179.

Third, Dr. Biswas conflates the eventual outcome of the five other physicians who had been erroneously converted along with her, when she argues that the other doctors were later given Professional Standards Boards but she was not. Pet. Br. at 39. What transpired *after* the erroneous conversions were corrected for the other five physicians does not answer the question of whether there was "evidence that another agency employee had engaged in misconduct similar to [Dr. Biswas's]." *Rickel*, 31 F.4th at 1326-27.

Additionally, Dr. Biswas argues that non-whistleblowers who actually refused patient assignments were treated more favorably than she was and that the administrative judge erred when he determined that they were not similarly situated.[2] Pet. Br. at 43-44. However, the administrative judge addressed this point and referred to Ms. Rogers's testimony that one or two emergency room physicians refused to see patients and they were disciplined, but not terminated. Appx193-194. He correctly determined that because the emergency room physicians were permanent employees, he accordingly did not find them to be similarly situated. Appx24 n.9; *see, e.g.*, *Watkins v. Dep't of Defense*, 2023 WL 1376354, at *5 (M.S.P.B., 2023) ("The fact that the law permits the agency to

[2] Indeed, Dr. Biswas concedes in her brief that permanent employees have more due process rights than temporary employees, *see* Pet. Br. at 35-37, which undercuts her argument that a temporary employee is similarly situated to a permanent employee. *Id.* at 43-44.

terminate the appellant's employment during his probationary period for any reason that is not illegal means that he is *not* similarly situated to permanent employees, who can only be removed for reasons that promote the efficiency of the service." (emphasis added)).

Finally, considering the evidence taken together, the administrative judge determined that "there is no evidence that any other hospitalist engaged in the full range of conduct that formed the basis of the agency's decision" to terminate Dr. Biswas. Appx23. In particular, he observed that there was "no evidence that other hospitalists refused to see patients" and "disregarded a directive from a superior." Appx23-24. The administrative judge is charged with considering the evidence in the aggregate, which he did, so the judge did not err by finding that the record evinced no similarly-situated comparators, resulting in this particular *Carr* factor being neutral to his overall analysis. *See Rickel*, 31 F.4th at 1365-66. This Court should sustain the board's determination, which is consistent with this Court's precedent.

## CONCLUSION

For these reasons, we respectfully request that the Court affirm the decision of the board.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/ Reginald T. Blades, Jr.
REGINALD T. BLADES, JR.
Assistant Director

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Washington, DC 20530
Tel: (202) 305-7571
Email:kara.m.westercamp@usdoj.gov

September 20, 2023

Attorneys for Respondent

CERTIFICATION OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure (FRAP) 32(a)(7)(B), I certify that the forgoing brief contains 10,275 words, excluding the parts of the brief exempted by the rule. The brief complies with the typeface requirements and type style requirements of FRAP 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

/s/ Kara M. Westercamp
KARA M. WESTERCAMP
Counsel for Respondent

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 20th day of September, 2023, a copy of the foregoing "BRIEF FOR RESPONDENT" was filed electronically. This filing was served electronically to all parties by operation of the Court's electronic filing system.

/s/ Kara M. Westercamp