23-1552

# United States Court of Appeals for the Federal Circuit

NEENA BISWAS,
*Petitioner*,

v.

DEPARTMENT OF VETERANS AFFAIRS,
*Respondent*.

On Appeal from the Merit Systems Protection Board
Case No. MSPB-1:DA-1221-15-0471-W-2

## CORRECTED OPENING BRIEF FOR PETITIONER

STERLING L. DERAMUS
300 Vestavia Parkway, Suite 2300
Birmingham, Alabama 35216
(205) 504-0189 (Tel)
(205) 449-7392 (Fax)
Email: sderamus@deramuslaw.com

*Counsel for Petitioner*

Becker Gallagher · Cincinnati, OH · Washington, D.C. · 800.890.5001

## CERTIFICATE OF INTEREST

Counsel for Petitioner, Neena Biswas certifies that:

1. **Represented Entities.** Provide the full names of all entities represented by undersigned counsel in this case.

Neena Biswas

2. **Real Party in Interest.** Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None.

3. **Parent Corporations and Stockholders.** Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities:

None.

4. **Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Not applicable.

5. **Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

No.

6. **Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not applicable.

Dated: June 21, 2023

/s/ Sterling L. Deramus
Sterling L. Deramus

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........................................................................ i

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF RELATED CASES ..................................................................1

JURISDICTIONAL STATEMENT ........................................................................1

STATEMENT OF THE ISSUES..........................................................................2

STATEMENT OF THE CASE.............................................................................2

A. Dr. Biswas Applies For The Chief Hospitalist Position As A Qualified Citizen...............................................................................................3

B. The VA Pre-Selects Dr. Ignatius Oyula, A Non-Citizen, Over Dr. Biswas. ...............................................................................................4

C. The VA Fails To Follow Hiring Guidelines When Refusing To Consider Dr. Biswas. ...............................................................................................5

D. Dr. Biswas Discloses Illegal Hiring Practices That Are Never Investigated.................................................................................................8

E. The VA Retaliates By Re-Classifying Dr. Biswas As A "Temporary" Employee.....................................................................................................9

F. The Administrative Judge's Findings...................................................13

SUMMARY OF THE ARGUMENT ..................................................................14

ARGUMENT.........................................................................................................15

Standard of Review ...........................................................................................15

A. Applicable Legal Principles.....................................................................15

B. The Administrative Judge Erroneously Applied the *Carr* Factors. ..............17

1. The administrative judge failed to properly weigh the strength of the evidence in support of the VA's personnel actions. ........................................17

a) The administrative judge misconstrued Dr. Biswas' "conduct." ...........17

(1) Dr. Biswas never criticized her co-workers' "national origin." ..........17

(2) Other hospitalists shared Dr. Biswas' concerns about harassing schedules made to favor non-citizen hospitalists. ..................................199

(3) The July 21st incident. ..................................................................22

b) The VA never actually investigated Dr. Biswas' complaints. .............288

2. The administrative judge failed to properly weigh evidence of retaliatory motive on the part of the VA officials involved in Dr. Biswas' termination. ..29

a) No incremental discipline was imposed before termination despite recommendations for counseling. ..................................................................29

b) The VA's failure to investigate Dr. Biswas' complaints is circumstantial evidence of retaliatory motive. ......................................................................33

c) The VA reclassified Dr. Biswas as a temporary employee to make it easier to fire her. ...................................................................................35

d) The administrative judge ignored evidence that Dr. Goodenberger had retaliated against other VA hospitalists. ......................................................37

3. The administrative judge failed to consider evidence that the VA did not take similar actions against non-whistleblowers .............................................38

C. The Administrative Judge Erroneously Applied The Law To The Facts. ....40

1. The VA cannot support its termination decision based on "conduct" not set forth in Dr. Biswas' termination letter. ....................................................40

2. Dr. Biswas was similarly situated to permanent employees who were not terminated for the same "conduct." ..............................................................433

3. The administrative judge erroneously applied case law describing the severity of misconduct required to justify termination. .................................455

4. Making protected disclosures "outside the chain of command" is not "insubordination." .........................................................................................47

CONCLUSION ...............................................................................................48

CERTIFICATE OF COMPLIANCE ..................................................................50

ADDENDUM

## TABLE OF AUTHORITIES

### CASES

*Carr v. Social Sec. Admin.*,
185 F.3d 1318 (Fed. Cir. 1999) .......................... 14, 17, 29, 30, 31, 32, 39, 44, 46

*Church v. Dept. of Army*,
6 M.S.P.R. 737 (1981) ..........................................................................45

*Crowe v. Smith*,
261 F.3d 558 (5th Cir. 2001) ..................................................................22

*Durr v. Dept. of Veterans Affairs*,
104 M.S.P.R. 509 (2007) ........................................................................45

*Frederick v. Dep't of Justice*,
73 F.3d 349 (Fed. Cir. 1996) ..................................................................15

*Greenspan v. VA*,
464 F.3d 1297 (Fed. Cir. 2006) ............................................ 15, 16, 40, 41, 45, 47

*Hawkins v. Smithsonian Institution*,
73 M.S.P.R.. 397 (1997) ....................................................................41, 42

*Huffman v. Office of Pers. Mgmt.*,
263 F.3d 1341 (Fed. Cir. 2001) ...........................................................47, 48

*Kewley v. Dep't of Health & Human Serv.*,
153 F.3d 1357 (Fed. Cir. 1998) ..............................................................15

*King v. Nazelrod*,
43 F.3d 663 (Fed. Cir. 1994) ...........................................................40, 41, 42

*LaChance v. White*,
174 F.3d 1378 (Fed. Cir. 1999) ...........................................................15, 46

*McCarthy v. Int'l Boundary and Water Comm: U.S. and Mexico*,
116 M.S.P.R. 594 (2011) ....................................................................46, 47

*Oliver v. Dep't of Health and Human Servs.*,
34 M.S.P.R. 465 (1987) ..........................................................................46

*Siler v. Envtl. Prot. Agency*,
908 F.3d 1291 (Fed. Cir. 2018) ....................................................29, 30, 39

*Smith v. Gen. Servs. Admin.*,
930 F.3d 1359 (Fed. Cir. 2018) ................................................ 29, 30, 32, 39, 43

*Spahn v. Dep't of Justice*,
93 M.S.P.R. 195 (2003) ..........................................................................43, 44

*Whitmore v. Dep't of Labor*,
680 F.3d 1353 (Fed. Cir. 2012) ................................................ 16, 27, 29, 44, 47

**STATUTES**

5 U.S.C. § 2302(b)(8)..........................................................................1, 39, 45

5 U.S.C. § 2302(b)(8)(A)..........................................................................15

5 U.S.C. § 2302(b)(9)..................................................................................1

5 U.S.C. § 7703 ..........................................................................................2

5 U.S.C. § 7703(c) .....................................................................................15

38 U.S.C. § 7401 ....................................................................................3, 35

38 U.S.C. § 7402(c) ....................................................................................5

38 U.S.C. § 7407 ....................................................................................2, 4, 5

38 U.S.C. § 7407(a) ..........................................................................8, 11, 12, 13

## STATEMENT OF RELATED CASES

There is no other appeal or proceeding in any other court related to this same civil action. There are no known cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in this pending petition.

## STATEMENT OF JURISDICTION

On July 2, 2015, Petitioner Neena Biswas filed an individual right of action (IRA) appeal and hearing request with the Merit Systems Protection Board, submitting her claim of reprisal for whistleblowing, pursuant to 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9). Biswas pled that the United States Department of Veterans Affairs (VA), and the Dallas VA Medical Center (DVAMC) (collectively, "the Agency") violated 5 U.S.C. § 2302(b)(8) and 5 U.S.C. § 2302(b)(9), when it retaliated against her for making protected disclosures by first reclassifying her as a temporary appointment and then terminating her from her position.

On May 4 – 5, 2016, the Administrative Judge, U. Sidney Cornelius, Jr., held a hearing on the matter and issued an initial decision on October 20, 2016, finding that the Petitioner had made a protected disclosure, that the protected disclosure was a contributing factor in the decision to terminate her employment, but that the Agency showed by clear and convincing evidence that it would have taken the same action notwithstanding her disclosures.

On November 23, 2016, the Petitioner filed a Petition for Review with the Merit Systems Protection Board (the "Board"). On January 4, 2023, the Board issued its Final Order upholding the decision of the Administrative Judge and denying Petitioner her requested relief.

This appeal is from the Final Order issued by the Board on January 4, 2023. Biswas timely filed a Petition for Review with this Court on February 27, 2023. Accordingly, this Court has jurisdiction to review this matter pursuant to 5 U.S.C. § 7703.

## STATEMENT OF THE ISSUES

1. Whether the Board erred in finding that the Agency showed by clear and convincing evidence that it would have converted the Petitioner to a temporary appointment notwithstanding her disclosures.
2. Whether the Board erred in finding that the Agency showed by clear and convincing evidence that it would have terminated Petitioner's appointment with the Agency notwithstanding her disclosures.

## STATEMENT OF THE CASE

This whistleblower case concerns Dr. Neena Biswas' retaliatory termination for reporting illegal hiring practices at the Dallas VA Hospital ("the VA"). The evidence adduced during the hearing of this matter demonstrated that Dr. Biswas reasonably believed that the VA violated 38 U.S.C. § 7407 by hiring non-citizen

doctors to serve as hospitalists when qualified U.S. citizens were available to serve in those positions. The administrative judge found that Dr. Biswas made protected disclosures regarding illegal hiring practices at the VA, and that those disclosures were a contributing factor in her termination. However, the administrative judge also found that the VA carried its heavy burden to establish *by clear and convincing evidence* that Dr. Biswas' termination was related to her *conduct* as opposed to her protected disclosures. In reaching this conclusion, the administrative judge made erroneous findings of material fact, erroneously applied the law to the facts, and abused his discretion by excluding witness testimony and other evidence.

### A. Dr. Biswas Applies For The Chief Hospitalist Position As A Qualified Citizen.

Dr. Biswas is a U.S. citizen who applied for, and was qualified to serve as, Chief Hospitalist at the Dallas VA. (Tr., 8:23-9:8, 11:2-13, Appx92-93).[1] The VA stipulated that Dr. Biswas in fact met the minimum qualifications for the position. (Tr., 17:21-19:11, Appx95); (Appx1173-1176). Even without that stipulation, Dr. Biswas provided unrebutted testimony that she met all of the qualifications listed in

[1] Dr. Biswas initially joined the VA in the Geriatrics Department in August 2010. After several months in that position, she became a U.S. citizen and subsequently applied for a new position as a VA hospitalist. (Tr., 15:4-23, 16:19-17:6, Appx94-95). She applied for that position as a U.S. citizen pursuant to 38 U.S.C. § 7401, and was approved for the position as a citizen. Tr., 15:4-23, 304:12-17, Appx94, Appx167); (Appx1173-1176) On April 25, 2012, the VA converted Dr. Biswas from temporary to permanent status, effective January 15, 2012. (Appx426-427)

the VA's job posting for the position, including the requirement that the position be filled by a U.S. citizen. (Tr., 14:20-17:20, 19:12-25, 77:24-78:7, Appx94-95, Appx95, Appx111). Further still, Dr. Biswas' most recent performance evaluation rated her overall "Outstanding," with a "High Satisfactory" rating on overall personal qualities including dependability and relations with staff, and cited her "outstanding clinical leadership." (Tr., 27:3-18, Appx98); (Appx269-271)[2] Dr. Biswas' qualifications were listed on the resume she submitted along with her application for the Chief Hospitalist position. (Appx415-419)

### B. The VA Pre-Selects Dr. Ignatius Oyula, A Non-Citizen, Over Dr. Biswas.

Despite her qualifications, Dr. Biswas was not interviewed before being notified that she was "not selected" for the Chief Hospitalist position. (Tr., 29:1-25, Appx99); (Appx272-275) The VA selected Dr. Oyula, a non-citizen, instead. (Appx294-295; Appx414) By pre-selecting Dr. Oyula, the VA violated federal law regarding hiring non-citizens. (Tr., 39:1-44:22, 241:11-244:8, Appx101, Appx152); (Appx450-453) According to Dr. Biswas, the VA committed additional violations by hiring non-citizens to serve in other hospitalist positions. (Tr., 42:25-43:15, Appx102). 38 U.S.C. § 7407 provides:

[2] Internal VA communications further acknowledged her "numerous accolades" and the fact that she was the "only triple-specialized physician in the Hospitalist section." (Appx267-268)

> When the Under Secretary for Health determines that it is ***not possible to recruit qualified citizens*** for the necessary services, appointments under sections 7405 and 7406 of this title may be made without regard to the citizenship requirements of Section 7402(c) of this title or of any other law prohibiting the employment of, or payment of compensation to, a person who is not a citizen of the United States.

38 U.S.C. § 7407 (emphasis added) (*see also* Tr., 45:22-46:16, Appx103). 38 U.S.C. § 7402(c) explicitly prohibits the hiring of non-citizens. The requirements of Section 7407 are included in the VA Handbook governing hiring hospitalists, and Dr. Biswas' testimony regarding Section 7407 was unrebutted. (Appx1119) In fact, VA Human Resources Director Barbara Rogers agreed that Dr. Oyula could not be hired over Dr. Biswas if she met the minimum qualifications. (Tr., 272:6-20, 278:5-25, Appx159, Appx161; *see also* Tr., 412:24-413:9, 418:21-419:4, Appx194-195, Appx196).

**C. The VA Fails To Follow Hiring Guidelines When Refusing To Consider Dr. Biswas.**

Upon learning that she was not selected, Dr. Biswas began raising questions about the hiring process and the grounds for her non-selection without even being afforded an interview. Dr. Biswas' first email was sent on May 10, 2012, to Dr. Daniel Goodenberger, the VA's Chief of Medical Services. (Appx272-275) On May 14, 2012, Dr. Goodenberger responded (incorrectly) that Dr. Biswas "did not meet the minimum criteria for selection to interview." (Appx1195)

One week later, on May 21st, Dr. Biswas arrived at Dr. Goodenberger's office for what she had been told by HR would be an interview for the Chief Hospitalist position. (Tr., 172:8-174:20, Appx134-135). To her surprise, Dr. Goodenberger began the "interview" by stating: "this meeting is to stop your emails." (Tr., 172:3-7, Appx134); (Appx276-278) When Dr. Biswas tried to explain that she was there for the scheduled interview, Dr. Goodenberger told her she "had no leadership experience." (Tr., 564:20-23, Appx236); (Appx276-278) Just as he was wrong about Dr. Biswas not meeting the minimum qualifications, Dr. Goodenberger was also wrong about Dr. Biswas' supposed lack of "leadership experience." (Tr., 603:10-21, Appx246); (Appx1176-1176; Appx269-271; Appx415-419) Dr. Goodenberger also lacked a basic understanding of Dr. Biswas' prior work experience. (Tr., 86:6-22, 598:15-24, 600:7-15, Appx113, Appx245, Appx245)); (Appx587-588) ("FYI – her medical director experience was at Grand Island, Nebraska Veterans Home – not a hospital – in extended care and rehabilitation – not hospital medicine. Basically a nursing home."). In fact, Dr. Biswas had extensive prior hospitalist experience at Methodist Hospital and the Grand Island, Nebraska VA Hospital, ***not*** the state-run "Veterans Home" Dr. Goodenberger referenced. (Tr., 149:2-150:7, 253:2-254:24, Appx129, Appx155); (Appx415-419). Ignorant of her qualifications and unwilling to listen to Dr. Biswas, Dr. Goodenberger informed Dr. Biswas that he was not required to interview her, showed her the door, threatened to call the police if she

refused to leave, and put his hand on her arm to make his point. (Tr., 175:1-177:1, 260:12-19, Appx135-136, Appx156); (Appx276-278). Reporting this incident to HR, Dr. Biswas wrote that Dr. Goodenberger was "openly violating the basic principles in the hiring process in a Federal workplace." (Appx276-278)

*Dr. Biswas was right.* The VA acknowledged its own failure to follow federal hiring guidelines in an email exchange three days later. Specifically, Ms. Rogers informed Dr. Goodenberger that he could not pre-select Dr. Oyula without actually conducting interviews. (Tr., 566:22-567:6, Appx237); (Appx665-669). In Ms. Rogers' own words: "Heads up – to select a non-citizen, *this is not going to hold up*, unfortunately. *Interviews should have been done* on the top applicant(s). Oyula – he's not on the referral list." (Appx665-669) (emphasis added).[3] At the hearing, Ms. Rogers attempted to explain away her email by testifying that she only meant that the "documentation supporting that selection needed to be complete." (Tr., 265:11-266:23, Appx158); (Appx292-293) Of course, this is not at all what Ms. Rogers wrote. Ms. Rogers actually told Dr. Goodenberger that "interviews should have been conducted" before hiring a non-citizen for Chief Hospitalist, *not* that "documents"

[3] Dr. Goodenberger responded: "Ok. No, several other citizens were not interviewed. We can re-create." (Appx665-669). Thus, Dr. Goodenberger effectively admitted that he was wrong (again) when he told Dr. Biswas he was not required to interview her before rejecting her application, and all but declared that he had no intention of conducting a meaningful interview process. Instead, he would "re-create" the process that pre-selected Dr. Oyula. *See id*.

were missing. (Tr., 272:6-20, Appx159); (Appx279-280, Appx292-293). The administrative judge ignored this contradiction (along with several others) between Ms. Rogers' emails and her testimony in finding her a credible witness. (Appx12-13).

On May 31, 2012, the VA "re-created" the hiring process by interviewing Dr. Biswas, but not before interviewing Dr. Oyula. (Appx281-283). Dr. Oyula was interviewed even though he did not meet the minimum requirement of U.S. citizenship, and even though the Undersecretary had not made a determination that it was not possible to recruit qualified citizens for the position. (Appx1173-1176); 38 U.S.C. § 7407(a). Despite his lack of minimum qualifications, Dr. Oyula was officially selected on May 31, 2012. (Tr., 557:3-11, Appx235); (Appx414). No one informed Dr. Biswas. (Tr., 177:21-178:12, Appx136). Instead, the VA repeatedly represented to Dr. Biswas that the process was ongoing even though Dr. Oyula had already been selected. *See, e.g.*, (Appx1202, Appx1207-1208, Appx1240).

**D. Dr. Biswas Discloses Illegal Hiring Practices That Are Never Investigated.**

In the following months, Dr. Biswas raised increasingly insistent questions about the hiring process. *See, e.g.*, (Appx1208); (*see also* Tr., 56:5-60:18, Appx105-106). Her questions went unanswered, and there is no evidence that the VA investigated whether its hiring process complied with the law. (Tr., 67:4-69:21, Appx108-109). The VA prepared no Report of Investigation, no AIB was convened,

and there is no written record of any *actual* investigation. (Tr., 251:5-252:3, 388:1-23, 616:9-13, Appx154, Appx188, Appx249).

Deputy Chief of Staff Dr. Stephen Holt and Ms. Rogers both testified that they did not investigate Dr. Biswas' complaints, but that they "would have" instructed Dr. Goodenberger to do so. (Tr., 432:19-433:5, Appx199-200).[4] Based on his own testimony, it is clear that Dr. Goodenberger performed no such investigation. In his view, Dr. Biswas was *not* qualified. (Tr., 564:20-23, Appx236). Moreover, Dr. Goodenberger repeatedly stated in emails that he believed the hiring process complied with federal law. (Appx286-287, Appx294-295). The most plausible inference to be drawn from the record is that the VA did *not* investigate Dr. Biswas' claims. (*See* Tr., 542:3-17, 588:11-12, Appx231, Appx242). Feeling stonewalled, Dr. Biswas escalated her reports higher up the chain of command. (Tr., 62:16-63:13, 67:4-69:21, Appx107, Appx108-109); (Appx1240, Appx1247-1249) The administrative judge found that these protected disclosures were a contributing factor in Dr. Biswas' termination. (Appx10-11).

### E. The VA Retaliates By Re-Classifying Dr. Biswas As A "Temporary" Employee.

Shortly before her termination, the VA finally responded to months of

[4] The VA offered no explanation for its apparent decision to charge Dr. Goodenberger with the supposed investigation of *his own conduct* when hiring non-citizens. (*See* Tr., 73:21-74:15, Appx110).

inquiries from Dr. Biswas regarding the VA's compliance with federal law in its hiring practices. (Appx1259-1260) The exchange began on September 2, 2012, with an email from Dr. Biswas to HR asking for clarification on the "reason for Non-selection as per AFGE guidelines." (Appx1260).[5] Two days later, the VA reclassified Dr. Biswas from a "permanent" to a "temporary" employee. (Tr., 146:18-147:2, Appx128). Dr. Biswas was not given advance written notice of the change, as required by AFGE guidelines. (Tr., 145:20-146:1, Appx128); (Appx1123). In her view, she was reclassified as "temporary" simply to make it easier to fire her. (Tr., 141:23-143:9, 147:3-6, Appx127-128). Dr. Biswas' view was corroborated by the VA's own witnesses. Ms. Rogers conceded that the VA did not look into Dr. Biswas' employment classification until *after* it had decided to terminate her. (Tr., 327:8-329:7, Appx173-174; *see also* 497:24-499:23, Appx220); (Appx1123; Appx322-324). Ms. Rogers also conceded that re-classifying Dr. Biswas as "temporary" made it easier to fire her. (Appx631-632).

After reclassifying Dr. Biswas as a temporary employee without written notice, the VA responded to Dr. Biswas' September 2nd email. (Appx1260) In its

[5] AFGE guidelines provide that employees inquiring about "the results of a specific promotion action *will be given* the following information:" "(a) whether they met the minimum qualification requirements; (b) whether they were within the group from which selection was made; (c) who was selected," and "in what areas, if any, they should improve to increase their chances for future promotion." (Appx1122) (emphasis added).

response, the VA (finally) informed Dr. Biswas that Dr. Oyula had been selected, and cited 38 U.S.C. § 7407(a) in support of its assertion that "the selection met all requirements that was [sic] needed in order to hire a non citizen." (Appx1260) Dr. Biswas immediately responded to point out—accurately—that Section 7407(a) only applies "WHEN it is NOT possible to recruit qualified citizens," and noted that the Undersecretary of Health had made no determination that it was not possible to recruit qualified citizens. (Appx1259) Dr. Biswas then reiterated: "Again I am a qualified citizen STILL available to be recruited for this position." (Appx1259). The VA never provided Dr. Biswas with a reason for non-selection, as required by AFGE guidelines. Nor did the VA take issue with Dr. Biswas' interpretation of Section 7407(a). (Tr., 77:24-78:7, Appx111); *see also* (Appx1259).

Hearing no response from HR, on September 11, 2012, Dr. Biswas made yet another disclosure of the "recruiting scam at Dallas VA," this time higher up the chain to Dr. Robert Petzel. (Appx1261-1262) Dr. Biswas' email cited Section 7407(a), then described the "heavily manipulated" process that led to Dr. Oyula's selection. (Appx1261-1262). Dr. Petzel forwarded the disclosure internally, and eventually Dr. Lawrence Biro advised: "We need to get a response. I would not use an IB to respond, a memo or some lower level of communication needs to be used[.]" (Appx1261). Dr. Biswas was terminated later that day. (Tr., 92:7-19, Appx114); (Appx528-530)

The next day, September 12, 2012, the VA generated a memorandum for the Undersecretary of Health. (Appx473-475). In its memo, the VA falsely stated that Dr. Biswas' "allegations regarding hiring practices" (which were not actually described in the memo) "have been investigated and addressed repeatedly in a variety of forums including one-on-one meetings between the physician and the Service Chief, group meetings with the entire Hospitalist physician group, and multiple telephone and email conversations." (Appx473-475).[6] Dr. Biswas testified that no such investigation occurred, and that no one met with her as part of any investigation of illegal hiring practices. (Tr., 69:12-21, 239:24-240:15, Appx109, Appx151). For its part, the VA identified no documents and adduced no testimony regarding any *actual* investigation of illegal hiring practices. Nor did the VA adduce a shred of evidence of any "group meetings" or "telephone and email conversations" to investigate those practices. (Tr., 86:23-89:16, Appx113-114).

Attempting to explain its decision to hire Dr. Oyula over Dr. Biswas, the VA told the Undersecretary in its memo: "Her application was reviewed along with the others, and it was determined that she was not the ***best*** qualified of the applicants." (Appx473-475) (emphasis added). The memo fails to note that "*best* qualified" is not the standard. Rather, Section 7407(a) only permits hiring a non-citizen if no

[6] The day after the VA circulated its memo for the Undersecretary of Health, the VA internally discussed its change of Dr. Biswas' employment status from "permanent" to "temporary." (Appx1268)

"*qualified*" citizen can be recruited for the position. *See* 38 U.S.C. § 7407(a). The VA's memo went on to say Dr. Biswas had been "instructed verbally and in writing on multiple occasions to follow the appropriate chain of command for grievances and/or complaints," then cited Dr. Biswas' protected disclosures as examples of her failure to follow the "chain of command." (Appx473-475) The memo made no mention of the *content* of Dr. Biswas' communications, and failed to inform the Undersecretary that Dr. Biswas' emails were protected disclosures under the WPA. (Appx473-475). Instead, the memo simply reported that Dr. Biswas had been handed her letter of termination. (Appx473-475).

**F. The Administrative Judge's Findings.**

The administrative judge correctly found that Dr. Biswas made protected disclosures of illegal hiring practices at the VA, and that those disclosures were a contributing factor in the VA's decision to reclassify and then terminate her. (Appx9, Appx11). However, the administrative judge went on to find that the VA had proved by clear and convincing evidence that (1) it would have reclassified Dr. Biswas as a temporary employee absent the protected disclosures, and (2) it terminated her for "disruptive and insubordinate conduct." (Appx13, Appx20). This finding involved errors of fact and law, and was the product of an abuse of discretion in refusing to allow Dr. Biswas to present countervailing evidence.

## SUMMARY OF THE ARGUMENT

The Board erred in finding that the Agency proved by clear and convincing that they would have converted from her temporary appointment and terminating her notwithstanding her protected disclosures. In doing so, the Board ignored clear guidance from this Court regarding the proper determination of and sufficiency of proof in whistleblower reprisal cases. The Agency failed to produce any evidence of similarly situated individuals who were also terminated, and indeed Agency witnesses indicated that progressive discipline is the standard for similarly situated employees as Petitioner. Instead, the Administrative Judge and the Board required Petitioner to provide similarly situated individuals and thus shifted the burden of proof to her instead of requiring the Agency to prove by clear and convincing evidence that they would have taken the same actions absent the protected disclosures. Thus, the Board failed to properly consider *Carr* factor 3, "any evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated." *See, Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).

Furthermore, the administrative judge and the Board's conclusions regarding Petitioner's alleged misconduct were not supported by substantial evidence, or were also not factors considered by the Agency in terminating her but were considered by the administrative judge in upholding the termination based on

Petitioner's alleged misconduct. Nor were the allegations of misconduct sufficiently severe to warrant the imposed discipline of termination.

## ARGUMENT

### Standard of Review

This Court must set aside the MSPB's decision if it finds it was: (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence. *See* 5 U.S.C. § 7703(c); *Kewley v. Dep't of Health & Human Serv.*, 153 F.3d 1357, 1361 (Fed. Cir. 1998). Questions of law are reviewed *de novo. See LaChance v. White*, 174 F.3d 1378, 1380 (Fed. Cir. 1999) (citing *Frederick v. Dep't of Justice*, 73 F.3d 349, 351-52 (Fed. Cir. 1996)).

### A. Applicable Legal Principles.

"The purpose of the WPA is to shield employees who are willing to speak out and criticize government management, to 'freely encourage employees to disclose that which is wrong with our government.'" *Greenspan v. VA*, 464 F.3d 1297, 1305 (Fed. Cir. 2006) (citation omitted).[7] "Although wrongful or disruptive conduct is not

[7] The WPA prohibits taking any adverse personnel action because of "any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences – (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to health and safety[.]" 5 U.S.C. § 2302(b)(8)(A).

shielded by the presence of a protected disclosure, when the disclosure is protected the burden is on the agency to show, by clear and convincing evidence, that it would have disciplined the employee for reasons unrelated to the protected disclosure." *Greenspan*, 464 F.3d at 1305. "Whether evidence is sufficiently clear and convincing to carry this burden of proof cannot be evaluated by looking only at the evidence that supports the conclusion reached." *Whitmore v. Dep't of Labor*, 680 F.3d 1353, 1368 (Fed. Cir. 2012). Rather, "[e]vidence only clearly and convincingly supports a conclusion when it does so in the aggregate considering all the pertinent evidence in the record, and despite the evidence that fairly detracts from that conclusion." *Id*. As the *Whitmore* court explained:

> Congress decided that we as a people are better off knowing than not knowing about such violations and improper conduct, even if it means that an insubordinate employee like Mr. Whitmore becomes, via such disclosures, more difficult to discipline or terminate. Indeed, it is in the presence of such non-sympathetic employees that commitment to the clear and convincing evidence standard is most tested and is in most need of preservation.

*Whitmore v. Dep't of Labor*, 680 F.3d at 1377.

The Court should reverse the decision of the Board upholding the decision as it contained erroneous findings of material fact, the decision was based on an erroneous application of the law to the facts, and the Board's rulings during the course of the initial decision were not consistent with required procedures or involved an abuse of discretion that affected the outcome of the case.

### B. The Administrative Judge Erroneously Applied the *Carr* Factors.

Here, the administrative judge erroneously applied the *Carr* factors in finding that the VA would have reclassified and then terminated Dr. Biswas regardless of her protected disclosures. *See Carr v. Social Sec. Admin.*, 185 F.3d 1318, 1323 (Fed. Cir. 1999).[8]

#### 1. The administrative judge failed to properly weigh the strength of the evidence in support of the VA's personnel actions.

##### a) The administrative judge misconstrued Dr. Biswas' "conduct."

###### (1) Dr. Biswas never criticized her co-workers' "national origin."

The VA contended that Dr. Biswas' "misconduct" included making "inflammatory" and "defamatory" statements about her co-workers based on their "national origin." *See* (Appx1224) But there was no evidence of any such communications. Dr. Biswas was actually complaining about the illegal hiring and preferential treatment of *non-citizens* in communications that say nothing at all about her co-workers' "national origin." (Tr., 62:16-63:13, 98:8-100:6, 426:9-427:5, 527:23-528:11, Appx107, Appx116, Appx198, Appx227); (Appx1249) The

---

[8] The *Carr* factors are as follows: "(1) the strength of the agency's evidence in support of its personnel action; (2) the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and (3) any evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated." *Id*.

administrative judge erred by refusing to acknowledge the significance of this distinction. (Appx22).

Also failing to appreciate the distinction, in an "outline for inclusion in letter of termination," Dr. Goodenberger identified a July 12, 2012 email from Dr. Biswas as one of the grounds for her termination. (Appx1251) In that email, Dr. Biswas stated: "Just informing you that anyone and everyone, who is involved in re-appointing Drs. Oyula, Pitafi, Gupta, and Mutua from the hospitalist group, are betraying the US government. Specifications are clear and Dallas VA has to follow the rules like other VAs." (Appx1213)

The VA identified no communication from Dr. Biswas that *actually* criticized a co-worker on the basis of race, gender, or national origin. In fact, as Dr. Holt acknowledged during his examination, Dr. Biswas shares the *same* national origin as Dr. Gupta, one of the physicians Dr. Biswas singled out as receiving favorable treatment in violation of Title 38. (Tr., 528:12-529:2, Appx227-228). The distinction is critical, as the VA's purported basis for conduct-based termination actually proves Dr. Biswas' point: she was terminated for making protected disclosures, not for making "defamatory" and "inflammatory" statements about co-workers based on *national origin*.

**(2) Other hospitalists shared Dr. Biswas' concerns about harassing schedules made to favor non-citizen hospitalists.**

The administrative judge also cited Dr. Biswas' email complaints about unfair scheduling practices as "conduct" that created a "hostile work environment," and thus justified the VA's decision to terminate her. (Appx16). In those emails, Dr. Biswas reported Dr. Oyula's abuse of authority (a protected disclosure under the WPA) in preparing unfair schedules that placed an inordinate burden on some doctors to handle night shifts:

- "I strongly object to what is going on as it has become evident that Dr. Oyula together with a few others have made schedules to suit themselves."
- "A 3 weeks schedule was made on purpose so that Dr. Oyula can show how difficult it is to hire."
- "The non-citizens have prepared a tough schedule to drive out citizens from a Federal job to keep their positions."
- "Let me know who is the 2nd person [to work night shifts along with Dr. Biswas], as this is an uncertain and outrageous schedule now being enforced to harass me."[9]

(Appx1214-1216)

Dr. Goodenberger listed several of these emails in his "outline for inclusion in letter of termination." (Tr., 96:23-98:7, Appx115-116); (Appx1251) There, Dr.

[9] The administrative judge identified this email as an example of Dr. Biswas threatening to take unscheduled days off. (Appx16). It is undisputed that Dr. Biswas never took unscheduled or unapproved leave at any time during her employment at the VA. (Tr., 215:8-216:23, Appx145).

Goodenberger characterized Dr. Biswas' protected disclosures as examples of "insubordination" that would support her termination. *Id*. Recognizing that these were protected disclosures of abuse of authority, Dr. Goodenberger attempted to distance himself from his "outline" at the hearing. Prompted by a series of leading questions, Dr. Goodenberger testified that he did not attempt to prevent Dr. Biswas from making protected disclosures. (Tr., 577:21-578:5, Appx240). The administrative judge relied on this testimony in support of his finding that Dr. Biswas was terminated for her "conduct." (Appx20).

In so finding, the administrative judge ignored the fact that Dr. Goodenberger's testimony cannot be reconciled with his contemporaneous emails. While Dr. Goodenberger testified that he did not deter Dr. Biswas from making protected disclosures, he stated *in writing* that Dr. Biswas' emails reporting protected disclosures were examples of "insubordination" to be cited in her termination letter. (Appx1251); (Appx1243-1244). But, as Ms. Rogers conceded, Dr. Biswas was not bound by instructions from superiors *not* to report hiring violations "outside the chain of command." (Tr., 299:12-20, 302:5-9, Appx166-167).[10] Thus, Dr. Goodenberger's assessment that Dr. Biswas' disclosures were acts

[10] Dr. Holt contradicted Ms. Rogers' testimony on this issue when he testified that Dr. Biswas' reporting of illegal hiring practices outside the chain of command was an act of insubordination. (Tr., 517:11-518:5, Appx225). In so testifying, Dr. Holt failed to acknowledge that Dr. Biswas made no complaints to superiors "outside the

of "insubordination" was (yet again) wrong.

In finding that Dr. Biswas' complaints about unfair scheduling created a "hostile environment," the administrative judge also ignored the fact that several of Dr. Biswas' fellow hospitalists shared her concerns about Dr. Oyula's abusive scheduling practices. (Appx1214-1216) The administrative judge also ignored glaring inconsistencies in the testimony of the VA's witnesses on this issue. For example, Dr. Holt dismissed Dr. Biswas' concerns in an email in which he remarked: "I must point out that, to date, no other Hospitalist has raised these concerns to senior leadership." (Appx1234). Dr. Holt repeated this statement on August 10, 2012: "I must point out that yours are the only complaints that have been raised on scheduling issues." (Appx504-506). On cross-examination, Dr. Holt was forced to admit that, just *two days* before he told Dr. Biswas she was the *only* one complaining, he was copied on an email chain in which *three* other doctors made the *same* complaints. (Tr., 476:12-481:25, Appx214-216); (Appx1214-1216) He further admitted that the difference between Dr. Biswas and the other doctors who complained about the schedule is that only Dr. Biswas also disclosed illegal hiring practices. (Tr., 482:14-483:3, Appx216).

---

chain of command" until *after* he and others lower on the chain had ignored several earlier disclosures. (*See* Tr., 67:4-69:21, Appx108-109).

Ms. Rogers similarly wrote that other doctors had made the same complaints as Dr. Biswas, even "using similar language." (Appx731-735) Here again, the VA was *wrong* on the facts, and its position that Dr. Biswas was a lone voice complaining and creating a "hostile work environment" was unsupported by the actual record. (Tr., 120:14-124:8, 481:17-25, Appx121-122, Appx216).

These inconsistencies between the VA's contemporaneous communications and the testimony of its witnesses made it impossible for the VA to carry its burden of proof by clear and convincing evidence. *Cf. Crowe v. Smith*, 261 F.3d 558, 566 (5th Cir. 2001) (finding that contradictory testimony was not "clear and convincing evidence – evidence so 'clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of the precise facts'"). The administrative judge erred by ignoring these inconsistencies to find the VA's witnesses credible, and then concluding that Dr. Biswas created a "hostile work environment." (Appx22).

**(3) The July 21st incident.**

The administrative judge also cited an incident between Drs. Biswas and Oyula, during which Dr. Biswas allegedly refused a patient assignment. (Tr., 449-50, Appx208); (Appx1251); (Appx15). As an initial matter, it is undisputed that Dr. Biswas *did* see the *one* patient at issue after she was instructed to do so. (Tr., 101:4-103:3, 621:6-16, Appx117, Appx251); (Appx1251) Nevertheless, to better

understand the genesis of the July 21st incident, an examination of Dr. Oyula's conduct prior to that date is in order. Dr. Biswas testified that, prior to July 21, 2012, Dr. Oyula had made it his practice to include himself on the rotation on days when he was not actually present at the VA. (Tr., 106:1-23, Appx118). Dr. Biswas further testified that Dr. Oyula improperly gave himself "credit" for seeing patients he had not actually seen. (Tr., 106:1-23, Appx118). These practices by Dr. Oyula constitute clear abuses of authority, endanger patient safety, and are critical to an understanding of the July 21st incident.

Dr. Biswas arrived at work that day to find she had been assigned two additional patients that were initially slated for Dr. Oyula. (Tr., 103:16-104:25, Appx117). Dr. Oyula had erased his name off the board that listed patient assignments and wrote Dr. Biswas' name instead, thus giving "his" patients to Dr. Biswas. (Tr., 104:16-105:2, Appx117-118). When Dr. Biswas objected to this inequitable distribution of patient responsibilities, Dr. Oyula represented to her that he took himself off the rotation because he had seen two additional patients the day before. (Tr., 105:3-19, Appx118). Believing he was lying to her to avoid work, Dr. Biswas asked for their names. (Tr., 105:20-106:23, Appx118). Dr. Oyula refused to give her the names, stuck his finger in her face, and shouted at her. (Tr., 107:5-15, Appx118). He then stormed out of the room, then returned for a second encounter. (Tr., 107:15-20, Appx118).

During the second meeting, Dr. Oyula called Dr. Holt at home and asked him to intercede. (Tr., 108:6-9, Appx118). Drs. Oyula and Biswas stated their positions to Dr. Holt, who never asked Dr. Oyula the identity of the "second patient" he had supposedly seen the day before. (Tr., 109:10-15, 463:22-464:7, Appx119, Appx211). Dr. Holt did tell Dr. Biswas she was required to comply with Dr. Oyula's work assignments, and it is undisputed that she did so. (Tr., 108:13-109:9, Appx118-119); (Appx1251).

To prove Dr. Oyula had abused his authority by lying about seeing patients to avoid work, Dr. Biswas investigated whether Dr. Oyula had in fact seen two patients on July 20th. (Tr., 109:16-110:20, Appx119). Two days after the incident, Dr. Biswas emailed Dr. Holt to inform him of the results of her investigation, and her discovery that there was no "second patient":

> I can positively confirm to you that **Dr. Oyula made several inaccurate statements about his admissions.** There was only ONE parecentesis done which was an admission. So in essence, he used this one patient on 7/20 as well as 7/21 to get out of admissions/overnight patients. . . . If you need to confirm data, please ask him the names but also look at notes through CPRS to verify. The end result is that **when he skips out, the others pick up extra patients** which should have been his.

(Appx1225-1226) (emphasis added); (Tr., 113:21-115:5, 467:4-469:25, Appx120, Appx212-213). Dr. Biswas freely conceded that Dr. Oyula had the right as her supervisor to assign patients, even if the distribution of work was inequitable. (Tr., 115:14-19, Appx120). The issue—which was completely lost on the administrative

judge—was whether Dr. Oyula had the right to lie about his own activities when exercising his authority. (Tr., 115:20-116:2, Appx120). The administrative judge erred by focusing solely on whether Dr. Biswas' "conduct" justified termination without considering her conduct in the context of the protected disclosure she making. (Tr., 466:7-467:3, Appx212). Worse, the administrative judge cited Dr. Holt's testimony that Dr. Biswas' initial refusal to see patients was "disruptive to patient care," when Dr. Goodenberger—the chief of the section—was not aware of any danger to patient care caused by the incident, and admitted that to the best of his knowledge *none* of Dr. Biswas' conduct caused any such disruption. (Tr., 621:17-20, 622:5-20, Appx251); (Appx21).

Just as the VA never investigated illegal hiring practices Dr. Biswas disclosed, no one at the VA ever investigated whether Dr. Oyula had abused his authority by lying about seeing patients on July 20, 2012. (Tr., 118:6-14, Appx121). This despite the fact that, as Dr. Holt conceded, Dr. Oyula *did not* have authority as Chief Hospitalist to misrepresent the patients he had seen, and had no authority to be verbally abusive to subordinates. (Tr., 470:4-472:4, Appx213). Rather than investigate the abuse of authority Dr. Biswas reported in her July 23rd email, Dr. Goodenberger listed that email as an example of the "insubordination" that supported terminating her. (Appx1251) ("Accuses Dr. Oyula of intimidating behavior").

The administrative judge cited Dr. Biswas' report of the incident as evidence of misconduct that supported the decision to terminate Dr. Biswas. (Appx15). The administrative judge also relied on Dr. Goodenberger's testimony that Dr. Biswas had made an "accusation against Dr. Oyula," but never addressed the validity of her "accusation" or whether her "disruptive behavior" was actually protected under the WPA. (Appx16).

In his email calling Dr. Biswas' protected disclosure "insubordination," Dr. Goodenberger stated that Dr. Biswas' version of the July 21st incident was not borne out by the VA's subsequent "fact-finding" regarding the incident. (Appx1251). That "fact-finding" consisted solely of talking to Dr. Oyula, Dr. Biswas, and two interns who witnessed a portion of the incident; nothing was done to investigate whether Dr. Oyula had abused his authority by lying about seeing two patients on July 20, 2012. (Tr., 464:2-466:6, Appx211-212); (Appx1184-1190). One of those interns, Mr. Nathaniel Berrios, stated that "he did not witness the original conversation" (where Dr. Oyula shouted at Dr. Biswas and threatened her). (Appx1190) He was only present for the *second* encounter when Dr. Oyula returned and called Dr. Holt.[11] Even though Mr. Berrios *was not there* to witness Dr. Oyula's threatening behavior,

[11] Dr. Holt testified that he did not know whether the two "witnesses" at the center of the VA's "investigation" were actually present for the first encounter. (Tr., 474:10-14, Appx214).

the VA's Ruth Kirkland emphasized in her report: "[Dr. Oyula] did not reach out to her in any way." (Appx1190) (original emphasis).

The other witness, Hunter Rackley, stated he was "staring ahead at the computer," and could not see whether or not Dr. Oyula made threatening gestures toward Dr. Biswas. (Appx1189).[12] Setting aside the question whether the VA's "fact-finding" actually supported the conclusion that Dr. Biswas' version of events was incorrect, it is undisputed that there was *no* "fact-finding" to look into Dr. Biswas' complaint that Dr. Oyula had lied about seeing patients on July 20th, which was the root cause of the entire incident. (Tr., 465:4-467:3, Appx212); *see also* (Appx1184-1190).

In sum, the administrative judge failed to consider all of the pertinent evidence before concluding that the July 21st incident justified the VA's decision to terminate Dr. Biswas, and thus erred in relying on that incident to find that the VA had carried its burden by clear and convincing evidence. *See Whitmore,* 680F.3d at 1368.

[12] Dr. Oyula testified during an EEO hearing that he *did* "shout" at Dr. Biswas, and "may have" put his finger in her face. (Tr., 510:3-20, Appx223). Dr. Goodenberger testified that he did not believe Dr. Oyula ever said he "shouted" at Dr. Biswas, but if true, he would change his view that Dr. Biswas' complaint about intimidating behavior was unfounded. (Tr., 624:22-625:10, Appx251-252). Moments after this testimony, when confronted with Dr. Oyula's testimony that he "shouted" at Dr. Biswas, Dr. Goodenberger reversed himself and said Dr. Biswas' complaint was *still* unfounded. (Tr., 626:22-627:23, Appx252). The administrative judge ignored this obvious—and complete—reversal of course.

**b) The VA never actually investigated Dr. Biswas' complaints.**

Viewed in the proper context, the individuals Dr. Biswas accused of illegal conduct simply decided it would be easier to fire Dr. Biswas than actually look into the illegality she reported. Failing to recognize as much, the administrative judge relied on Dr. Goodenberger's testimony that Dr. Biswas "had already been notified that her complaints had been investigated and found meritless and, therefore, he considered her ongoing emails, including to individuals outside her chain of command, to be inappropriate." (Appx18). In so finding, the administrative judge ignored overwhelming record evidence that no such investigation ever occurred. *See* Part II(D), *supra*; (Tr., 251:5-253:1, Appx154-155); (Appx20).

The administrative judge also ignored the direct contradiction between the VA's stipulation that Dr. Biswas met the minimum qualifications and the testimony of the VA's witnesses, who testified that they did not believe she met those qualifications. (Tr., 278:11-15, 564:20-23, Appx161, Appx236). It is difficult to conceive how the VA could possibly have actually investigated Dr. Biswas' complaints about illegal hiring practices, when at the hearing of this matter the individuals charged with the investigation disagreed with the VA's own conclusion that Dr. Biswas was in fact qualified for the Chief Hospitalist position. (Tr., 438:7-16, Appx201). After all, if the VA had actually investigated, it would have at least found out (as the VA later stipulated) that Dr. Biswas was in fact qualified. These

obvious contradictions between the VA's stipulation and the testimony of the VA's witnesses were completely lost on the administrative judge.

**2. The administrative judge failed to properly weigh evidence of retaliatory motive on the part of the VA officials involved in Dr. Biswas' termination.**

**a) No incremental discipline was imposed before termination despite recommendations for counseling.**

"Since direct evidence of . . . retaliatory motive is typically unavailable (because such motive is almost always denied), federal employees are entitled to rely on circumstantial evidence to prove a motive to retaliate." *See Whitmore*, 680 F.3d at 1371. Here, the VA's departure from established procedure—which called for counseling or other incremental discipline short of termination—is evidence of retaliatory motive. *See id*. "Though we have explained that *Carr* imposes no affirmative burden on the agency to produce evidence for each of the three factors, *see Whitmore*, 680 F.3d at 1374, the Board cannot ignore record evidence relevant to the existence and strength of any motive to retaliate or the treatment of similar employees. Rather, the Board must 'provide an in depth review and full discussion of the facts to explain its reasoning.' *Id*. at 1368." *Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1366 (Fed. Cir. 2018). The *Smith* court also cites to *Siler v. Envtl. Prot. Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018), which held that:

> Once a whistleblower shows that his protected disclosures contributed to adverse action against him, the agency bears the burden of showing that it would have acted in the same way even absent any

> whistleblowing. 5 U.S.C. § 1221(e)(2); *Miller*, 842 F.3d at 1257 (burdening the agency to prove independent causation by clear and convincing evidence). Though an agency need not introduce evidence of every Carr factor to prove its case, the "risk associated with having no evidence on the record" for a particular factor falls on the government. *Miller*, 842 F.3d 1262. The Board "may not simply guess what might happen absent whistleblowing." *Id*.

*Siler v. Envtl. Prot. Agency*, 908 F.3d 1291, 1299 (Fed. Cir. 2018).

Here, as in *Smith*, 930 F.3d 1359, and, *Siler*, 908 F.3d 1291, the administrative judge failed to properly apply the *Carr* factors in weighing the evidence of retaliatory motive on the part of the VA officials responsible for Dr. Biswas's termination, thereby demonstrating that the Agency repeatedly failed to meet its burden of demonstrating it would have acted in the same way absent any whistleblowing by Dr. Biswas. *See Id.* Dr. Biswas' termination – spearheaded by Dr. Goodenberger and others who had been singled out in her disclosures – was handled contrary to directives the VA received from superiors inside the Department of Health. Jeffrey Milligan, Director of the facility, and Dr. Clark Gregg, Chief of Staff, recommended counseling. (Tr., 645:12-646:2, Appx257); (Appx518-520). Dr. Holt also recommended *counseling*. (Tr. 501:7-504:10, Appx221); (Appx640-641). These recommendations were ignored. (Tr., 294:16-297:15, 378:18-379:1, 641:4-16, 642:13-22, Appx165-166, Appx186, Appx256); (Appx631-632).

Ms. Rogers and Dr. Holt both admitted that no incremental discipline was imposed before termination. (Tr., 347:16-19, 391:18-392:4, Appx178, Appx189; *see*

*also* Tr., 147:7-148:9, Appx128). Also conceding this point, Dr. Goodenberger offered that counseling would have been "useless" because the "myelin sheath" inside Dr. Biswas' brain was fully formed, her conduct could not be changed by counseling, and the very idea that counseling could alter adult behavior was a "false paradigm." (Tr., 647:3-648:11, Appx257). Whatever the state of Dr. Biswas' "myelin sheath," her most recent performance review had rated her "Outstanding" overall, with a "High Satisfactory" rating for emotional stability, dependability, and relations with staff. (Tr., 637:1-20, Appx255). Further still, the VA offered no coherent explanation (other than retaliation) for its decision to terminate Dr. Biswas rather than impose the lesser discipline that was actually recommended by superiors. (Appx640-641).

Even Ms. Rogers testified that she "wouldn't define it as typical" for doctors in Dr. Biswas' position to be immediately terminated rather than have some lesser form of discipline imposed. (Tr., 351:2-12, Appx179). In fact, Ms. Rogers conceded that physicians who had actually refused patient assignments were not terminated, but were instead reprimanded. (Tr., 406:19-407:12; 409:17-410:16, Appx193-194); (Appx1113-1116). Such a statement is incompatible with third *Carr* factor, i.e., evidence that the agency takes similar actions against employees who are not whistle blowers but who are otherwise similarly situated, and the Board erred in failing to properly consider it. *Carr*, at 1393. As this Court has opined numerous times, the

"Where whistleblowing is at issue, however, the proper inquiry is not whether the agency action is justified; it is whether the agency would have acted in the same way absent the whistleblowing." *Smith v. Gen. Servs. Admin.*, 930 F.3d 1359, 1365 (Fed. Cir. 2018).

In this case the Administrative Judge acknowledged that physicians were not terminated for failing to see patients, but erroneously concluded that Petitioner had refused to see patients – which is totally refuted by the evidence as outlined above. But then the Administrative Judge turned this third *Carr* factor on its head by saying that since the other physicians were not permanent employees, they were not comparable and thus Appellant has somehow failed to show a comparator employee. The Administrative Judge's argument is confusing but undeniably it is the Agency's burden to demonstrate a comparator – not Appellant. As this Court explained in *Smith*, "To the extent the agency failed to introduce evidence on how this employee or other similarly situated employees were treated, *Carr* factor 3 cannot support the agency." *Id.*, at 1367. This Court then opined that where an agency failed to provide comparator evidence, they did so at their peril. The Respondent here failed to provide comparator evidence and the case should be reversed and remanded.

The facts in this case are indeed quite similar to the *Smith* case where Mr. Smith also was charged with 5 instances of disrespectful conduct – similar to Petitioner here. In that case, the Court also required the Board to analyze the penalty

under the *Douglas* factors, and to carefully analyze each of the charges against him. In this matter though, Petitioner was never charged with wrongdoing – she was simply reverted to the status of a temporary employee and then terminated without notice as to what she had precisely done wrong. The allegations of misconduct have always been vague and unclear because none were specifically made against her at the time of her termination.

While the administrative judge did acknowledge that Dr. Biswas had adduced some evidence of retaliatory motive, he did not address any of the evidence of the VA's failure to follow its own disciplinary guidelines in finding that the VA did not fire Dr. Biswas as retaliation for making protected disclosures. This despite the fact that, viewed together, Dr. Biswas' emails were no doubt a source of irritation for the superiors she singled out in those disclosures, specifically Dr. Goodenberger and the HR department headed by Ms. Rogers.

**b) The VA's failure to investigate Dr. Biswas' complaints is circumstantial evidence of retaliatory motive.**

The VA's troubling pattern of failing to investigate Dr. Biswas' complaints constitutes circumstantial/inferential evidence of a retaliatory motive. (*See* Tr., 84:5-86:5, Appx112-113). The VA's testimony on this issue amounted to an epic case of buck passing. Dr. Holt admitted he did not investigate Dr. Biswas' reports, saying it would have been "inappropriate" for him to do so. (Tr., 529:25-532:10, Appx228). Ms. Rogers also admitted she did no investigation, but asked Dr. Goodenberger to

conduct one. (Tr., 279:1-280:16, 428:3-13, Appx161, Appx198). Dr. Goodenberger testified that an investigation was conducted, but cited only the HR investigation of the July 21st incident with Dr. Oyula. He said nothing about an investigation of ***his own*** illegal hiring practices. (Tr., 583:21-585:23, Appx241-242).

If, between all the finger-pointing, an actual investigation of illegal hiring practices occurred, there is no written record of it. (Tr., 428:17-24, Appx198). Ms. Rogers admitted there was no Report of Investigation, and no AIB review either. (Tr., 281:21-282:23, 427:13-428:2, Appx162, Appx198).[13] The only written document that could possibly be characterized as a report of an investigation is the VA's September 12, 2012 memorandum to the Undersecretary (which repeats almost verbatim the contents of an internal "Issue Brief" prepared in August 2010). (Appx473-475). As explained in Part II(E), *supra*, that memo is rife with what can be charitably described as factual *errors*. The memo does not describe with any specificity the "hiring practices" that were supposedly investigated, much less the results of any such "investigation." *See* (Appx473-475).

---

[13] Ms. Rogers testified that no AIB was necessary because there were no disputed fact issues on the question whether Dr. Oyula had discouraged citizens from applying for the Chief Hospitalist position. (Tr., 427:19-428:2, Appx198). The administrative judge refused to allow Dr. Biswas to call Dr. Rex Moss, who would have testified that he was discouraged from applying for the position. *See* (Appx1110-1112) This abuse of discretion is addressed in Part III(D)(1), *infra*.

The memo does, however, bolster Dr. Biswas' contention that she was terminated as retaliation for making protected disclosures. The memo identifies the same emails Dr. Goodenberger cited as examples of "insubordination" in his "outline for inclusion in letter of termination," and reports that Dr. Biswas continued to make disclosures even after she was instructed not to go outside the chain of command. (Appx473-475). The VA's memo thus contradicts the testimony of its witnesses that Dr. Biswas' disclosures did not prompt her termination.

**c) The VA reclassified Dr. Biswas as a temporary employee to make it easier to fire her.**

Waving away criticisms of the VA's termination decision, Ms. Rogers testified that the VA had no obligation to explore lesser discipline before terminating a temporary employee. (Tr., 353:20-354:3, 355:23-356:4, Appx180).[14] On this point, it is undisputed that the VA did not begin looking into Dr. Biswas' employment classification until *after* it had decided to terminate her. (Tr., 327:8-329:7, Appx173-174). Ms. Rogers acknowledged that converting Dr. Biswas back to temporary status deprived her of certain rights, and VA officials discussed internally the benefits of reclassifying her as "temporary" in advance of a termination.[15] (Tr., 320:2-10,

[14] Elsewhere, Ms. Rogers testified that Dr. Biswas was terminated for her "conduct," yet another inconsistency that made it impossible to rely on her as a credible witness. (Tr., 317:21-318:1, Appx171).

[15] It is not at all clear that Dr. Biswas should have ever been converted back to "temporary" status. Dr. Biswas applied for the hospitalist position as a citizen for a full time appointment under 38 U.S.C. § 7401. Indeed, that is how the VA

321:14-18, Appx171); (Appx631-632). The VA did not treat any other doctors this way. Not coincidentally, those other doctors had not made protected disclosures of illegal hiring practices. (Tr., 364:9-13, Appx182).

Despite this evidence, the administrative judge found that the VA clearly and convincingly proved that the reclassification of Dr. Biswas as a temporary employee was simply done to correct the VA's "error" in classifying Dr. Biswas as a permanent employee in the first place. (Appx12-13). Completely lost in the administrative judge's analysis was any consideration of the VA's error in reclassifying Dr. Biswas as a temporary employee. In addition to advance written notice, AFGE guidelines mandate that any change in Dr. Biswas' employment status had to be conducted through a Professional Standards Board. (Tr., 327:8-24, Appx173); (Appx1123) The VA adduced no evidence that a PSB was convened prior to reclassifying Dr. Biswas as a temporary employee.

Yet, the administrative judge accepted Ms. Rogers' testimony that the VA was simply fixing "errors" in the process without acknowledging that the VA's "fix" was an error in itself. Had the VA actually followed the process in reclassifying Dr. Biswas (by giving her prior written notice and convening a PSB), then perhaps its excuse could withstand scrutiny. But the reality is the VA reclassified Dr. Biswas as

characterized the appointment in Dr. Biswas' SF-50 signed by Ms. Rogers herself. (Appx570)

"temporary" only *after* it decided to fire, and did so knowing that doing so would limit Dr. Biswas' rights. (Appx631-632) The VA's failure to actually follow the correct process in reclassifying Dr. Biswas makes it *impossible* to conclude (by clear and convincing evidence) that the VA was actually motivated by concern for correcting "errors" in the "process," when the fact is the VA knew that its "fix" would make it easier to terminate Dr. Biswas. (*See* Tr., 225:7-226:18, Appx148).[16] In sum, the VA's conduct raises serious questions about the veracity of the excuses it raised at the hearing of this case. This conduct also renders it impossible to conclude that the VA carried its burden to prove by clear and convincing evidence that Dr. Biswas' reclassification was not retaliation for making protected disclosures.

**d) The administrative judge ignored evidence that Dr. Goodenberger had retaliated against other VA hospitalists.**

In finding Dr. Goodenberger's testimony credible, the administrative judge also ignored Dr. Goodenberger's history of inventing "insubordinate" conduct to justify improperly terminating VA physicians. (Appx1113-1116) (Tr., 129:4-140:25, Appx124-126). The administrative judge ignored Dr. Biswas' testimony

[16] In the Initial Decision, the administrative judge pointed out that a VA employee named Daniel Harper was reprimanded for incorrectly changing Dr. Biswas' appointment to "permanent." However, he made no mention of the fact that Ms. Rogers' signature, *not* Mr. Harper's, appears on the document converting Dr. Biswas to a permanent employee. The scapegoating of Mr. Harper to protect Ms. Rogers is hardly clear and convincing evidence that the VA was not retaliating against Dr. Biswas by converting her back to "temporary" status immediately before her termination. (Appx13; Appx570)

that, as he had done so many times before, Dr. Goodenberger orchestrated her retaliatory termination in September 2012 on trumped up charges of "insubordination." (Appx1265-1266) The administrative judge's failure to recognize as much was error.

**3. The administrative judge failed to consider evidence that the VA did not take similar actions against non-whistleblowers.**

The decision to terminate Dr. Biswas over several recommendations for counseling was apparently unprecedented. Dr. Holt could not identify a single instance in which Dr. Goodenberger did not follow Dr. Holt's recommendation regarding employee discipline. (Tr., 501:7-504:10, Appx221). Not coincidentally, Dr. Holt also could not recall any incident involving employee discipline when potentially protected disclosures were in issue. (Tr., 504:11-16, Appx221). Nor was there any testimony from the VA identifying any instance in which a non-whistleblowing doctor was reclassified as "temporary" from "permanent" contemporaneously with a termination.

Ms. Rogers testified that other VA employees were also reclassified as temporary around the same time as Dr. Biswas. (Tr., 312:21-313:5, Appx169-170). While the administrative judge cited this testimony in support of his finding, it is undisputed that the VA did not terminate any of those employees. (Tr., 313:6-11, Appx170). Those employees were all reclassified as permanent after the VA corrected its "mistake." (Tr., 313:24-314:12, Appx170). Of course, none of those

employees had raised complaints about illegal hiring practices and abuse of authority at the VA. (Tr., 364:9-13, Appx182). Despite these admissions, Ms. Rogers insisted that Dr. Biswas' re-classification was simply done to correct a "mistake" in classifying her as a permanent employee. (Tr., 362:3-9, Appx182).

Whether or not Ms. Rogers' testimony is remotely credible, the timing of Dr. Biswas' reclassification as "temporary" only *after* the VA had already decided to terminate her cannot be chalked up to a mere coincidence. *See* 5 U.S.C. § 2302(b)(8) (prohibiting an agency from penalizing its employees for whistleblowing); *see Smith v. Gen. Servs. Admin.*, 930 F.3d 1359 (Fed. Cir. 2019)(vacating the Board's decision and remanding for reconsideration, in relevant part, for failing to consider the Agency's failure to introduce evidence relevant to *Carr* factor 3 pertaining to treatment of non-whistleblowers who engaged in similar misconduct as the whistleblower); *see also, Siler v. EPA*, 908 F.3d 1291, 1299 (Fed. Cir. 2018). In this case, Dr. Biswas should have been at least been given a Professional Standards Board as the other doctors were; and as a PSB only reviews *professional standards,* as opposed to allegations of misconduct, she would have been made a permanent doctor and giving her substantial more rights and abilities to challenge her termination. Given this record, the administrative judge and the Board erred in finding that the VA's reclassification was not done in retaliation for Dr. Biswas' protected disclosures.

### C. The Administrative Judge Erroneously Applied The Law To The Facts.

#### 1. The VA cannot support its termination decision based on "conduct" not set forth in Dr. Biswas' termination letter.

"The Board cannot change the agency's grounds from those Noticed by the agency at the time of the discipline." *Greenspan*, 464 F.3d at 1305 (citing *King v. Nazelrod*, 43 F.3d 663, 666 (Fed. Cir. 1994)). In *Greenspan*, Dr. Greenspan bluntly criticized management for nepotism and other illegal practices at an open staff meeting. *Greenspan,* 464 F.3d at 1300-01. The VA defended the case on the ground that Dr. Greenspan was not disciplined for the *content* of his words, but instead for "derogatory, inappropriate, and disrespectful 'conduct'" in the *manner* in which he criticized his superiors. *Id*. at 1303-04. The VA further contended that it would have disciplined Dr. Greenspan for that "conduct" even if his statements were not protected disclosures. *Id*. Dr. Greenspan maintained that "the present posture that he was properly disciplined for 'disrespect' cannot be separated from the content of his whistleblowing criticisms of management." *Id*.

The administrative judge agreed with the VA, deemed it "irrelevant" that the "conduct" the VA contended supported the discipline was not set forth in Dr. Greenspan's letter of reprimand, and dismissed Dr. Greenspan's appeal. *Id*. The administrative judge's ruling was reversed on appeal to the Federal Circuit. *Id*. at 1306. The *Greenspan* Court reasoned:

> When a disclosure is of protected subject matter, it is more likely than not to be critical of management, perhaps highly critical. The WPA protects those employees who are willing to speak out on subjects that could incur retaliation if unshielded. We have not been shown substantial evidence in support of the agency's burden to establish by clear and convincing evidence that it would have taken these disciplinary actions absent the protected disclosures.

*Id*. at 1305-06. The *Greenspan* Court pointed out that Dr. Greenspan was not initially charged with "disrespect," and noted that "the Board cannot change the agency's grounds from those Noticed by the agency at the time of discipline." *Id*. at 1304.

In light of *Greenspan*, the VA's attempt to carry its burden of proof was doomed from the start. While the VA contended that Dr. Biswas was terminated because of her "conduct," the VA failed to include any of that conduct in her actual termination letter. (Appx528-530) Having failed to provide required notice of Dr. Biswas' right to appeal a conduct-based termination, the VA cannot rely on that conduct to support its decision to terminate her. *See, e.g., King,* 43 F.3d at 666; *Greenspan*, 464 F.3d at 1305; *Hawkins v. Smithsonian Institution,* 73 M.S.P.R. 397, 401 (1997).

The administrative judge erroneously distinguished these cases on the ground that they all dealt with *permanent* employees, not *temporary* employees like Dr. Biswas. (Appx22). However, the cases themselves make no such distinction between *permanent* and *temporary* employees, and the administrative judge cites no authority

for the proposition that an agency can terminate a *temporary* employee for grounds not stated in a termination letter.[17]

The administrative judge also made this finding despite testimony from Dr. Holt that the termination letter was the "critical" document to reference for the grounds of termination. (Tr., 515:12-24, Appx224). Dr. Biswas' termination letter stated no grounds for termination, and further provided that *if* the termination were conduct-related, Dr. Biswas would receive a "separate notice" regarding her appeal rights. (Appx528-530) Dr. Biswas testified that she never received any "separate notice"; nor was any such notice produced in this case. (Tr., at 92:20-94:2, Appx114-115).

In sum, the VA's stated position – that Dr. Biswas was terminated for her conduct as opposed to her protected disclosures – cannot be reconciled with her actual termination letter. (Appx528-530) The administrative judge erroneously applied case law that precludes the VA from justifying its termination based on "conduct" that is not included in a termination letter. Setting aside these errors, the administrative judge's reasoning actually proves Dr. Biswas' point: the VA retaliated by reclassifying her as a temporary employee to make it easier to fire her.

---

[17] In *Hawkins*, the appellant was only identified as a "GS-12 Contract Specialist," with no indication whether the appellant served in that role on a temporary or permanent basis. *See Hawkins*, 73 M.S.P.R. at 399; *see also King*, 43 F.3d at 664 (identifying appellant only as an "employee").

### 2. Dr. Biswas was similarly situated to permanent employees who were not terminated for the same "conduct."

The administrative judge cited Dr. Biswas' refusal to accept patient assignments as an example of the conduct that justified termination even though Dr. Biswas never actually refused a patient assignment. (Appx23-24). Worse, Dr. Biswas adduced evidence that non-whistleblowers who *did* refuse to see assigned patients were treated more favorably. (Tr., 409:17-410:12, Appx194); (Appx1113-1116). To avoid finding that Dr. Biswas was in fact treated differently than non-whistleblowers, the administrative judge reasoned that "unlike the appellant, those physicians were permanent employees. . . . I do not find that they are similarly situated to the appellant." (Appx24).

This was error on several grounds. As argued above, it is the Agency's burden to prove by clear and convincing evidence that they would have taken the same action notwithstanding the protected disclosures. Thus, it is the Agency's burden to demonstrate comparators, as this Court opined in *Smith v. Gen. Servs. Admin, supra*.

This is also not a correct way to look at similarly situated employees regardless. "For other employees to be deemed similarly situated, the Board has held that all relevant aspects of the appellant's employment situation must be 'nearly identical' to those of comparative employees." *Spahn v. Dep't of Justice*, 93 M.S.P.R. 195, 202 (2003). As quoted in *Spahn*, the EEOC "has stated the matter in the following way: 'To be similarly situated, comparative employees must have

reported to the same supervisor, been subjected to the same standards governing discipline, and engaged in conduct similar to complainant's without differentiating or mitigating circumstances.'" *Id*. (quotation omitted); *see also Whitmore*, 680 F.3d at 1373 ("*Carr*, however, requires the comparison employees to be 'similarly situated'—not identically situated—to the whistleblower.").

Here, as hospitalists in the same VA, Dr. Biswas and the permanent employee hospitalists were all supervised by the same Chief Hospitalist. Regardless of whether the hospitalists were temporary or permanent employees, they were subjected to the same standards governing discipline. As for "differentiating or mitigating circumstances," the hospitalists who were *not* terminated behaved *worse*. They actually refused to see patients, yet they were only reprimanded. The administrative judge cited no authority for the proposition that VA hospitalists on temporary appointments are somehow not similarly situated to hospitalists who are permanent employees, and Ms. Rogers was unable to identify any statute or regulation that justified treating Dr. Biswas any differently from those permanent hospitalists who refused to see patients. Nor did the VA adduce any evidence of non-whistleblowing physicians being terminated for similar conduct. For all these reasons, the administrative judge erred in finding that Dr. Biswas was not similarly situated to permanent employee hospitalists.

**3. The administrative judge erroneously applied case law describing the severity of misconduct required to justify termination.**

Cases in which *conduct* rather than *content* actually justified the discipline demonstrate that the conduct must be egregious indeed to remove whistleblower protection. *See, e.g., Durr v. Dept. of Veterans Affairs*, 104 M.S.P.R. 509, 512 (2007) ("The fact that the appellant was blunt or intemperate, standing alone, does not bring this disclosure outside the protection of 5 U.S.C. § 2302(b)(8)."); *see also Greenspan*, 464 F.3d at 1305-06. In this case, the administrative judge and the Board erroneously applied cases in which egregious conduct removed whistleblower protection in order to find for the VA just as in *Greenspan*.

In *Church v. Dept. of Army*, the appellant did little work, and spent nearly all of his time complaining. 6 M.S.P.R. 737, 739 (1981) (finding that the appellant's behavior was "grossly insubordinate and provocative"). Here, Dr. Biswas was an "Outstanding" employee. While she was charged with "insubordination" for making protected disclosures outside the chain of command, Ms. Rogers conceded Dr. Biswas was *not* bound by any instructions from superiors not to make such disclosures. The VA further conceded that Dr. Biswas' complaints did not disrupt patient care, and it is undisputed that she saw all the patients assigned to her. On this record, Dr. Biswas' conduct can hardly be characterized as "highly insubordinate or provocative," as was the case in *Church*. *See id*. Indeed, even the

administrative judge made no finding that Dr. Biswas was "grossly insubordinate" or "provocative" in the Initial Decision. *See* (Appx23).

The administrative judge also relied on *Oliver v. Dep't of Health and Human Servs.*, a case decided twelve years before *Carr*. 34 M.S.P.R. 465 (1987). The Board in *Oliver* (obviously) did not apply the *Carr* factors; nor did *Oliver* apply the clear and convincing evidentiary standard applicable to WPA cases. *See id*. at *12 ("What is required is a weighing of the motive to retaliate against the gravity of the misconduct charged."). Even so, the Board in *Oliver* noted the Board's previous holdings that "while simply rude or impertinent conduct in the course of presenting a grievance provides no basis for discipline, gross insubordination or threats of physical harm do." *Oliver*, 34 M.S.P.R. at 17. Again, the administrative judge made no finding that Dr. Biswas was "grossly insubordinate," and the "unprofessional" behavior he cited is precisely the kind of "rude or impertinent conduct" that even the *Oliver* Board recognized would not support a termination. *See id*.

The administrative judge next relied on *McCarthy v. Int'l Boundary and Water Comm: U.S. and Mexico.* 116 M.S.P.R. 594 (2011) (citing *LaChance v. White*, 174 F.3d 1378, 1381 (Fed. Cir. 1999)); (Appx23). In *McCarthy*, the appellant's termination letter provided that he was "unfit" for continued employment. *Id*. at *598. Finding the agency had carried its burden of proof, the Board in *McCarthy* relied on agency testimony that the appellant's protected disclosures did not "cause

the deterioration" of the appellant's relationship with his employer. *Id*. at 601. Here, Dr. Biswas' disclosures *did* cause the deterioration: the "conduct" cited by the VA in support of its termination decision consists entirely of the disclosures themselves and conduct that supposedly occurred after or in connection with those disclosures. (Appx1251) Moreover, the agency in *McCarthy* justified the termination on the grounds that the appellant—an attorney—was terminated for circulating incorrect legal advice in contentious memoranda. *McCarthy*, 116 M.S.P.R. at 620. Here, the VA adduced no evidence that Dr. Biswas was a bad doctor. *See* (Appx269-271) Further still, the agency in *McCarthy* drafted the appellant's termination letter ten days prior to being notified of the appellant's protected disclosures. *Id*. at 622. Here, the VA drafted Dr. Biswas' termination letter *after* the protected disclosures, and only handed it to her after reclassifying her as a temporary employee to facilitate the termination.

To support his decision, the administrative judge erroneously relied on all of these cases, and ignored guiding authority set forth in cases that track the facts at issue in this appeal. *See, e.g.*, *Whitmore*; *Greenspan*.

#### 4. Making protected disclosures "outside the chain of command" is not "insubordination."

The WPA does not permit an agency to discipline an employee for disclosing protected information merely because that information has been reported outside the chain of command. *Huffman v. Office of Pers. Mgmt.*, 263 F.3d 1341, 1351 (Fed.

Cir. 2001). Despite this clear authority, the administrative judge found that Dr. Biswas made protected disclosures outside the chain of command that were "disruptive to the work environment" and thus grounds for the VA's decision to terminate Dr. Biswas. (Appx20).[18] Even assuming Dr. Biswas *had* made disclosures outside the chain of command, that conduct would not support a finding of "insubordination" that justified her termination. *Huffman*, 263 F.3d at 1351. The administrative judge's failure to correctly apply the law on this issue was error.

## CONCLUSION

The record demonstrates the Agency did not meet its burden to show by clear and convincing evidence it would have taken the same personnel actions in the absence of Biswas's disclosures, and the Board erred in not considering or analyzing whether the Agency met this heavy burden.

As such, Biswas respectfully requests this Court reverse and vacate the Board's Final Order, and find that she engaged in protected activity when she complained about the selection of non-citizens over U.S. Citizens; find that Biswas was subject to covered personnel actions when the Agency first rescinded her permanent status and second terminated her; find that Biswas's protected disclosures were a contributing factor in the adverse actions taken against her; find the Agency

---

[18] Again, Dr. Biswas never actually made disclosures outside the chain of command. She simply continued to report higher up the chain when her earlier disclosures were ignored. (*See* Tr., 66:18-68:6, 69:22-70:16, Appx108-109).

failed to prove by clear and convincing evidence it would have taken the same actions in the absence of Biswas's protected whistleblowing; and remand this matter to the Board for judgment in Biswas's favor and all appropriate remedies, including compensatory damages for the emotional distress and reputational harm caused by the Agency, and her attorney's fees. In the alternative, Biswas respectfully requests that the Court vacate the Board's Final Decision and remand for reconsideration of the Agency's chosen penalty of termination.

Respectfully submitted,

/s/ Sterling L. Deramus
STERLING L. DERAMUS
300 Vestavia Parkway, Suite 2300
Birmingham, Alabama 35216
(205) 504-0189 (Tel)
(205) 449-7392 (Fax)
Email: sderamus@deramuslaw.com

*Counsel for Petitioner*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[X] this brief contains [11,390] words.

[ ] this brief uses a monospaced type and contains [*state the number of*] lines of text.

2. This brief complies with the typeface and type style requirements because:

[X] this brief has been prepared in a proportionally spaced typeface using Microsoft Office Professional Plus 2016 in 14-pointTimes New Roman; *or*

[ ] this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

/s/ Sterling L. Deramus
STERLING L. DERAMUS
300 Vestavia Parkway, Suite 2300
Birmingham, Alabama 35216
(205) 504-0189 (Tel)
(205) 449-7392 (Fax)
Email: sderamus@deramuslaw.com

*Counsel for Petitioner*