# United States Court of Appeals for the Federal Circuit

---

**NEENA BISWAS,**
*Petitioner*

**v.**

**DEPARTMENT OF VETERANS AFFAIRS,**
*Respondent*

---

2023-1552

---

Petition for review of the Merit Systems Protection Board in No. DA-1221-15-0471-W-2.

---

Decided: January 17, 2025

---

STERLING DERAMUS, Sterling L. DeRamus Law Offices, Birmingham, AL, argued for petitioner.

KARA WESTERCAMP, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for respondent. Also represented by REGINALD THOMAS BLADES, JR., BRIAN M. BOYNTON, PATRICIA M. MCCARTHY.

---

Before DYK, CHEN, and HUGHES, *Circuit Judges*.

CHEN, *Circuit Judge*.

Dr. Neena Biswas petitions for review of the decision of the Merit Systems Protection Board (Board) denying her request for corrective action under the Whistleblower Protection Act of 1989, Pub. L. No. 101-12, 103 Stat. 16 (codified as amended in scattered sections of 5 and 22 U.S.C.) (WPA), for two personnel actions taken against her by the Department of Veterans Affairs (VA). Although the Board held that Dr. Biswas made protected disclosures under the WPA and that these disclosures contributed to the VA's personnel actions, the Board denied relief because it determined that the VA showed it would have taken the same personnel actions even in the absence of Dr. Biswas's protected disclosures. For the reasons explained below, we *affirm*.

## BACKGROUND

### I.

Dr. Biswas, a United States citizen, worked as a physician at the VA's Dallas, Texas facility (Dallas VA) within the Veterans Health Administration (VHA). The VA hired Dr. Biswas in August 2010 in a temporary appointment under 38 U.S.C. § 7405(a)(1)(A), with a not-to-exceed date of July 30, 2012. *See* J.A. 50; J.A. 82. Originally assigned to Geriatrics, Dr. Biswas was later transferred to the Medicine Service, Hospitalist Section, effective January 15, 2012. *See* J.A. 50; J.A. 80. On April 25, 2012, Dr. Biswas's appointment was converted to a permanent appointment under 38 U.S.C. § 7401(1) with a retroactive effective date of January 15, 2012. *See* J.A. 50; J.A. 570. Five other Dallas VA physicians were converted from temporary to permanent appointments along with Dr. Biswas.

Around April 2012, the Dallas VA advertised the position of Chief of the Hospitalist Section, which, at the time, was held by Dr. Ignatius Oyula, a non-U.S. citizen, under a three-year appointment scheduled to expire later that year. J.A. 50. The VA was prohibited by statute from appointing a non-U.S. citizen to the position unless "the

Under Secretary for Health determine[d] that it [was] not possible to recruit qualified citizens for the necessary services." 38 U.S.C. § 7407(a); *see id.* § 7402(c) (providing that the VA may not appoint a non-citizen to a position listed in 38 U.S.C. § 7401(1) "[e]xcept as provided in section 7407(a)"). Dr. Biswas applied but was not selected for the position, which was given again to Dr. Oyula. J.A. 50.

In May 2012, Dr. Biswas began sending emails questioning why she was not selected for the position, including to a human resources (HR) Specialist, Daniel Harper, and to the selecting official for the position, Dr. Daniel Goodenberger, who was the Chief of the Medical Service at the Dallas VA. J.A. 273–75. On May 21, 2012, Dr. Biswas met with Dr. Goodenberger and an administrative officer, Ruth Kirkland, to discuss her non-selection. J.A. 77. After Dr. Goodenberger explained his reasons for not deeming Dr. Biswas qualified for the position, the meeting became heated, and Dr. Biswas refused to leave Dr. Goodenberger's office until he began to call the police. *Id.* Later that day, Dr. Biswas again emailed Mr. Harper, asserting, among other things, that Dr. Goodenberger "openly is violating the basic principles in the hiring process in a Federal workplace. In addition, I have the basic and many more requirements, including being a US citizen and permanent employee . . . ." J.A. 277.

Over the next several months, Dr. Biswas sent numerous emails to VA staff, including Dr. Goodenberger, Ms. Kirkland, Mr. Harper, Wanda Jackson (an HR supervisor), Barbara Rogers (Chief of HR Management at the Dallas VA), Dr. Stephen Holt (Deputy Chief of Staff and Acting Chief of Staff at the Dallas VA), and all Dallas VA hospitalists. Dr. Biswas's emails complained about both the process of hiring Dr. Oyula for the Hospitalist Section Chief position and the scheduling practices within the hospitalist section. In more than one instance, Dr. Biswas's emails transcended civility. In a July 10, 2012, email that Dr. Biswas sent to all Dallas VA hospitalists, for example,

Dr. Biswas accused Dr. Oyula of moonlighting and falsifying his work schedule and wrote that Dr. Oyula made "stupid schedules to suit himself" and was "a total failure at running this group." J.A. 734. In a July 12, 2012, follow-up email, Dr. Biswas accused Dr. Oyula and three other doctors of being "the reason the rest of the group is being subjected to harassing schedules" and called for the non-renewal of their appointments. *Id.* at 733–34. In another July 12, 2012, email, Dr. Biswas stated to Ms. Rogers, Mr. Harper, and Drs. Holt and Goodenberger, among others, that "anyone and everyone[] who is involved in re-appointing Dr[.] Oyula" and the same three other doctors "are betraying the US government." J.A. 1213.

On July 13, 2012, Dr. Goodenberger responded to Dr. Biswas, instructing her that "complaints must ascend the appropriate chain of command" and "not to disseminate inflammatory and accusatory e-mails regarding your colleagues and superiors." *Id.* On July 21, 2012, Dr. Biswas refused to see the patients assigned to her by Dr. Oyula until Dr. Oyula called Dr. Holt, who was able to talk her down. On August 6, 2012, Dr. Biswas emailed Ms. Rogers, Mr. Harper, Ms. Kirkland, and Drs. Goodenberger and Holt—in spite of Dr. Goodenberger's July 13 email—accusing Dr. Oyula of "degrading" the program and "harassing citizens with nasty schedules," while also referring to a "scam to keep Dr[.] Oyula's position." J.A. 1240.

On August 7, 2012, Dr. Biswas began emailing then-Secretary of the VA, Eric Shinseki, expressing her concerns regarding the Hospitalist Section Chief hiring process and hospitalist scheduling practices. J.A. 1243. The following day, Ms. Kirkland sent Dr. Biswas a memorandum outlining the proper grievance and complaint procedures, which directed staff not to contact Secretary Shinseki directly so as to avoid delays in the grievance process and not compromise the Secretary's role as the VA's ultimate decisionmaker. J.A. 1248. Dr. Biswas emailed Secretary Shinseki again later that same day, J.A. 1247–48, and then

again on August 17, 2012, J.A. 627. On August 18, 2012, Dr. Goodenberger emailed Dr. Biswas, instructing her to stop contacting Secretary Shinseki directly and stop bringing her complaints outside her chain of command, and explaining that her emails in contravention of those directives were insubordination. J.A. 626.

Meanwhile, on August 10, 2012, Dr. Biswas emailed Drs. Oyula and Goodenberger, among others, stating that she would work day instead of night shifts and "tak[e] the appropriate number of days off to compensate for the hours worked." J.A. 1250. Dr. Goodenberger responded to Dr. Biswas, instructing her that "you may not unilaterally change your work assignment." *Id.* at 1249.

Not long after this series of incidents, Ms. Rogers "correct[ed]" Dr. Biswas's appointment on September 4, 2012, by converting it from permanent back to temporary under 38 U.S.C. § 7405(a)(1)(A), with a not-to-exceed date of February 14, 2013 and effective retroactively to January 15, 2012. J.A. 79. Then, on September 11, 2012, Dr. Biswas was informed by letter that she was being terminated, effective September 25, 2012. J.A. 60. The termination letter did not list any specific grounds, though the corresponding notification of personnel action stated the reason for removal as "[c]onduct does not reflect the necessary level required for successful government service." J.A. 57–58. In an email outlining his reasons for deciding to terminate Dr. Biswas's appointment, Dr. Goodenberger stated four separate bases: (1) insubordination for contravening an instruction to bring complaints only within her chain of command; (2) insubordination for contravening an instruction to cease disseminating inflammatory and defamatory emails regarding her colleagues; (3) insubordination for refusing a patient assignment; and (4) creation of a hostile work environment. J.A. 653.

II.

Dr. Biswas filed an individual right of action (IRA) appeal with the Board, alleging that the VA unlawfully retaliated against her for engaging in protected whistleblowing by (1) converting her appointment from permanent to temporary, and (2) terminating her appointment. The administrative judge conducted a two-day hearing and issued an initial decision denying Dr. Biswas's request for corrective action. *Biswas v. Dep't of Veterans Affs.*, No. DA-1221-15-0471-W-2, 2016 WL 6236460 (M.S.P.B. Oct. 20, 2016) (*Decision*).[1]

The initial decision found that Dr. Biswas's May 2012 emails regarding the VA's process of hiring Dr. Oyula for the Hospitalist Section Chief position were protected disclosures under the WPA. *Id.* at 9. Specifically, the administrative judge found that Dr. Biswas had a reasonable belief that these disclosures evidenced a violation of the required priority hiring for U.S. citizens. *Id.* The administrative judge further found that, under the "knowledge/timing test," Dr. Biswas's protected disclosures were a contributing factor in both personnel actions at issue. *Id.* at 10–11; *see* 5 U.S.C. § 1221(e)(1). The VA does not challenge these findings.

The administrative judge next considered the three factors set forth in *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999), and found that the VA proved by clear and convincing evidence that it would have both converted Dr. Biswas to a temporary appointment and terminated her appointment notwithstanding her protected disclosures. *Decision* at 11–24. As to the termination, the administrative judge was particularly persuaded

---

[1] Because the electronic version of the initial decision lacks page designations, we employ the pagination used in the decision at J.A. 1–29.

by *Carr* factor one: the strength of the evidence in support of the agency's action. *Id.* at 24; *see Carr*, 185 F.3d at 1323. The Board found that Dr. Biswas engaged in "unprofessional and improper acts," including, for example, refusing to see her assigned patients, threatening to take unscheduled leave, and continuing to contact Secretary Shinseki after being instructed not to. *Decision* at 21–22. Separately, the administrative judge found that "the tone and content of [Dr. Biswas's] communications, including name-calling, demands for the non-renewal of colleagues' appointments disseminated throughout the practice group, and accusations of a betrayal of the government, are unprofessional on their face, and provide strong support for the [VA's] action." *Id.* at 23.

The full Board denied Dr. Biswas's petition for review and affirmed the initial decision, which became the final decision of the Board.[2] *Biswas v. Dep't of Veterans Affs.*, No. DA-1221-15-0471-W-2, 2023 WL 105606, at *1 (M.S.P.B. Jan. 4, 2023). Dr. Biswas now petitions this court for review. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

We review decisions of the Board under 5 U.S.C. § 7703(c), which requires that the decision be affirmed unless it is "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." *Einboden v. Dep't of Navy*, 802 F.3d 1321, 1324 (Fed. Cir. 2015) (quoting 5 U.S.C. § 7703(c)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Higgins v. Dep't of*

---

[2] Accordingly, we refer interchangeably to the administrative judge and the Board.

*Veterans Affs.*, 955 F.3d 1347, 1353 (Fed. Cir. 2020) (citation omitted). The petitioner bears the burden of establishing reversible error. *Sacco v. Dep't of Just.*, 317 F.3d 1384, 1386 (Fed. Cir. 2003).

I. Background Law

Whistleblower retaliation claims under the WPA follow a burden-shifting framework. "Where, as here, the government does not dispute that whistleblowing contributed to the agency's decision to take adverse personnel action against an employee, the agency must prove [by clear and convincing evidence] it would have taken the same action absent the whistleblowing." *Siler v. EPA*, 908 F.3d 1291, 1298 (Fed. Cir. 2018); 5 U.S.C. § 1221(e)(2). We sometimes refer to the government's burden as a showing of "independent causation." *Miller v. Dep't of Just.*, 842 F.3d 1252, 1257 (Fed. Cir. 2016). "'Clear and convincing' evidence has been described as evidence which produces in the mind of the trier of fact an abiding conviction that the truth of a factual contention is 'highly probable.'" *Id.* at 1257–58 (citation omitted).

The three *Carr* factors are used in evaluating whether the agency has met its burden to demonstrate independent causation:

> [1] the strength of the agency's evidence in support of its personnel action;
>
> [2] the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and
>
> [3] any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated.

*Carr*, 185 F.3d at 1323. "*Carr* does not impose an affirmative burden on the agency to produce evidence with respect to each and every one of the three *Carr* factors to weigh

them each individually in the agency's favor." *Whitmore v. Dep't of Lab.*, 680 F.3d 1353, 1374 (Fed. Cir. 2012). Rather, "[t]he factors are merely appropriate and pertinent considerations for determining whether the agency carries its burden of proving by clear and convincing evidence that the same action would have been taken absent the whistleblowing." *Id.*

## II. Conversion of Dr. Biswas's Appointment

We begin with the first personnel action at issue: the VA's conversion of Dr. Biswas's appointment from permanent to temporary. Dr. Biswas contends that the Board erred in finding that the VA had proven that it would have converted Dr. Biswas's appointment notwithstanding her protected disclosures.

Under the first *Carr* factor, the Board relied on testimony by Ms. Rogers to find that the VA presented "very strong evidence that its initial conversion of [Dr. Biswas's] status to a permanent appointment was erroneous and that its conversion of her status back to a temporary appointment in September 2012 was made to correct that error." *Decision* at 13. The Board cited Ms. Rogers's testimony that conversion of a physician's appointment from temporary to permanent requires a request by the service chief—here, Dr. Goodenberger—and a review by the Professional Standards Board. *See id.* at 12; *see also* J.A. 461–65 (VA handbook describing the Professional Standards Board review process). Ms. Rogers testified that she learned from Dr. Goodenberger that he never requested the conversion to a permanent appointment and no Professional Standards Board had been held for the conversion. Ms. Rogers confirmed the appropriate records were not in Dr. Biswas's file, and thus Dr. Biswas had not been legally converted to a permanent appointment in the first place. Accordingly, Ms. Rogers explained that Dr. Biswas, and five other VA physicians whose

appointments were erroneously converted at the same time as hers, were reverted to temporary appointments.

For the second *Carr* factor, the Board acknowledged that Dr. Biswas "presented some evidence of a motive to retaliate" by Dr. Goodenberger and Ms. Rogers. *Decision* at 12. Dr. Biswas's protected disclosures regarding illegal hiring practices directly implicated Dr. Goodenberger and the HR department, which Ms. Rogers supervised. *Id.* On the other hand, having "carefully observed" the demeanor of Dr. Goodenberger and Ms. Rogers during the hearing, the administrative judge found both "to be credible in denying any retaliatory motive." *Id.* at 12–13. No reason exists to disturb this credibility finding, which is "virtually unreviewable on appeal." *Bieber v. Dep't of Army*, 287 F.3d 1358, 1364 (Fed. Cir. 2002); *see also Holmes v. U.S. Postal Serv.*, 987 F.3d 1042, 1047 (Fed. Cir. 2021) (credibility determinations "will not be disturbed unless inherently improbable, discredited by undisputed evidence, or contrary to physical facts" (citation omitted)). Notwithstanding the competing evidence, the Board appeared to weigh factor two slightly in Dr. Biswas's favor.[3]

For the last *Carr* factor, the Board found that the VA "took similar actions with regard to the status of other physicians whose status had also been erroneously changed, and [Dr. Biswas] presented no evidence in support of her claim that the agency converted the status of the other doctors back to temporary appointments solely for the purpose of retaliating against her." *Decision* at 13–14. The Board

---

[3] The Board did not expressly state whether it weighed factor two neutrally or in favor of one side. But, after conducting essentially the same analysis for this factor with respect to the VA's removal action, the Board found that "there was some motive to retaliate on the part of relevant agency officials." *Decision* at 24; *see also id.* at 20.

relied on Ms. Rogers's testimony that the other physicians were not known to her to be whistleblowers, and the Board noted that Mr. Harper—the HR employee who erroneously converted the physicians to permanent appointments—received a written admonishment for his negligence. *Id.* at 13; *see* J.A. 182–83 at 364:1–365:5. All six physicians, including Dr. Biswas, were retroactively converted back to temporary appointments.

Given that *Carr* factors one and three weighed strongly in the VA's favor, the Board found that the VA "presented clear and convincing evidence that it would have converted [Dr. Biswas's] status to a temporary appointment absent [her] protected disclosures." *Decision* at 13. This finding is supported by substantial evidence. The Board was entitled to rely on Ms. Rogers's credible explanation of how the VA came to learn of, and fixed, the erroneous temporary-to-permanent conversions of Dr. Biswas and the other physicians.

Dr. Biswas argues that the VA instead reclassified Dr. Biswas as a temporary employee to make it easier to fire her. But this argument, at its base, asks us to discredit the testimony of Ms. Rogers and "reweigh the evidence on appeal, which we cannot do." *McIntosh v. Dep't of Def.*, 53 F.4th 630, 643 (Fed. Cir. 2022). Dr. Biswas additionally argues that the Board ignored that the VA violated the appropriate conversion procedures when it reclassified Dr. Biswas back to a temporary appointment. Dr. Biswas cites no authority that the VA was required to follow such procedures to undo an unlawful conversion. Regardless, this argument does not undermine the Board's reliance on Ms. Rogers's testimony that she was simply correcting what she believed to be a legal nullity in the first place. *Decision* at 12–13. We thus affirm the Board's denial of corrective action regarding the VA's conversion of Dr. Biswas's appointment from permanent to temporary.

## III. Termination of Dr. Biswas's Appointment

We turn next to the second personnel action at issue: the VA's termination of Dr. Biswas's appointment. We agree with Dr. Biswas that the VA unlawfully restricted her from making protected disclosures outside her chain of command and that the Board erroneously relied on her failure to comply with that restriction as an act of insubordination that supported the VA's personnel action. We conclude, however, that the Board's error was harmless. Accordingly, we affirm the Board's denial of corrective action as to the VA's removal of Dr. Biswas.

### A.

The WPA, as in effect prior to the amendments enacted by the Whistleblower Protection Enhancement Act of 2012 (WPEA), prohibits an agency employee with the requisite authority from taking, failing to take, or threatening to take or fail to take a personnel action because of "*any* disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences— (i) a violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C. § 2302(b)(8)(A) (Supp. V 2011) (emphasis added).[4] In *Huffman v. Office of Personnel Management*, 263 F.3d 1341, 1347–48 (Fed. Cir. 2001), we detailed the legislative history of § 2302(b)(8)(A), explaining

[4] Dr. Biswas was removed shortly before the enactment of the WPEA. *See* WPEA, Pub. L. No. 112-199, 126 Stat. 1465. We have previously declined to "decide whether . . . the WPEA's 'clarification' of the term 'disclosure' applies retroactively," *Hicks v. Merit Sys. Prot. Bd.*, 819 F.3d 1318, 1323 n.3 (Fed. Cir. 2016), and we need not do so here, as neither party has argued that the WPEA has any bearing on the issues before us.

that the WPA employed the term "any disclosure" to deliberately broaden the scope of disclosures protected by the predecessor version of the statute, which merely covered "*a* disclosure." *Id.* at 1347 (quoting 5 U.S.C. § 2302(b)(8)(A) (Supp. III 1979)).

The Senate Committee on Governmental Affairs, in particular, stated that the change was intended to emphasize that an employee's disclosures should not be protected "only if they are made for certain purposes or to certain employees." *Id.* at 1347–48 (quoting S. Rep. No. 100-413, at 13 (1988)). Indeed, the plain language of § 2302(b)(8)(A) does not specify to whom the disclosure must be made, in contrast to § 2302(b)(8)(B), which protects disclosures made to only particular recipients. *See* 5 U.S.C. § 2302(b)(8)(B). In light of the language and legislative history of the WPA—as well as the WPA's purpose "to encourage disclosures that are likely to remedy" government wrongdoing—we held in *Huffman* that § 2302(b)(8)(A) protects disclosures made to any supervisor even if that supervisor lacks actual authority to correct the reported wrongdoing. 263 F.3d at 1350–51; *see id.* at 1351 ("Any government employee, in a supervisory position, other than the wrongdoer himself, is in a position to 'correct' or 'remedy' the abuse by bringing the matter to the attention of a higher authority.").

Here, the VA's restrictions on the channels through which Dr. Biswas could make disclosures of alleged government wrongdoing ran afoul of the WPA. Dr. Goodenberger—one of Dr. Biswas's supervisors and the very person that Dr. Biswas had accused of wrongdoing—twice instructed Dr. Biswas that she may not bring her complaints to higher-level personnel outside of her direct chain of command. Ms. Kirkland likewise instructed Dr. Biswas that she may not report her concerns directly to Secretary Shinseki. Yet the WPA does not require a protected disclosure to be channeled through a whistleblower's chain of command. Restrictions like those imposed on Dr. Biswas

by the VA are contrary to both the text and spirit of the WPA, which plainly protects "*any* disclosure" falling within the scope of the statute, regardless to whom the disclosure was made. 5 U.S.C. § 2302(b)(8)(A) (emphasis added); *see Huffman*, 263 F.3d at 1351 ("To be consistent with the statute and its purposes, complaints to supervisors concerning wrongdoing by other employees or other matters within the scope of the WPA should be *encouraged* and *not discouraged* . . . ." (emphases added)).

Moreover, as we observed in a non-precedential decision, "[t]he WPA does not permit an agency to *discipline* an employee for disclosing protected information merely because that information has been reported outside the chain of command." *Detrich v. Dep't of Navy*, 251 F. App'x 679, 680–81 (Fed. Cir. 2007) (per curiam) (emphasis added). The deciding official for Dr. Biswas's removal, Dr. Goodenberger, considered Dr. Biswas's continued emails to Secretary Shinseki as a disciplinable act of insubordination. But "[t]he purpose of the WPA is to *shield* employees who are willing to speak out and criticize government management," not to punish them. *Greenspan v. Dep't of Veterans Affs.*, 464 F.3d 1297, 1305 (Fed. Cir. 2006) (emphasis added). Though an agency might have good reasons for preferring that an employee first report to lower-level supervisory personnel, a report of wrongdoing is still protected under the WPA, and may not be prohibited nor retaliated against, if made outside the chain of command or even to the head of the agency.

The VA's errors propagated to the Board, which found that Dr. Biswas's "contact[ing] [Secretary] Shinseki directly with her complaints after being instructed not to do so" constituted improper, insubordinate conduct weighing in the agency's favor under *Carr* factor one. *Decision* at 21–22; *see also id.* at 18–20. We hold that this finding was contrary to the law. Nevertheless, we conclude that the error was harmless.

Courts of appeals review cases "without regard to errors or defects which do not affect the substantial rights of the parties." 28 U.S.C. § 2111; *see Shinseki v. Sanders*, 556 U.S. 396, 407 (2009). In conducting that review, we ask whether the outcome "could have been different" absent the Board's error. *Sistek v. Dep't of Veterans Affs.*, 955 F.3d 948, 957 (Fed. Cir. 2020). Dr. Biswas has failed to establish such prejudice. *See Shinseki*, 556 U.S. at 409 ("[T]he party that 'seeks to have a judgment set aside because of an erroneous ruling carries the burden of showing that prejudice resulted.'" (citation omitted)).

In its analysis of *Carr* factor one, the Board laid out numerous pieces of evidence—apart from the continuing emails to Secretary Shinseki—that it found provided "strong evidence" in support of the VA's termination of Dr. Biswas. *Decision* at 20–23. The Board focused predominantly on Dr. Biswas's "highly inappropriate" and "disruptive" refusal to see patients, creation of a hostile work environment, and "unprofessional" communications. *Id.* (citation omitted). In fact, the Board's conclusion for its *Carr* factor one analysis did not rely on the emails to Secretary Shinseki, finding that the "tone and content of [Dr. Biswas's] communications including name-calling, demands for the non-renewal of colleagues' appointments disseminated throughout the practice group, and accusations of a betrayal of the government, are unprofessional on their face, and provide strong support for the agency's action." *Id.* at 23. In other words, we need not speculate in this case what the Board would have decided absent the error of considering the emails to Secretary Shinseki because the Board's ultimate finding that *Carr* factor one weighed strongly in the VA's favor was based on other incidents to establish that Dr. Biswas engaged in improper,

unprofessional conduct.[5] And for the reasons that follow, we conclude that substantial evidence supports the Board's findings. *Cf. Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1294 (Fed. Cir. 2023) (concluding that any error in admitting testimony was harmless as substantial evidence supported the verdict of infringement even without considering that testimony); *Munoz v. Strahm Farms, Inc.*, 69 F.3d 501, 505 (Fed. Cir. 1995) ("Attacking only one piece of evidence among a wide variety of cumulative evidence presented in a jury trial does not provide a reasonable basis for reversal.").

B.

Like with the first personnel action, Dr. Biswas contends that the Board erroneously found that the VA satisfied its burden to show it would have terminated Dr. Biswas's appointment notwithstanding her protected disclosures. We disagree.

---

[5] We also note that Dr. Goodenberger's "outline" of the four grounds for Dr. Biswas's termination included creation of a hostile work environment and three categories of insubordinate conduct, just one of which was Dr. Biswas's disregard of instructions to cease making protected disclosures beyond her chain of command. J.A. 653. Accordingly, in finding that Dr. Biswas's "appointment was terminated due to her disruptive and insubordinate conduct and not due to her whistleblowing," *Decision* at 20, the Board viewed Dr. Biswas's insubordinate conduct as encompassing more than merely her disregard of those instructions. *See, e.g.*, *id.* at 15 (discussing Dr. Biswas's refusal to see patients as conduct considered by Dr. Goodenberger to be "insubordinate and disruptive to the service, and . . . conduct [that] led to [Dr. Biswas's] termination"). This further supports our conclusion that the VA's and the Board's error was harmless.

*Carr* Factor One

We begin with the first *Carr* factor. But before we reach the sufficiency of the evidence weighing in favor of the VA's action under this factor, we must first address Dr. Biswas's argument that the VA could not carry its burden of proof because it is not permitted to support its decision based on conduct not set forth in Dr. Biswas's termination letter and that letter lists no grounds for removal at all.

Dr. Biswas relies primarily on our decision in *Greenspan v. Department of Veterans Affairs*, 464 F.3d 1297 (Fed. Cir. 2006). There, we held that "[a] personnel action is reviewed on the grounds on which the agency based the action when it was taken" and "[t]he Board cannot change the agency's grounds from those Noticed by the agency at the time of the discipline." *Id.* at 1304–05. This requirement stems from the right to notice of the charges supporting a proposed adverse action, afforded to certain federal government employees by 5 U.S.C. § 7513(b)(1). *See Brook v. Corrado*, 999 F.2d 523, 526–27 (Fed. Cir. 1993). Section 7513, however, is applicable to only an "employee" as defined in 5 U.S.C. § 7511, which does not apply to an individual "who holds a position within the Veterans Health Administration which has been excluded from the competitive service by or under a provision of title 38, unless such employee was appointed to such position under section 7401(3) of such title." 5 U.S.C. § 7511(b)(10); *see also United States v. Connolly*, 716 F.2d 882, 886 (Fed. Cir. 1983) (en banc). Certain title 38 employees do receive separate procedural protections before an adverse action may be taken against them. *See* 38 U.S.C. § 7461–7464. But these protections apply to only title 38 employees appointed to *permanent* positions under 38 U.S.C. § 7401(1). *See id.*

Dr. Biswas was a temporary employee of the VHA appointed under 38 U.S.C. § 7405(a)(1)(A), not under § 7401(1). As such, she was excluded from the protections

of both 5 U.S.C. § 7513 and 38 U.S.C. §§ 7461–7464. *See* J.A. 85 (VA Handbook providing that "the procedural requirements prescribed for separations . . . do not apply" for "involuntary separations of employees serving under 38 U.S.C. § 7405[(a)(1)(A)]" (alteration in original)). Because temporary VHA employees like Dr. Biswas are not entitled to advance notice of the grounds for their removal, the usual rule that the agency may defend its action on only those grounds noticed is not applicable.[6]

Turning now to the *Carr* factor one evidence supporting the VA's termination, the Board found that the VA "presented strong evidence in support of its action." *Decision* at 20. The Board relied on evidence of numerous instances of disruptive, inappropriate, and insubordinate conduct by Dr. Biswas. For example, the Board discussed the July 2012 incident in which Dr. Biswas refused to see the patients assigned to her until Dr. Holt intervened. *Id.* at 15, 21. The Board cited Dr. Holt's testimony, in which he explained that Dr. Biswas's behavior was "highly inappropriate" and "argumentative" and the incident was only the second time in his years of leadership that he had to deal with a provider refusing to accept patients. *Id.*; J.A. 208–10 at 449:16–450:8, 453:20–454:3, 457:6–19. Dr. Holt testified that it was disruptive and "unprecedented" for "an issue of patient care, like this, [to be] elevated to the top physician for a 4,000 plus person hospital." J.A. 209 at 456:3–13. Following the incident, Dr. Holt emailed Dr. Biswas to explain that the incident was "a sign of

---

[6] We note, too, that Dr. Biswas received informal notice on multiple occasions that the VA considered to be inappropriate and discipline-worthy much of the same conduct relied on by the VA and the Board in support of the VA's removal action. *See, e.g.*, J.A. 210 at 457:20–458:4; J.A. 243 at 592:9–16; J.A. 251 at 623:22–624:3; J.A. 599; J.A. 626; J.A. 1213.

significant disruption" and "very concerning." J.A. 599. And Dr. Goodenberger considered the incident to be one of Dr. Biswas's acts of insubordination, namely, "refusing patient assignment." J.A. 653.

Another incident discussed by the Board as one of Dr. Biswas's "unprofessional and improper acts" was Dr. Biswas's announcement to Drs. Oyula and Goodenberger in August 2012 that she would work day instead of night shifts and "tak[e] the appropriate number of days off to compensate for the hours worked." *Decision* at 16, 21 (quoting J.A. 1250). The Board explained that Dr. Goodenberger understood Dr. Biswas to be threatening not to come to work as scheduled, and Dr. Biswas offered no alternative explanation for her email. *Id.* at 16.

Dr. Biswas argues it is undisputed that she eventually saw her assigned patients and that she never took unscheduled or unapproved leave. But her eventual compliance on each occasion, only after counseling by her superiors, does not preclude the Board from considering her initial refusals as misconduct. Dr. Biswas also argues that the Board failed to consider the context of the July 2012 incident, arguing, for example, that Dr. Oyula inequitably distributed patient assignments and lied about seeing his own patients. The Board, however, considered Dr. Biswas's testimony on this point and nonetheless credited Dr. Holt's testimony regarding the impropriety and disruptive nature of Dr. Biswas's actions. *See id.* at 20–21. Even if we were to agree with Dr. Biswas that her actions were justified, it is not for us to substitute our judgment for the Board's.

The Board additionally relied on evidence of Dr. Biswas's inappropriate and inflammatory emails. Some of these emails extend well beyond the protected disclosures argued to the Board—i.e., "[Dr. Biswas's] May 2012 disclosures regarding the hiring process for the Hospitalist Section Chief [to which Dr. Oyula was appointed]."

*Decision* at 9. The protected disclosures relate to Dr. Biswas's belief that the agency failed to follow proper procedures in appointing Dr. Oyula (a non-citizen) without interviewing her (a citizen) or determining that it was not possible to recruit qualified citizens for the position. The Board explained that Dr. Biswas's later emails—some disseminated widely—included name-calling, accused Dr. Oyula of moonlighting and falsifying his work schedule, and demanded that the appointments of several doctors not be renewed. *See id.* at 16–18, 21–23. Two of those doctors complained to Dr. Goodenberger about Dr. Biswas's emails, reporting that they found her comments to be inappropriate, discriminatory, and hostile. As just one example, in an email sent to all Dallas VA hospitalists, Dr. Biswas called Dr. Oyula a "total failure at running this group" and stated that his scheduling decisions were "stupid." *Id.* at 21 (quoting J.A. 734). The Board found that Dr. Biswas's emails were "disruptive to the work environment" and "unprofessional on their face," thus providing "strong support for the agency's action." *Id.* at 20, 23.

To be sure, some of Dr. Biswas's emails relate to her protected whistleblower disclosures. For instance, Dr. Biswas stated that Dr. Oyula's reappointment was a "scam," J.A. 1240, 1243, and those involved in that decision were "betraying the US government," *id.* at 1213. But we have previously explained that "wrongful or disruptive conduct is not shielded by the presence of a protected disclosure." *Greenspan*, 464 F.3d at 1305. In other words, the fact that Dr. Biswas's emails contain or relate to her protected disclosures does not preclude the unprofessional and disruptive "character or nature" of the emails from supporting the VA's action. *Kalil v. Dep't of Agric.*, 479 F.3d 821, 825 (Fed. Cir. 2007); *see also Duggan v. Dep't of Def.*, 883 F.3d 842, 846 (9th Cir. 2018) (adopting our "holdings to the effect that an employee may be disciplined for the *way* in which he or she communicates a protected

disclosure”).[7] The WPA protects Dr. Biswas from being punished for making protected disclosures, not for the way in which she chose to do so.[8] Furthermore, Dr. Biswas’s persistence in sending inflammatory emails regarding her colleagues even after Dr. Goodenberger instructed her to cease doing so was reasonably considered as yet another act of insubordinate conduct supporting her termination. *See Decision* at 17–18; J.A. 653.

In short, we believe that the Board’s *Carr* factor one analysis—largely divorced from its error in considering her whistleblowing beyond the chain of command to be an act of misconduct—was supported by more than ample evidence of Dr. Biswas’s unprofessional, disruptive, and insubordinate conduct.

---

[7] We recognize that not all protected whistleblowing disclosures are made in a polite way. Such disclosures are “more likely than not to be critical of management, perhaps highly critical.” *Greenspan*, 464 F.3d at 1305. As we have explained, “the WPA does not contemplate removal of protection when protected subject matter is stated in a blunt manner.” *Id.* at 1299. In other words, the WPA protects impolite whistleblowing as much as it protects polite whistleblowing. It does not, however, shield a whistleblower from being punished for harassment, the creation of a hostile work environment, or other improper conduct. *See id.* at 1305 (“[W]rongful or disruptive conduct is not shielded by the presence of a protected disclosure.”).

[8] Although the Board improperly considered Dr. Biswas’s repeated emails to Secretary Shinseki for going outside the chain of command, we note that the Board might have appropriately considered the character of those disclosures.

*Carr* Factor Two

The second *Carr* factor is "the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision." *Carr*, 185 F.3d at 1323. The Board conducted a similar analysis under this factor for the VA's removal action as it did for the VA's conversion action. It found both that Dr. Biswas "presented evidence that [Dr.] Goodenberger had some motivation to retaliate against her in that [Dr.] Goodenberger was directly implicated in [Dr. Biswas's] allegations of hiring improprieties" and that Dr. Goodenberger credibly denied a retaliatory motive. *Decision* at 20. Despite the competing evidence, the Board found that this factor favors Dr. Biswas. *See id.* at 24 ("[T]here was some motive to retaliate on the part of relevant agency officials . . . .").

Dr. Biswas argues that "[t]he administrative judge failed to properly weigh evidence of retaliatory motive on the part of the VA officials involved in Dr. Biswas'[s] termination." Pet'r's Br. 29. As just explained, we view the Board as having weighed factor two in *Dr. Biswas's* favor. To the extent Dr. Biswas contends that the factor should have been weighed even more heavily in her favor, we are unpersuaded by her arguments.

Dr. Biswas argues, for example, that the VA's failure to employ incremental discipline—by beginning with counseling or other lesser discipline before termination—is evidence of retaliatory motive that the Board did not properly weigh. The Board considered this argument and rejected it, crediting Ms. Rogers's explanation that "it is not unusual for the agency not to attempt lesser sanctions prior to terminating a physician, and there is no requirement that it do so, particularly for a temporary employee." *Decision* at 22 n.8 (citing J.A. 179 at 351–52). Ms. Rogers's testimony is consistent with the legal distinction between temporary and permanent VHA employees, *see supra*, and we may not reweigh the evidence. *See McIntosh*, 53 F.4th at

643. The Board's analysis weighing the second *Carr* factor in Dr. Biswas's favor was reasonable.

*Carr* Factor Three

The third *Carr* factor is "any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated." *Carr*, 185 F.3d at 1323. For this factor, the Board acknowledged evidence that "other hospitalists who complained about scheduling, but who did not complain about allegedly illegal hiring practices or otherwise engage in protected activities, were treated more favorably" than Dr. Biswas. *Decision* at 23. However, the Board found no evidence that any of those hospitalists "engaged in the full range of conduct that formed the basis of the agency's decision to terminate [Dr. Biswas's] appointment," including no evidence that other hospitalists engaged in insubordination such as "refus[ing] to see patients." *Id.* at 23–24. The Board further acknowledged evidence that "one or two emergency room physicians refused to see patients and were disciplined but not terminated"—i.e., treated more favorably than Dr. Biswas—but "unlike [Dr. Biswas], those physicians were permanent employees." *Id.* at 24 n.9. Accordingly, the Board found "no evidence that similarly situated employees who were not whistleblowers were treated more favorably" and thus weighed the third factor neutrally. *Id.* at 24.

Dr. Biswas asserts that several errors lie in the Board's *Carr* factor three analysis, but we do not agree. Dr. Biswas first argues that the Board incorrectly found that she refused a patient assignment. As we have already explained, that Dr. Biswas ultimately complied following intervention by Dr. Holt does not change that she at first refused the patient assignment.

Dr. Biswas next argues that the Board erred in finding other hospitalists not similarly situated merely because they were permanent rather than temporary employees.

As an initial matter, the Board did not rely on the difference in employment status alone but rather found "no evidence that any other hospitalist engaged in the full range of conduct" as Dr. Biswas. *Decision* at 23. Additionally, Dr. Biswas's argument continues to ignore the material differences in the process due to permanent versus temporary employees before the VA may remove them—differences that Dr. Biswas herself acknowledges. *See supra*; Pet'r's Br. 35, 37; *see, e.g.*, 38 U.S.C. § 7461(a) (providing for the right to appeal an adverse personnel action for a § 7401(1) employee). Because of such differences, it was appropriate for the Board to consider those employees as not "otherwise similarly situated" for purposes of the *Carr* factor three analysis.

Finally, Dr. Biswas contends that the Board improperly placed on her the burden to demonstrate a comparator employee. We see no support for this argument in either the Board's decision or in our precedent. "We have repeatedly stated that the agency 'need not produce evidence with regard to each of the [*Carr*] factors, nor must each factor weigh in favor of the agency for it to carry its burden.'" *Rickel v. Dep't of the Navy*, 31 F.4th 1358, 1366 (Fed. Cir. 2022) (cleaned up). "Indeed, the absence of any evidence relating to *Carr* factor three can effectively remove that factor from the analysis." *Whitmore*, 680 F.3d at 1374. In this instance, the Board determined that "the evidence does not support a finding that hospitalists who were not whistleblowers were otherwise similarly situated to [Dr. Biswas]," and thus there was no evidence relevant to *Carr* factor three. *Decision* at 24; *see, e.g.*, *McIntosh*, 53 F.4th at 646 (*Carr* factor three was "effectively removed from the analysis" where no evidence pertinent to the factor was presented).

* * *

After reviewing the relevant evidence and considering each *Carr* factor, the Board concluded that "[w]hile there

was some motive to retaliate on the part of relevant agency officials, evidence of that motive is significantly outweighed by the strength of the evidence in support of the agency's termination decision." *Decision* at 24. Because of the absence of evidence relevant to factor three, the Board did not weigh that factor in favor of either side. *Id.* The Board's findings are supported by substantial evidence, and it reasonably found that the VA met its burden of proving independent causation by clear and convincing evidence based on the strength of *Carr* factor one. *See, e.g.*, *Rickel*, 31 F.4th at 1366 (affirming the Board's finding that the agency satisfied its burden to show independent causation, "particularly when 'considering . . . the strength of *Carr* factor one'" (quoting *Robinson v. Dep't of Veterans Affs.*, 923 F.3d 1004, 1020 (Fed. Cir. 2019))).

## CONCLUSION

We have considered Dr. Biswas's remaining arguments and find them unpersuasive. We therefore affirm the Board's final decision.

## AFFIRMED

## COSTS

No costs.